April 4, 2024

**VIA ECF**

The Honorable James Donato
United States District Court for the Northern District of California
San Francisco Courthouse, Courtroom 11, 19th Floor
450 Golden Gate Avenue
San Francisco, CA 94102

Re:     *Adler v. Twitter, Inc. & X Corp.*, No. 3:23-cv-01788-JD

Dear Judge Donato:

In this case, Plaintiff Eitan Adler ("Adler" or "Plaintiff") asserts two claims against Defendant X Corp. (successor in interest to Defendant Twitter, Inc.) ("X"): (1) the alleged failure to provide federal and California WARN Act notice to Adler and other employees who were not laid off, but rather were fired for cause/performance; and (2) the alleged failure to pay Adler and other employees their final pay and expense reimbursements on the date of termination.   ECF No. 3 at 5-6.   The core issue in this matter is whether X terminated Adler's employment for cause – if he was, then he was not entitled to any notice under the federal or state WARN Act.

As Plaintiff's Motion makes clear, however, he is seeking an apex deposition of Elon Musk on topics that are irrelevant to this case and relevant only to separately pending court cases before other judges and individual arbitrations that involve different legal claims altogether.   That is reason enough to deny Plaintiff's Motion.   But even if Plaintiff sought to limit Musk's apex deposition to topics "relevant to any party's claim or defense" in the present case, Plaintiff's request still must be denied.   Depositions of high-level executives create "a tremendous potential for abuse or harassment."   *See Apple Inc. v. Samsung Elecs. Co. Ltd*, 282 F.R.D. 259, 263 (N.D. Cal. 2012) (quotation marks omitted).   Courts protect apex witnesses such as Musk unless (1) the witness possesses "unique first-hand, non-repetitive knowledge of the facts at issue in [this] case"; *and* (2) the party seeking the deposition has "exhausted other less intrusive discovery methods" in obtaining such information.   *Ellena v. Standard Ins. Co.*, No. 12-5401, 2013 WL 4520200, at *2 (N.D. Cal. Aug. 23, 2013) (quotation marks omitted).   Here, as to this first requirement, other than mere conclusions, Plaintiff has not even attempted to demonstrate that Musk has "first-hand, non-repetitive knowledge" as to Adler's termination, why Adler did not receive a WARN notice, or the elements of Adler's final-pay-related claims.   Indeed, Plaintiff has not pointed to any evidence at all (and X is aware of none) indicating that Musk even knew who Adler was.   Nor could Adler make a showing that Musk had non-repetitive knowledge of such facts given that prior X deponents have already testified about terminations for cause, like Adler's.   As to the second requirement, Plaintiff has yet to depose at least two X witnesses—*including X's Rule 30(b)(6) representatives*— who very likely will provide further relevant testimony.   Nor has Adler pursued any other less intrusive means of discovery, such as interrogatories directed to Musk. Plaintiff's Motion is both premature, and unwarranted: it is nothing more than a thinly veiled attempt to harass Elon Musk and should be denied.

## I.      Adler Seeks to Depose Musk about Irrelevant Topics in Violation of the FRCP.

The Federal Rules of Civil Procedure provide that "Parties may obtain discovery regarding any nonprivileged matter that is *relevant* to any *party*'s claim or defense and proportional to the needs of the case …." Fed. R. Civ. P. 26(b)(1) (emphases added); *accord CollegeSource, Inc. v. AcademyOne, Inc.*, 709 F. App'x 440, 443 (9th Cir. 2017) ("Parties are entitled to discovery of only material that is 'relevant to any party's claim or defense.'"). It follows, of course, that a "*party*" to the action is not entitled to discovery that is admittedly *not relevant* to either party's claims or defenses. This premise holds true even if the discovery might be relevant to some other case involving the same counsel and X. *See e.g.*, *Richtek Tech. Corp. v. uPI Semiconductor Corp.*, No. 09-5659, 2011 WL 1627986, at *3-4 (N.D. Cal. Apr. 28, 2011) (denying plaintiff's motion to compel production of documents, where defendant argued that plaintiff's "efforts to obtain the present discovery [were] aimed at accessing information relevant to … other cases" that plaintiff filed against defendant, and where the court held that "the documents [were] about other products not even part of this litigation or [were] otherwise irrelevant").

Here, although Adler's claims are limited to alleged federal and state WARN Act violations and California final pay violations, his counsel has brought at least 10 other federal and state court cases and more than 2,000 individual arbitrations against X (pending before the AAA and JAMS) involving completely different substantive claims and different parties. Most of these other cases and arbitrations assert claims on behalf of individuals who (unlike Adler) were admittedly laid off by X and received WARN Act notice. In addition, plaintiffs/claimants in these other matters (unlike Adler) are alleging claims under Title VII for discrimination (based on race, gender, age, etc.) and/or claims for the alleged failure to pay severance benefits. Plaintiff's counsel admit that they seek Musk's apex deposition in this action for the purpose of obtaining testimony about these "other court cases and arbitrations," including for example "whether terminated employees were offered severance" and who made employment termination decisions for reasons other than those applicable to Plaintiff (e.g., "poor performance"). Mot. at 3; *see also id.* at 2 (asserting Musk has relevant information relating to "the other cases filed by Plaintiffs' counsel"). The Federal Rules expressly prohibit Adler's counsel from deposing Musk concerning cases and claims that have nothing whatsoever to do with Adler's claim and X's defenses in the present action. *See supra* at 2.

Plaintiff argues that the "Parties have agreed that discovery produced in one matter between Defendants and any individual represented by Plaintiff's counsel can be used in any other matter." Mot. at 2 (emphasis added). While that is true, the Parties' agreement simply means that the parties can use "produced" evidence they have already obtained across all cases and arbitrations for purposes of efficiency; it does not mean that Plaintiff can circumvent the proper scope of discovery under the Federal Rules in one case as a "back door" method to obtain discovery that would be relevant only in separate cases and arbitrations. As in any other federal court case, the threshold question of "relevance" must be determined based upon both the Federal Rules and the nature of the claims at issue in the case. *See supra* at 2. And only if the discovery sought is "relevant," and ultimately "produced," may Adler invoke the agreement his counsel references above. Neither requirement is met here: Plaintiff's Motion seeks new testimony from Musk—it does not seek access to testimony already "produced"—and it goes well beyond the scope allowed for under the Federal Rules and based upon the claims at issue in this lawsuit.

Adler's counsel appears to be using the Federal Rules—and counsels' agreement in other matters regarding the use of "produced" discovery across matters—as both a sword and a shield. On one hand, Plaintiff ignores the Federal Rules' limitation to seek only discovery relevant to this action; while on the other, he demands that Musk sit for a "seven-hour" deposition as allowed under the Rules, even though Plaintiff's counsel has only been permitted four-hour depositions in the arbitrations. Similarly, Plaintiff relies on the parties' agreement in the individual arbitrations to use "produced" discovery across matters but refuses to abide by the provision in that agreement that all depositions (which would necessarily include any deposition of Musk) are limited to just four hours. Plaintiff's tactics should not be rewarded, and the Motion should be denied for these reasons.

## II.     The Apex Deposition Doctrine Bars Adler's Motion.

"When a party seeks the deposition of a high-level executive (a so-called 'apex' deposition), courts have observed that such discovery creates a tremendous potential for abuse or harassment." *Ellena*, 2013 WL 4520200, at *2 (quotation marks omitted). As a result, courts have wide "discretion to limit discovery where the discovery sought can be obtained from some other source that is more convenient, less burdensome, or less expensive." Id. "In determining whether to allow an apex deposition, courts consider (1) whether the deponent has unique first-hand, non-repetitive knowledge of the facts at issue in the case and (2) whether the party seeking the deposition has exhausted other less intrusive discovery methods." Id. (quotation marks omitted) (emphasis added). Plaintiff has met neither prong here, as described below.

### A.     Musk Does Not Possess Unique Knowledge Relevant to Adler's Claims.

For Musk's deposition to proceed, he must have "unique first-hand, non-repetitive knowledge." *See Ellena*, 2013 WL 4520200, at *2. Plaintiff argues that "[i]t is clear from the discovery Defendants have already produced (as publicly available information) that [] Musk played a direct and crucial role in setting and implementing the Company's policies and strategies regarding cost-cutting and employee layoffs and termination following his acquisition." Mot. at 2. Based on this overly broad and unsupported assertion, Plaintiff then leaps to the conclusion that Musk "clearly has first-hand knowledge of the relevant facts that underly [sic] the claims at issue in this case (as well as the other cases filed by Plaintiff's counsel)." *Id.*

But Plaintiff never identifies the specific "unique," "first-hand knowledge" that Musk allegedly possesses as it relates to Adler's claims (*i.e.*, whether Adler was properly terminated for cause and therefore did not need to receive a WARN notice, or the issues relating to his final pay) nor does Plaintiff point to any "evidence produced during discovery" to substantiate the need to depose Musk. *Id.* at 3. Plaintiff instead just proclaims—without a scintilla of support—that prior X deponents "denied knowledge of relevant facts" and that Musk has "non-redundant" knowledge. *Id.* at 2, 3. That is false. The truth is that, to date, Plaintiff has deposed five individuals: James Musk, Andrew Musk, Steve Davis, Tim Perzyk, and Ross Nordeen. And far from denying knowledge of relevant facts,[1] those prior X deponents testified extensively about terminations for

---

[1] Plaintiff complains that X's prior deponents could not answer: "(1) whether Elon Musk had plans prior to the closing of acquisition to lay off employees; (2) the intended size or scope of any layoffs; (3) who made the ultimate decision on which employees to terminate or how the final determination was made (whether as part of an acknowledge RIF or for alleged cause due to supposed

cause like Adler's. Just by way of example, James Musk testified that, after X conducted layoffs on November 4, 2022, it conducted a separate "insubordination and security review exercise" out of concern that certain employees who "had privileged access to the database and different pieces of the software" were hostile to X's new management and Elon Musk. Ex. 1 (J. Musk Dep.), 156:11-23.  In fact, it was this security review that resulted in Plaintiff's termination.  James and Andrew Musk and Ross Nordeen each testified that they personally participated in the security review, and described the methods used in the review (including, for example, the examination of Slack posts showing the employees making comments demonstrating security risk and/or insubordination).  Ex. 1 (J. Musk Dep.), 160:2-4; 160:11-16, 162:15-18, 163:2-164:3, 164:14-20; Ex. 2 (A. Musk Dep.), 170:5-11, 170:13-171:10, 173:22-174:3; Ex. 3 (Nordeen Dep.), 86:19-87:2, 87:20-25, 89:5-13, 90:8-91:5.  And each testified unequivocally that the employees who were found to be security risks and/or insubordinate like Plaintiff—were not laid off but rather were terminated for cause.  Ex. 1 (J. Musk Dep.), 159:21-160:1 ("No, those individuals weren't laid off.  They were fired."); Ex. 2 (A. Musk Dep.), 187:4-13 ("I understand that there was a group let go as a security threat [for] cause."); Ex. 3 (Nordeen Dep.), 116:12-15, 163:4-8 ("[T]hey were terminated for cause not let go.").[2]

Although Plaintiff tries to paint Musk as the only witness who has relevant knowledge, the reality is that Adler has not identified a single inquiry at deposition that Andrew and James Musk and Ross Nordeen either did not, or could not, answer as it relates to *Adler's* claims pending in this Court.

Plaintiff has done nothing to show Musk possesses some unique knowledge relating to his claim that Plaintiff cannot obtain elsewhere—either through the five depositions that have already occurred or the other noticed and pending depositions (discussed below).  And precisely because Musk does not have unique, non-repetitive knowledge, the cases that Adler relies on are easily distinguishable.  *See, e.g.*, *LivePerson, Inc. v. [24]7.Ai, Inc.*, No. 17-1268, 2018 WL 1319424, at *1-2 (N.D. Cal. Mar. 14, 2018) (plaintiff had included CFO on its "initial disclosures as a witness with discoverable knowledge who would support its case"); *Finisar Corp. v. Nistica, Inc.*, No. 13-3345, 2015 WL 3988132, at *1-3 (N.D. Cal. June 30, 2015) (plaintiff's CEO "may well have unique, non-repetitive information," because no prior deponents were "able to provide a substantive answer"); *see also Bos. Ret. Sys. v. Uber Techs., Inc.*, No. 19-6361, 2023 WL 6132961, at *3 (N.D. Cal. Sept. 19, 2023) (court did not specify reasons for ordering particular depositions); *In re Apple*

---

insubordination or poor performance; and (4) whether terminated employees were offered severance." But Plaintiff does not explain how topics (1), (2), or (4) have anything to do with his claims (which did not involve layoffs, but rather a dispute over Adler's termination for cause) as opposed to those in the "other cases" brought by his counsel; and, as noted above the line in this section, James and Andrew Musk and Ross Nordeen testified to topic (3).

[2] Adler argues without merit that Musk is subject to deposition because, purportedly, "[a]s part of his efforts to reduce Twitter's headcount, he demanded that anyone who was perceived to be 'disloyal' to him be immediately exited."  Mot. at 3.  The "disloyal" reference comes from a text message Musk sent to Steve Davis, but Mr. Davis was not involved in the security review terminations for cause such as Adler's, so the text message has no relation to Adler's termination.  Ex. 7 (Davis Dep.), 87:14-88:12. Davis testified that he was working on "nonlabor" cost-cutting in November 2022.  *Id*. at 35:1-11.

*Iphone Antitrust Litig.*, No. 11-6714, 2021 WL 485709, at *3 (N.D. Cal. Jan. 26, 2021) (the cases "[did] not involve the traditional apex inquiry into the witness's participation in or knowledge about this or that historical decision," but rather "implicate[d] the competition the company faces and important aspects of its business model"; and CEO had "testified before Congress on issues relevant to these cases")

### B.      Adler Has Not Exhausted Other, Less Intrusive Discovery Methods.

"Exhaustion of other less intrusive discovery methods … is an important consideration" because "[t]he history of the propounding party's efforts to obtain the information through other discovery, or lack of such efforts, can shed considerable light on whether the party is seeking the apex deposition for appropriate purposes." *Faulks v. Wells Fargo & Co.*, No. 13-2871, 2015 U.S. Dist. LEXIS 164507, *5-6 (N.D. Cal. Dec. 8, 2015) (quotation marks omitted). Less intrusive means of discovery would include "interrogatories directed at the apex, the deposition of lower-level employees with relevant information, and a Rule 30(b)(6) deposition of the corporation itself." *Brown v. Google, LLC*, No. 20-3664, 2022 WL 2289059, at *1 (N.D. Cal. Apr. 4, 2022). Plaintiff has exhausted none of these avenues, let alone all. This failure is yet another, independent reason to deny Plaintiff's Motion.

As an initial matter, Plaintiff's counsel failed question the witnesses they did depose in a manner to obtain relevant testimony.  For example, X has produced more than 3,500 responsive documents for which prior X deponents James Musk, Andrew Musk, Steve Davis, and Ross Nordeen were custodians, out of a total production of approximately 10,692 documents. Yet Claimant's counsel marked as exhibits and questioned them about *only 3.5 documents on average at each of these four depositions*. In most of the instances when these witnesses testified that they did not recall a specific fact (as one would reasonably expect given that the events at issue occurred about 1.5 years ago), Claimant's counsel made no attempt to show them any documents that would have assisted in refreshing their recollection.

In addition, Plaintiff has not deposed all of the relevant individuals that X has identified to date.  For example, in its Initial Disclosures and interrogatory responses in this case, X identified Christopher Stanley as a witness. Ex. 4 (Defendant's Initial Disclosures) at 2; Ex. 5 (Defendant's Response to Interrogatories) at 4-5.  And this is the same individual who James and Andrew Musk testified was involved in the security review that led to Plaintiff's termination.  *See* Ex. 1 (J. Musk Dep.), 160:5-10; Ex. 2 (A. Musk Dep.), 173:15-20, 174:14-20.  Plaintiff has yet to depose Stanley or any additional personnel who participated in the security review for that matter.  Worse still, Plaintiff has noticed the deposition of X's Rule 30(b)(6) representative to cover topics such as decisions about which X employees would receive WARN notices and X's expense reimbursement and paid time off policies and payments – and X has identified witnesses to cover these topics – but Plaintiff nonetheless moved to depose Musk before the Rule 30(b)(6) deposition. Ex. 6 (Plaintiff's Notice of Deposition of Rule 30(b)(6) Representative) at 4.  The depositions of X employee Lauren Wegman is scheduled for April 17, 2024 and she will cover several topics in the 30(b)(6) notice. Plaintiff also recently informed Twitter that it would seek several other depositions.  Attempting to depose Musk prior to these depositions is premature.

At minimum, Plaintiff should complete the depositions of lower-level witnesses, including Lauren Wegman, Christopher Stanley and X's Rule 30(b)(6) representatives, before seeking

Musk's deposition. *See Rembrandt Diagnostics, LP v. Innovacon, Inc.*, No. 16-698, 2018 WL 692259, at *7 (S.D. Cal. Feb. 2, 2018) (granting protective order until after lower-level employees were deposed); *Anderson v. County of Contra Costa*, No. 15-1673, 2017 WL 930315, at *4 (N.D. Cal. Mar. 9, 2017) ("Plaintiff shall first depose a Rule 30(b)(6) witness …."); *Mehmet v. PayPal, Inc.*, No. 08-1961, 2009 WL 921637, at *2 (N.D. Cal. Apr. 3, 2009) ("[Courts] generally refuse to allow the immediate deposition of a high-level executive, before the depositions of lower level employees with more intimate knowledge of the case."); *Google Inc. v. Am. Blind & Wallpaper Factor, Inc.*, No. 03-5340, 2006 WL 2578277, at *3 n.3 (N.D. Cal. Sept. 6, 2006) (same).  And, to the extent Adler's counsel simply failed to properly inquire about the circumstances of his termination with prior X deponents, Plaintiff cannot attempt to cure that deficiency by slotting Musk in their place.  *See Reif v. CNA*, 248 F.R.D. 448, 454-55 (E.D. Pa. 2008) (denying plaintiffs' motion for leave to move to compel CEO's deposition, reasoning that the depositions taken to that point "failed to demonstrate the deponents lack[ed] the information, especially when the pertinent questions ha[d] not been asked").

None of the cases Plaintiff cites alters that conclusion, as all these cases stand on different footing. *See e.g.*, *Apple Iphone Antitrust Litig.*, 2021 WL 485709, at *4-5 (two witnesses had a "lesser degree of apex-ness," so "less [was] required to justify their depositions," including "no further exhaustion hoops"); *LivePerson*, 2018 WL 1319424, at *1-2 (plaintiff no longer employed the apex witness, so "a deposition [was] virtually the only discovery method available to ascertain his personal knowledge"); *Hunt v. Cont'l Cas. Co.*, No. 13-5966, 2015 WL 1518067, at *3 (N.D. Cal. Apr. 3, 2015) (plaintiff had deposed other executives, who testified that they lacked knowledge); *Apple*, 282 F.R.D. at 262, 264, 266, 268, 269 (defendant had obtained discovery from other witnesses, including 30(b)(6) depositions).  Applying the principles discussed above, at least one court has protected Musk from an apex deposition. *See Blasdell v. Space Exploration Techs. Corp.*, No. BC615112, slip op. at 1 (Cal. Super. Ct. Feb. 27, 2017). There, the plaintiff sought the deposition of Musk in a whistleblower case, contending that he directly communicated with Musk on "multiple occasions" as it related to the core allegations underlying his complaint. Even so, the Court found those allegations (which are absent here) were not enough to demonstrate Musk had unique, non-repetitive knowledge sufficient to subject Musk to deposition. *See id.* Moreover, though the plaintiff had deposed several of his former direct managers and human resource managers before seeking to compel Musk to deposition, the Court still found plaintiff had not exhausted other less intrusive means of discovery. *Id.* While the Court allowed the plaintiff to "serve written interrogatories seeking Mr. Musk's personal knowledge relevant to the specific claims in this case," it disallowed Musk's deposition. *Id.* The same protection is all the more relevant here for the reasons discussed above.

In addition, X has proposed less-intrusive alternatives such as (1) allowing Plaintiff to first depose an X corporate representative, such as the individuals designated as Rule 30(b)(6) deponents, (2) providing a declaration signed by Musk, and (3) exploring whether the parties could stipulate to certain facts that would eliminate the need to obtain testimony from Musk.  These are precisely the types of discovery alternatives that a party must pursue before demanding an apex deposition.  *See e.g.*, *Brown v. Google, LLC*, 2022 WL 2289059, at *1 (N.D. Cal. Apr. 4, 2022) ("Less intrusive discovery methods may include interrogatories directed at the apex, the deposition of lower-level employees with relevant information, and a Rule 30(b)(6) deposition of the corporation itself.").

Respectfully submitted,

*/s/ Eric Meckley*
Eric Meckley
Counsel for Defendant X CORP.,
as successor in interest to TWITTER, INC.


## CERTIFICATE OF SERVICE

I hereby certify that, on April 4, 2024, a true and accurate copy of this document was served on counsel for Plaintiff via the CM/ECF system.

*/s/ Eric Meckley*
Eric Meckley

EXHIBIT 1

# In the Matter of:

*Jessica Pan vs*

*Twitter, Inc. and X Corp.,*

---

*James Musk*

*January 31, 2024*

---

68 Commercial Wharf ● Boston, MA 02110
888.825.3376 - 617.399.0130
Global Coverage
Magnals.com



Jessica Pan vs                    Attorneys Eyes Only                    James Musk
Twitter, Inc. and X Corp.,                                          January 31, 2024

```
 1                    JAMS ARBITRATION

 2          BEFORE ARBITRATOR MICHAEL LOEB, ESQ.

 3

 4  JESSICA PAN,

 5                Claimant,
                                    Jams No.: 1100115270
 6                v.

 7  TWITTER, INC.,

 8                Respondent.

 9  _____

10

11

12      HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

13

14              DEPOSITION OF JAMES MUSK

15

16                 January 31, 2024

17                   12:13 p.m.

18

19        1 Market Street, Spear Street Tower

20             San Francisco, California

21

22

23  REPORTED BY:

24  Siew G. Ung

25  CSR No. 13994, RPR, CSR
```

156

11        Q.  Did you play any role in determining who
12   would be laid off or terminated after November 3rd
13   and 4th with respect to employees outside engineers?
14        A.  There -- there was a -- kind of like
15   insubordination and security review exercise.
16        Q.  What was that?
17        A.  We, essentially, were very worried about
18   security at the company because there were many
19   employees who were hostile to Elon and the -- or
20   that we believed were hostile to Elon and the new
21   Twitter management and had privileged access to the
22   database and different pieces of the software.  So
23   we reviewed people like that.



```
12              (Whereupon, the requested portion of
13              the transcript was read back as
14              follows:  "Okay.  So there were
15              further layoffs after November 3rd and
16              4th of individuals who were deemed to
17              be security risks or not sufficiently
18              loyal to Elon?")
19         MS. CHOE:  Same objections as before.
20         THE WITNESS:  This is not what I said.
21   There was an exercise to determine people who were
22   being insubordinate and who were security risks.
23   BY MS. LISS-RIORDAN:
24        Q.  And those individuals were laid off?
25        A.  No, those individuals weren't laid off.
```

1  They were fired.

2      Q.  You were involved in determining who those

3  individuals would be?

4      A.  I helped with that process, yes.

5      Q.  Who else was involved in that process?

6      A.  I don't recall everyone.  But Ross Nordeen

7  is one person.  Andrew Musk, Thomas Dmytryk, Tim

8  Zaman, I believe, Jake Yoni [phonetic],  Chris

9  Stanley, Dhaval.  I don't know if that's

10  comprehensive though.

11      Q.  And what did that group do?

12          MS. CHOE:  This is the last question then

13  we are taking a break to go off the record.

14          THE WITNESS:  There were many factors

15  there were considered.  One factor was looking at

16  who had sudo access to the various systems.

162

4        Q.   You were telling me about this process for
5   reviewing employees after November 3rd and 4th who
6   were seen as some type of a risk?
7        A.   Insubordinate or -- yeah, security risk.
8        Q.   Okay.  How -- what was the process for
9   determining who those employees were?
10            MS. CHOE:  Objection.  Calls for a
11   narrative.
12            THE WITNESS:  There were multiple things
13   there were considered in making that decision.
14   BY MS. LISS-RIORDAN:
15        Q.   What was the process for making that
16   decision?
17        A.   Well, one thing we looked at was who had
18   privileged access to the Twitter back-end system.
19        Q.   Okay.  So anyone who had access to
20   Twitter's back end systems was targeted for
21   termination?
22            MS. CHOE:  Objection to form.
23            THE WITNESS:  No.  That was one thing we
24   looked at because you have to be cognizant of who
25   has sudo access in a software system.

163

1   BY MS. LISS-RIORDAN:

2       Q.  Okay.  But how was it decided who would be

3   let go based on these concerns about risk?

4       A.  There were multiple factors.  We would

5   look at, you know, various -- various public -- or

6   not public, like within the company, it's -- it's a

7   term in Slack, like open to anyone Slack channels,

8   and see if people were posting, you know, messages

9   or remarks that were insubordinate or security

10  risks.

11      Q.  Okay.  Did you look at postings that

12  employees were making to determine if they appeared

13  insubordinate?

14      A.  Yes.

15      Q.  All right.  So what did you look at?

16      A.  We looked at messages in -- in -- in Slack

17  channels, and we would also look at, you know,

18  public statements by the employees on social

19  platforms.

20      Q.  Including Twitter?

21      A.  Including Twitter.

22      Q.  All right.  And then who made the decision

23  about which of these employees would be let go?

24      A.  We gave a recommendation of, you know,

25  who -- who the insubordinate and security risks

164

1  were, and then HR processed that -- that list, I
2  believe.  I don't know what happened after we
3  generated the list.

14      Q.  Did you determine any of these employees
15  who should be let go because they constituted a
16  risk?
17          MS. CHOE:  Objection as to form and vague.
18          THE WITNESS:  I gave inputs as to whether
19  they were a security risk and whether their messages
20  constituted insubordination or security risk.

230

1          DEPOSITION OFFICER'S CERTIFICATE

2          I, the undersigned, a Certified Shorthand

3   Reporter of the State of California, do hereby

4   certify:

5          That the foregoing proceedings were taken

6   before me at the time and place herein set forth; that

7   any witnesses in the foregoing proceedings, prior to

8   testifying, were duly sworn; that a record of the

9   proceedings was made by me using machine shorthand,

10  which was thereafter transcribed under my direction;

11  that the foregoing transcript is a true record of the

12  testimony given.

13         Further, that if the foregoing pertains to the

14  original transcript of a deposition in a federal case,

15  before completion* of the proceedings, review of the

16  transcript [ ] was [ ] was not requested.

17         I further certify I am neither financially

18  interested in the action nor a relative or employee of

19  any attorney or party to this action.

20         IN WITNESS WHEREOF, I have this date

21  subscribed my name.

22  *Proceedings were suspended.

23  Dated:   2/1/2024

24         *Siew Ung*
    _____

25         Siew Ung, RPR, CSR No. 13994

EXHIBIT 2

# In the Matter of:

*Jessica Pan vs*

*Twitter, Inc. and X Corp.,*

---

*Andrew Musk*

*February 02, 2024*

---

68 Commercial Wharf ● Boston, MA 02110
888.825.3376 - 617.399.0130
Global Coverage
Magnals.com



```
 1                    JAMS ARBITRATION

 2          BEFORE ARBITRATOR MICHAEL LOEB, ESQ.

 3

 4   JESSICA PAN,

 5               Claimant,
                                    Jams No.: 1100115270
 6               v.

 7   TWITTER, INC.,

 8               Respondent.

 9   _____

10

11

12       HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

13

14              DEPOSITION OF ANDREW MUSK

15

16                  February 2, 2024

17                   10:14 a.m.

18

19       1 Market Street, Spear Street Tower

20            San Francisco, California

21

22

23   REPORTED BY:

24   Siew G. Ung

25   CSR No. 13994, RPR, CSR
```

170

5          Q.  Did you participate in figuring out which

6     employees might be at risk of potential sabotage

7     against the company?

8               MS. PARKER:  Objection.  Vague.

9               THE WITNESS:  Yes.  In general, I was

10    looking at people who might be at risk or might be a

11    security risk to the company.

12    BY MS. LISS-RIORDAN:

13         Q.  How did you look for those people?

14         A.  I mean, some of -- so also this was part

15    of what I was doing, so it was not fully what I was

16    doing, but I had Slack.  And so there were cases in

17    Slack where people were writing messages that

18    posed -- or showed ideas of security threats,

19    basically.

20         Q.  So were you looking at Slack to see which

21    employees were writing messages that made them look

22    like security threats?

23         A.  Yes.

24         Q.  And what did you do with that information?

25         A.  I wrote down the name of the person.

171

1       Q.   And what did you do with it after you
2  wrote it down?
3       A.   Just that, I wrote down the name.
4       Q.   Did you give it to anybody?
5       A.   I don't remember personally giving that
6  information to anyone.
7       Q.   Did you write it down for anyone to
8  review?
9       A.   I didn't know who was going to be
10 reviewing it, but I took note of it.



3        And there were also -- I remember there

4   being a security team who was -- whose main concern

5   was around internal threat, basically.

6   BY MS. LISS-RIORDAN:

7        Q.  Who asked you to take you down the list of

8   people who could be a threat?

9            MS. PARKER:  Objection.  Misstates

10  testimony.  Lacks foundation.

11            THE WITNESS:  Like I said, I don't

12  remember anyone specifically telling me to take down

13  a list of names.

14  BY MS. LISS-RIORDAN:

15       Q.  Do you know if anyone else was taking down

16  such a list of names?

17            MS. PARKER:  Objection.  Calls for

18  speculation.

19            THE WITNESS:  I believe James was a part

20  of this.  I don't know about others for sure.

21  BY MS. LISS-RIORDAN:

22       Q.  All right.  Did you discuss this topic

23  with James?

24       A.  Yes, I -- I do remember discussing this

25  with James.

174

1        Q.   What do you recall discussing?

2        A.   I remember sending him some Slack messages

3   of something that I thought might be a threat.

14       Q.   Who was on the security team you just

15  mentioned?

16       A.   I know that Yoni, a security engineer from

17  Tesla, was there.  I know that Chris Stanley from

18  SpaceX who runs security was there.  There was

19  someone from The Boring Company on a security team,

20  but I don't know his name.

21       Q.   So the security team was made up of

22  individuals who had not been from Twitter?

23       A.   I can't -- this was -- in my head, those

24  were security people.  I don't know who they were

25  speaking to.  I don't think -- I don't know if I

187



4        Q.   Okay.  What about before the code review?

5        A.   I wasn't -- your question is:  Do I know

6   if people -- do I know, today, if people were let go

7   for cause?

8        Q.   Yes.

9        A.   As far as I understand, yes, other people

10  were let go for cause.

11       Q.   Who do you know was let go for cause?

12       A.   I understand that there was a group let go

13  as a security threat of cause.

Jessica Pan vs                    Attorneys Eyes Only                    Andrew Musk
Twitter, Inc. and X Corp.,                                          February 02, 2024

204

1                       CERTIFICATE OF REPORTER

2

3        I, Siew Ung, a Certified Shorthand Reporter, do

4   hereby certify:

5        That prior to being examined, the witness in the

6   foregoing proceedings was by me duly sworn to testify to

7   the truth, the whole truth, and nothing but the truth;

8        That said proceedings were taken before me at the

9   time therein set forth and were taken down by me in

10  shorthand and thereafter transcribed into typewriting

11  under my direction and supervision;

12       I further certify that I am neither counsel for,

13  nor related to, any party to said proceedings, nor in

14  any way interested in the outcome thereof.

15       In witness whereof, I have hereunto subscribed my

16  name.

17

18

19  2/6/2024

20

21

22

23  Siew Ung

24  _____

25  Siew Ung
    CSR No. 13994, RPR, CSR

EXHIBIT 3

ROUGH NON CERTIFIED ***CONFIDENTIAL***

1  -----------------------------------------------------

2  REAL-TIME AND INTERACTIVE REALTIME TRANSCRIPT ROUGH

3                DRAFT DISCLAIMER

4  -----------------------------------------------------

5  We, the party working with realtime and rough-draft

6  transcripts, understand that if we choose to use the

7  realtime rough-draft transcripts or the printout,

8  that we are doing so with the understanding that the

9  rough draft is a noncertified copy.  We further

10  agree NOT TO SHARE, give, copy, scan, fax or in any

11  way distribute this realtime rough-draft in any form

12  (written or computerized) to any party or other law

13  firms.  However, our own experts, co-counsel, and

14  staff may have limited internal use of same with the

15  understanding that we agree to destroy our realtime

16  rough-draft and/or any computerized form, if any,

17  and replace it with the final transcript upon its

18  completion.

19           **  ATTORNEYS' EYES ONLY  **

20  Case: EITAN ADLER V. TWITTER, INC. AND X CORP.

21  Date: 3/26/24

22  WITNESS: ROSS NORDEEN

23

24    Also, please be aware that the realtime screen and

25    uncertified rough draft of the transcript MAY

2

ROUGH NON CERTIFIED ***CONFIDENTIAL***

1    CONTAIN UNTRANSLATED STENO, REPORTERS's NOTES IN

2    DOUBLE PARENTHESES, MISSPELLED PROPER NAMES,

3    INCORRECT OR MISSING Q/A OR PUNCTUATION, AND/OR

4    NONSENSICAL ENGLISH WORD COMBINATIONS.  All such

5    entries will be correct on the final, certified

6    transcript.

7    The unedited rough draft of the transcript has not

8    been proofread and it is NOT CERTIFIED, AND MAY NOT

9    BE CITED OR USED IN ANY WAY OR AT ANY TIME TO REBUT

10   OR CONTRADICT THE CERTIFIED TRANSCRIPTION OF

11   PROCEEDINGS.

12

13   REPORTER:  Ashley Soevyn, CSR 12019

14

15

16

17

18

19

20

21



86



```
19        Q    Were you involved in going through

20   employee slack Chans to see who might be a threat to    01:06:37

21   the company?

22        A    I was involved in compiling a list of

23   people who had super user access.  And other types

24   of privileged access.  And then working with people

25   that were reviewing the list for you know,.            01:07:03
```
                                                                87

                    ROUGH NON CERTIFIED ***CONFIDENTIAL***

```
 1        Q    The list for what?                           01:07:09
```

2       A    Of -- of the privileged access.



9       Q    What do you mean by privilege access?

10      A    These are sort of the people like you        01:07:44

11 give your it's access to the the root of the system

12 so so tools like agent tools are built at a Hi level

13 and this access goes below that level.  So they can

14 go around the other types of pre section text

15 messages that's are in place so top X means nothing   01:08:07

16 to these people.

17      Q    So you put together a list of those

18 people?

19      A    Correct.

20      Q    What did you do with that list?           01:08:15

21      A    Shared it with people that were reviewing

22 it for the trust worthiness of those people.

23      Q    Who was reviewing for trust worthiness?

24      A    I believe James and Thomas are the couple

25 I remember.                                           01:08:41

```
25        A    I said I compiled a list of people with        01:09:58

                                                              89
```

ROUGH NON CERTIFIED ***CONFIDENTIAL***

```
 1   privilege access.                                        01:10:01

 2        Q    Of privilege access okay you gave that to

 3   the group then you said?

 4        A    Yes.

 5        Q    You don't know what the group did with         01:10:07

 6   that?

 7        A    I said group was reviewing it for trust

 8   worthiness.

 9        Q    Group was reviewing it for trust

10   worthiness did you know what they did with it at         01:10:17

11   that point?

12        A    I do believe slack review is part of

13   that.
```

90

8       Q     When the group finished their review for

9    trust worthiness base on list that you had provided

10   about access there was a compiled list at that point   01:12:29

11   of individuals that were determined not to be

12   trustworthy, correct?

13             MS. PARKER:   Objection lacks foundation

14   calls for speculation.

15       A     Yeah there was a list of people that were   01:12:44

16   compiled yes.

17       Q     Okay and ultimately those people were

18   fired?

19             MS. PARKER:   Objection calls for

20   speculation.                                          01:12:53

21        A    I remember giving the list to HR.

22   BY MR. MANEWITH:

23        Q    Do you remember who at HR?

24        A    I think Katie.

25        Q    By Katie are you talking about Katie        01:13:11

                                                                 91

          ROUGH NON CERTIFIED ***CONFIDENTIAL***

1   Marcotte?                                              01:13:13

2        A    Sounds familiar yeah.

3        Q    You don't know once you gave that list to

4   Katie what happened to those individuals?

5        A    Yeah I believe they were let go.            01:13:30

116

3          Do you recall how many employees were let

4    go for cause due to their untrust worthiness?

5          A    I don't remember the exact amount is.        02:48:19

6          A    No.

7          Q    Okay ultimately the facts that they were

8    let go resulted in a further reduction in the head

9    count of Twitter correct?

10          MS. PARKER:  Objection.  Lacks        02:48:37

11    foundation.

12          THE WITNESS:  I would like to clarify as

13    well that they were terminated for cause not let go.

14    But yes  but yes, that would end up reducing the

15    tote number if you subtract.        02:48:53



ROUGH NON CERTIFIED ***CONFIDENTIAL***



    4        Q    At one point in your testimony earlier

    5    you said that certain employees were laid off for        04:27:22

    6    cause.  Could you clarify what you meant when you

    7    said that?

    8        A    I meant terminated for cause.

EXHIBIT 4

1    MORGAN, LEWIS & BOCKIUS LLP
     Eric Meckley, Bar No. 168181
2    eric.meckley@morganlewis.com
     Brian D. Berry, Bar No. 229893
3    brian.berry@morganlewis.com
     Kassia Stephenson, Bar No. 336175
4    kassia.stephenson@morganlewis.com
     One Market, Spear Street Tower
5    San Francisco, CA  94105-1596
     Tel:    +1.415.442.1000
6    Fax:    +1.415.442.1001

7    MORGAN, LEWIS & BOCKIUS LLP
     Ashlee N. Cherry, Bar No. 312731
8    ashlee.cherry@morganlewis.com
     1400 Page Mill Road
9    Palo Alto, CA  94304
     Tel:    +1.650.843.4000
10   Fax:    +1.650.843.4001

11   Attorneys for Defendants
     X CORP. as Successor in Interest to
12   TWITTER, INC.

13                  UNITED STATES DISTRICT COURT

14                 NORTHERN DISTRICT OF CALIFORNIA

15                    SAN FRANCISCO DIVISION

16

17   EITAN ADLER, on behalf of himself and all        Case No. 3:23-CV-01788-JD
     others similarly situated,
18                                                     **INITIAL DISCLOSURES OF**
                        Plaintiff,                     **DEFENDANT X CORP. AS**
19                                                     **SUCCESSOR IN INTEREST TO**
                  vs.                                  **TWITTER, INC.**
20
     TWITTER, INC. and X CORP.,
21
                        Defendants.
22

23

24

25

26

27

28

MORGAN, LEWIS &
  BOCKIUS LLP
 ATTORNEYS AT LAW
  SAN FRANCISCO

1    Defendant X Corp., on its own behalf and as successor in interest to Defendant Twitter,

2    Inc. (hereinafter "Defendant"), by and through its undersigned counsel, hereby submits these

3    Initial Disclosures pursuant to Rule 26(a)(1) of the Federal Rules of Civil Procedure.  These

4    Initial Disclosures are based on the information reasonably available to Defendant at the present

5    time.  Investigation is continuing and Defendant reserves the right to supplement and/or amend

6    these disclosures as new information is discovered.

7    **INDIVIDUALS LIKELY TO HAVE DISCOVERABLE INFORMATION**

8    As an initial matter, Defendant contends that this action is not appropriate for class action

9    treatment, and the Court has not ruled that this action may be maintained as a class action.  At this

10   stage of the litigation, Defendant contends it would be premature, unjustified, and unduly

11   burdensome to attempt to determine and identify all individuals with discoverable information as

12   to the claims of individual putative class members.  Providing disclosures regarding putative class

13   members where no class action has been adequately identified, certified, or maintainable is

14   inappropriate and premature, and Defendant objects on that basis to providing any such

15   disclosures.

16   Subject to the above objections and limitations, in addition to the named Plaintiff Eitan

17   Adler ("Plaintiff"), the individuals identified below are likely to have discoverable information

18   that Defendant may use to support its defenses to the individual claims alleged in Plaintiff's

19   Complaint:

20       1.    James Musk has knowledge regarding the following subjects: The facts underlying

21           Plaintiff's termination and the fact that Plaintiff was terminated for cause and did

22           not suffer an employment loss as a result of a mass layoff.

23       2.    Christopher Stanley has knowledge regarding the following subjects: The facts

24           underlying Plaintiff's termination and the fact that Plaintiff was terminated for

25           cause and did not suffer an employment loss as a result of a mass layoff.

26   The witnesses identified above, with the exception of the named Plaintiff, may be

27   contacted through Defendant's counsel.  Defendant's investigation and discovery remains

28   ongoing as does its discovery of facts related to the basis of Plaintiff's claims.  As such,

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

2

DEFENDANT'S INITIAL DISCLOSURES
CASE NO. 3:23-CV-01788-JD

Defendant reserves the right to identify additional potential witnesses and supplement its disclosures.

**DOCUMENTS, ELECTRONICALLY STORED INFORMATION, AND TANGIBLE THINGS**

Subject to the objections and limitations identified above, Defendant identifies the following categories of documents that it may use to support its defenses:

1. Plaintiff's personnel records;

2. Documents relating to Plaintiff's termination;

3. Relevant policies provided and/or available to Plaintiff, including but not limited to Defendant's Playbook, Respectful Workplace policy, Standards of Conduct, and Code of Business Conduct & Ethics.

Defendant will produce the above-referenced documents, and any additional documents that it identifies that it may use to support its defenses, and identify the applicable Bates range, subject to and after entered into a mutually agreed Stipulated Protective Order.

Defendant's investigation is still ongoing.  As such, Defendant reserves the right to supplement these Initial Disclosures as new documents are discovered.

**COMPUTATION OF DAMAGES**

Defendant does not claim at this time that it is entitled to recover any damages from Plaintiff in this case, but Defendant reserves its right to assert claims for any amounts to which it may be entitled under applicable laws.  Also, should Defendant prevail in this action, it reserves the right to recover from Plaintiff its costs, reasonable attorneys' fees, and expenses.

**INSURANCE AGREEMENTS**

Defendant is not currently aware of any insurance coverage to satisfy part or all of a judgment which may be entered in the action or to indemnify or reimburse for payments made to satisfy the judgment.

/ / /

/ / /

/ / /

Morgan, Lewis &
Bockius LLP
Attorneys at Law
San Francisco

3

DEFENDANT'S INITIAL DISCLOSURES
CASE NO. 3:23-CV-01788-JD

1    Dated: September 8, 2023                    MORGAN, LEWIS & BOCKIUS LLP

2

3                                          By    /s/ Eric Meckley
                                                Eric Meckley
4                                               Brian D. Berry
                                                Ashlee N. Cherry
5                                               Kassia Stephenson
                                                Attorneys for Defendants
6                                               X CORP. as Successor in Interest to
                                                TWITTER, INC.
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Morgan, Lewis &
Bockius LLP
Attorneys at Law
San Francisco

4

DEFENDANT'S INITIAL DISCLOSURES
CASE NO. 3:23-CV-01788-JD

EXHIBIT 5

1  MORGAN, LEWIS & BOCKIUS LLP
   Eric Meckley, Bar No. 168181
2  eric.meckley@morganlewis.com
   Brian D. Berry, Bar No. 229893
3  brian.berry@morganlewis.com
   One Market, Spear Street Tower
4  San Francisco, CA 94105-1596
   Tel:   +1.415.442.1000
5  Fax:   +1.415.442.1001

6  MORGAN, LEWIS & BOCKIUS LLP
   Ashlee N. Cherry, Bar No. 312731
7  ashlee.cherry@morganlewis.com
   Kassia Stephenson, Bar No. 336175
8  kassia.stephenson@morganlewis.com
   1400 Page Mill Road
9  Palo Alto, CA 94304
   Tel:   +1.650.843.4000
10 Fax:   +1.650.843.4001

11 Attorneys for Defendants
   X CORP. as Successor in Interest to
12 TWITTER, INC.

13

14                  UNITED STATES DISTRICT COURT

15                  NORTHERN DISTRICT OF CALIFORNIA

16                     SAN FRANCISCO DIVISION

17 EITAN ADLER, on behalf of himself and all      Case No. 3:23-CV-01788-JD
   others similarly situated,
18                                                 **DEFENDANT'S RESPONSE TO**
                      Plaintiff,                   **PLAINTIFF EITAN ADLER'S**
19                                                 **INTERROGATORIES, SET ONE**
                 vs.
20
   TWITTER, INC. and X CORP.,
21
                      Defendants.
22

23

24 PROPOUNDING PARTY:          Plaintiff EITAN ADLER

25 RESPONDING PARTY:           Defendant X CORP. as Successor in Interest to TWITTER,

26                             INC.

27 SET NUMBER:                 One

28

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DEFENDANT'S RESPONSE TO
PLAINTIFF'S INTERROGATORIES,
SET ONE
CASE NO. 3:23-CV-01788-JD

1   Defendant X Corp. as successor in interest to Twitter, Inc. (collectively, "Twitter") hereby

2   answers, objects and otherwise responds to Plaintiff Eitan Adler's ("Plaintiff" or "Adler")

3   Interrogatories, Set One, as follows:

4   <center>**PRELIMINARY STATEMENT**</center>

5   The information contained in the responses set forth below is based upon information

6   currently available to Defendant. Defendant's investigation and discovery in preparation for trial

7   have not been completed.  Additional investigation and discovery may disclose further

8   information and documents relevant to these responses, as could information obtained from

9   Plaintiff or third parties through additional discovery procedures.  Accordingly, Defendant

10  reserves the right at any time to amend, alter, supplement, modify, or otherwise revise these

11  responses if, for any reason, such amendments, alterations, supplements, modifications, or

12  revisions become appropriate or warranted, without acknowledging a duty to do so other than as

13  set forth in the Federal Rules of Civil Procedure.  Defendant further reserves the right to make use

14  of or introduce at any hearing or trial documents responsive to these Interrogatories but

15  discovered subsequent to the date of these responses.  All of Defendant's responses are made

16  subject to this preliminary statement.

17  <center>**GENERAL OBJECTIONS**</center>

18  The following general objections are incorporated into each response herein:

19  1.   Defendant objects to Plaintiff's Interrogatories because they are overbroad to the

20  extent they seek to improperly obtain discovery from non-parties.  Defendant will only respond

21  on behalf of itself and objects to Plaintiff's attempt to require responses from others who are not

22  parties to this action.

23  2.   Defendant objects to Plaintiff's Interrogatories on the grounds that they are overly

24  broad in scope, impermissibly intrusive, and unduly burdensome and oppressive to the extent they

25  seek discovery concerning individuals other than the named Plaintiff when individuals other than

26  Plaintiff are not otherwise parties to or participants in this action.

27  3.   Defendant objects to Plaintiff's Interrogatories because they seek information that

28

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

2

DEFENDANT'S RESPONSE TO
PLAINTIFF'S INTERROGATORIES, SET
ONE
CASE NO. 3:23-CV-01788-JD

1    is not relevant or reasonably calculated to lead to the discovery of admissible evidence.

2          4.      Defendant objects to all of the Interrogatories to the extent they seek disclosure of

3    proprietary, confidential, competitively sensitive or trade secret information protected from

4    disclosure by California Civil Code § 3295.

5          5.      Defendant objects to Plaintiff's Interrogatories to the extent that they seek

6    information protected from disclosure by the attorney-client privilege and/or the attorney work

7    product doctrine or any other applicable privilege or protection, including information that by its

8    nature would disclose the mental thought processes of Defendant's counsel relating to this

9    litigation.

10         6.      Defendant objects to Plaintiff's Interrogatories, including the definitions and

11    instructions, to the extent that they attempt to impose on Defendant any obligation beyond those

12    imposed by law.

13         7.      Plaintiff is not entitled to contact information, personnel records, payroll or any

14    other data for other putative class members because has he cannot demonstrate either a *prima*

15    *facie* showing that Rule 23 class-action requirements may be satisfied or that the sought-after

16    discovery is likely to substantiate the class allegations.  Plaintiff cannot show "that discovery is

17    likely to produce substantiation of the class allegations." *Mantolete v. Bolger*, 767 F.2d 1416,

18    1424 (9th Cir. 1985) (holding that "a trial court's refusal to allow class discovery is not an abuse

19    of discretion" absent a "prima facie showing of the class action requirements of [Rule 23]").  In

20    *Doninger v. Pacific Northwest Bell, Inc.*, 564 F.2d 1304, 1313 (9th Cir. 1977), the Ninth Circuit

21    held that "where the plaintiffs fail to make even a *prima facie* showing of Rule 23's prerequisites

22    ... the burden is on the plaintiff to demonstrate that discovery measures are likely to produce

23    persuasive information substantiating the class action allegations."

24         8.      Defendant objects to Plaintiff's Interrogatories to the extent that they seek

25    information that is equally available to Plaintiff, that are more easily obtained through other

26    means of discovery, or that are not within Defendant's possession, custody or control.

27         9.      Defendant objects to Plaintiff's Interrogatories to the extent that they seek

28

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

3

DEFENDANT'S RESPONSE TO
PLAINTIFF'S INTERROGATORIES, SET
ONE
CASE NO. 3:23-CV-01788-JD

1    information the release of which would be a violation of any individual's right of privacy under

2    Article I, Section 1 of the California Constitution, or Sections 1799.1 and 3344 of the California

3    Civil Code, or any other constitutional, statutory or common law right of privacy of any person.

4        10.    Defendant objects to Plaintiff's Interrogatories to the extent that they do not

5    conform to the requirements set forth in the Federal Rules of Civil Procedure.

6        Subject to and without waiving any of the foregoing objections and for the purpose of

7    responding to these Interrogatories only, Defendant responds as follows:

8                    **OBJECTIONS AND RESPONSES TO INTERROGATORIES**

9    **INTERROGATORY NO. 1:**

10        Identify all persons who have or whom you believe have knowledge of facts relating to

11    the allegations contained in the Complaint or Answer (including Affirmative Defenses), including

12    but not limited to any external third party, as well as Defendants. In addition, describe the facts

13    about which each such person has knowledge.

14    **RESPONSE TO INTERROGATORY NO. 1:**

15        Twitter incorporates its Preliminary Statement and General Objections as if fully set forth

16    herein. Twitter further objects that this Interrogatory is compound, vague and ambiguous,

17    overbroad and unduly burdensome, and premature at this stage considering, among other things,

18    Plaintiff's Complaint is conclusory and devoid of any factual allegations specific to Plaintiff.

19    Twitter further objects to this Interrogatory as not proportional to the needs of the case

20    considering the importance of the issues at stake, the amount in controversy, the parties' relative

21    ease of access to the information, and the importance of the discovery in resolving the issues

22    because, among other things, it is neither feasible nor reasonable for Twitter to identify every

23    individual who may have knowledge of any fact relating in any way to the myriad generalized

24    allegations in Plaintiff's Complaint and to identify what facts each such individual may know,

25    including because a number of potentially identifiable persons are no longer Twitter employees

26    and are thus not subject to Twitter's control. Twitter further objects to this Interrogatory to the

27    extent the requested information is protected from disclosure by the attorney-client privilege

28

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

4

DEFENDANT'S RESPONSE TO
PLAINTIFF'S INTERROGATORIES, SET
ONE
CASE NO. 3:23-CV-01788-JD

and/or the work product doctrine.  Twitter further objects to this Interrogatory as overly broad and unduly burdensome insofar as it asks for the identities of all persons who have knowledge of the parties' allegations, "including but not limited to any external third party."  Twitter will construe this Interrogatory as only seeking the identities of current or former Twitter employees with relevant knowledge.

Subject to and without waiving the foregoing objections, Twitter identifies the following individuals whom it believes may have knowledge related to the claims in Plaintiff's Complaint and/or Twitter's defenses to the same:

- **Claimant** presumably has knowledge of the facts supporting the allegations in his Complaint.

- **James Musk**, Staff Software Engineer, has knowledge related to, among other things, the facts underlying Plaintiff's termination and the fact that Plaintiff was terminated for cause and did not suffer an employment loss as a result of a mass layoff.  Musk may be contacted through Twitter's below-signed counsel.

- **Ross Nordeen**, Data Engineer, has knowledge related to, among other things, the facts underlying Plaintiff's termination and the fact that Plaintiff was terminated for cause and did not suffer an employment loss as a result of a mass layoff. Nordeen may be contacted through Twitter's below-signed counsel.

- **Christopher Stanley**, Senior Director, Security Engineering, has knowledge related to, among other things, the facts underlying Plaintiff's termination and the fact that Plaintiff was terminated for cause and did not suffer an employment loss as a result of a mass layoff.  Stanley may be contacted through Twitter's below-signed counsel.

Pursuant to FRCP Rule 26(e), Twitter will supplement its answer to this Interrogatory to the extent necessary.

**INTERROGATORY NO. 2:**

Identify every individual involved in the decisions regarding which Twitter employees

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

5

DEFENDANT'S RESPONSE TO
PLAINTIFF'S INTERROGATORIES, SET
ONE
CASE NO. 3:23-CV-01788-JD

1    Dated: January 17, 2024                    MORGAN, LEWIS & BOCKIUS LLP

2

3                                          By    /s/ Eric Meckley
                                                Eric Meckley
4                                               Brian D. Berry
                                                Ashlee N. Cherry
5                                               Kassia Stephenson
                                                Attorneys for Defendants
6                                               X CORP. as Successor in Interest to
                                                TWITTER, INC.
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

18

DEFENDANT'S RESPONSE TO
PLAINTIFF'S INTERROGATORIES, SET
ONE
CASE NO. 3:23-CV-01788-JD

1

## <u>VERIFICATION</u>

2

I, Lauren Wegman, declare,

3

I am employed as a Senior Director on the People team at X Corp. (successor in interest to

4

Twitter, Inc. (collectively, "Twitter")), a defendant in the above-entitled action.

5

I have read the foregoing Responses to DEFENDANTS TWITTER, INC. AND X

6

CORP.'S RESPONSE TO PLAINTIFF EITAN ADLER'S INTERROGATORIES, SET ONE,

7

and know the contents thereof and that the matters stated therein are true and correct based upon

8

information and belief.

9

I declare under penalty of perjury under the laws of the United States and the State of

10

California that the foregoing is true and correct.

11

Signed on January 17, 2024, at Atlanta, Georgia.

12

13

14

_____
Lauren Wegman

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Morgan, Lewis &
Bockius LLP
Attorneys at Law
San Francisco

19

DEFENDANTS' RESPONSE TO
PLAINTIFF'S INTERROGATORIES, SET
ONE
CASE NO. 3:23-CV-01788-JD

EXHIBIT 6

SHANNON LISS-RIORDAN (SBN 310719)
(sliss@llrlaw.com)
THOMAS FOWLER (*pro hac vice* forthcoming)
(tfowler@llrlaw.com)
LICHTEN & LISS-RIORDAN, P.C.
729 Boylston Street, Suite 2000
Boston, MA 02116
Telephone:     (617) 994-5800
Facsimile:     (617) 994-5801

*Attorneys for Plaintiff Eitan Adler,*
*on behalf of himself and all others similarly situated*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

EITAN ADLER, on behalf of himself and all others similarly situated,

Plaintiff,

v.

TWITTER, INC., and X CORP.

Defendants.

Case No. 3:23-cv-01788-JD

**NOTICE OF DEPOSITION**

Please take notice that, pursuant to Fed. R. Civ. P. 30(b)(6), Plaintiff's counsel will take the deposition upon oral examination of Defendant X Corp., as successor in interest to Defendant Twitter, Inc. This deposition will take place before an officer authorized by law to administer oaths at 9:00 AM Pacific Time on March 13, 2024, at the address below.  The deponent will be examined on the subjects identified in the attached "Schedule A."  You are invited to attend and participate.

Magna Legal Services,
One Sansome Street, Suite 3500
San Francisco, CA 94104

Respectfully submitted,

EITAN ADLER, on behalf of himself and all others similarly situated,

By his attorneys,

 /s/ Shannon Liss-Riordan
Shannon Liss-Riordan, SBN 310719
Thomas Fowler (*pro hac vice* forthcoming)
LICHTEN & LISS-RIORDAN, P.C.
729 Boylston Street, Suite 2000
Boston, MA 02116
(617) 994-5800
Email: sliss@llrlaw.com; tfowler@llrlaw.com

Dated:        February 26, 2024

## CERTIFICATE OF SERVICE

I, Shannon Liss-Riordan, hereby certify that a true and accurate copy of the foregoing document was served on counsel of record for Defendants in this matter by electronic mail on February 26, 2024.

/s/ Shannon Liss-Riordan
Shannon Liss-Riordan

**SCHEDULE A**

(1) Defendants' decisions regarding which Twitter employees would be provided notice (or pay in lieu of notice) under the WARN Act and/or California WARN Act.

(2) Defendants' decisions regarding which Twitter employees would not be provided notice (or pay in lieu of notice) under the WARN Act and/or California WARN Act.

(3) Defendants' intention and efforts to reduce the size and cost of Twitter's workforce following Elon Musk's acquisition of Twitter.

(4) Defendants' expense reimbursement policy before and after Elon Musk acquired Twitter.

(5) Requests for expense reimbursement made by employees who Defendants laid off or terminated, and by employees who resigned, after Elon Musk acquired Twitter.

(6) Payments made by Defendants to employees who Defendants laid off or terminated, and by employees who resigned, after Elon Musk acquired Twitter for expense reimbursements.

(7) Defendants' paid time off policy before and after Elon Musk acquired Twitter.

(8) Defendants' payout of any accrued, but unused, paid time off to employees who were laid off or terminated by Defendants, or who resigned, during the period of October 2022 through October 2023.

EXHIBIT 7

# In the Matter of:

*Eitan Adley, et al vs*

*Twitter, Inc. and X Corp.,*

---

*Steve Davis*

*February 21, 2024*

---

*68 Commercial Wharf • Boston, MA 02110*
*888.825.3376 - 617.399.0130*
*Global Coverage*
*Magnals.com*



A MAGNA LEGAL SERVICES COMPANY

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

EITAN ADLER, on behalf of      ) Case No. 3:23-cv-01788-JD

himself and all others        )

similarly situated,           )

                              )

      Plaintiff,      )

                              )

v.                            )

                              )

                              )

                              )

TWITTER, INC. and X CORP.,    )

                              )

      Defendants.     )

ORAL & VIDEO DEPOSITION OF STEVE DAVIS

FEBRUARY 21, 2024

    Oral & video deposition of Steve Davis,

produced as a witness at the instance of the

plaintiffs, and duly sworn, was taken in the

above-styled and numbered cause on the 21st day

of February, 2024, before Patrick Stephens,

Certified Court Reporter, at 300 West 6th Street,

2010, Austin, Texas 78701.

1      **Q    What did you do with the information you**
2  **gained about what people were doing at Twitter?**
3      A   So before the acquisition, nothing.
4      **Q   Okay.  After the acquisition?**
5      A   So after the acquisition, I ended up working
6  on nonlabor cost-cutting.  Is it -- it would be helpful
7  to say what that means?
8      **Q   Please.**
9      A   Yeah, just the -- basically any expenditure
10  that wasn't on payroll, I -- I looked at that in detail
11  and then looked for ways to reduce that.

14    Q    Are you aware of any attempt to exit from the
15   company any employees who were deemed not loyal to Elon?
16       A    That were deemed not loyal to Elon?  Like, is
17   there context or a time period?
18    Q    In -- sometime after Elon acquired Twitter, do
19   you remember any discussion about figuring out which
20   employees may not be loyal to Elon or happy about his
21   acquisition of the company in order to decide who should
22   be exited from the company?
23       A    The only thing I can recall was -- and, again,
24   more conceptually, was -- there a lot -- there was a lot
25   of discussion about -- about leaks at the company, like

Page 88

1   people telling -- speaking to media about what was
2   happening at the company.  So I remember that was
3   something that was, like, conceptually being looked at,
4   like, very heavily.
5    Q    Okay.  Do you remember that there was an
6   effort to find people who were involved in leaks so that
7   they could be exited from the company?
8       A    I don't remember the concerted effort, nor do
9   I remember the direct connection, but I do know that was
10   a -- topic that was often talked about.
11    Q    Do you know who was involved in that?
12       A    Oh, no.

Page 95

```
 1              UNITED STATES DISTRICT COURT
 2            NORTHERN DISTRICT OF CALIFORNIA
 3                SAN FRANCISCO DIVISION
 4
 5 EITAN ADLER, on behalf of    ) Case No. 3:23-cv-01788-JD
   himself and all others       )
 6 similarly situated,          )
                                )
 7          Plaintiff,          )
                                )
 8 v.                           )
                                )
 9                              )
                                )
10 TWITTER, INC. and X CORP.,   )
                                )
11          Defendants.         )
12
13              REPORTER'S CERTIFICATE
14      ORAL & VIDEO DEPOSITION OF STEVE DAVIS
15                FEBRUARY 21, 2024
16
17
18          I, Patrick A. Stephens, Certified National
19   Court Reporter, hereby certify to the following:
20
21          That the witness, STEVE DAVIS, was duly
22   sworn and that the transcript of the deposition is a
23   true record of the testimony given by the witness;
24
25          That pursuant to FCRP Rule 30(f)(1), request
```

Page 96

```
 1 to review the transcript was not made by either
 2 deponent or party before the deposition was
 3 completed.
 4          That pursuant to information given to the
 5 deposition officer at the time said testimony was
 6 taken, the following includes all parties of record
 7 and the amount of time used by each party at the time
 8 of the deposition:
 9
10    Shannon Liss-Riordan (1 hr 45 mins)
11       Attorney for Plaintiffs
12    Alex Spiro (0 mins)
13       Attorney for Defendants
14
15          I further certify that I am neither counsel
16 for, related to, nor employed by any of the parties in
17 the action in which this proceeding was taken, and
18 further that I am not financially or otherwise
19 interested in the outcome of this action.
20
21          Certified to by me on this 4th day of
22 March, 2024.            Patrick A. Stephens
23                    PATRICK A. STEPHENS
                      NVRA NO. 5462
24                    Expiration:  06/01/2024
                      Imperial Reporting, LLC
25                    Del Valle, TX  78617
```