Shannon Liss-Riordan (SBN 310719)
*sliss@llrlaw.com*
Bradley Manewith (*pro hac vice*)
*bmanewith@llrlaw.com*
LICHTEN & LISS-RIORDAN, P.C.
729 Boylston Street, Suite 2000
Boston, MA 02116
Tel: (617) 994-5800
Fax: (617) 994-5801

*Attorneys for Plaintiff Eitan Adler,*
*on behalf of himself and all others similarly situated*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| EITAN ADLER, on behalf of himself and all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> TWITTER, INC. and X CORP., <br><br> Defendants. | Case No. 3:23-cv-01788-JD <br><br> **MOTION FOR CLASS CERTIFICATION** <br><br><br> Date: August 22, 2024 <br> Time: 10:00 a.m. <br> Judge: Hon. James Donato |

## <u>**TABLE OF CONTENTS**</u>

I.      INTRODUCTION ............................................................................................. 1

II.     BACKGROUND ............................................................................................... 2

III.    LEGAL STANDARD ...................................................................................... 5

IV.     ARGUMENT .................................................................................................... 5

      A.    The proposed classes satisfy Rule 23(a)'s prerequisites. ...................... 6

           1.   Numerosity .................................................................................. 6

           2.   Commonality ............................................................................... 7

           3.   Typicality .................................................................................... 9

           4.   Adequacy .................................................................................... 10

      B.    The proposed classes are maintainable under Rule 23(b)(3). .............. 12

           1.   Common questions predominate over questions affecting individual class members. ......................................................... 12

           2.   A class action is the superior mechanism for addressing the drivers' claims. ........................................................................ 13

      C.    The presence of arbitration agreements among putative class members does not preclude certification. ............................................................ 14

V.      CONCLUSION ................................................................................................ 16

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Anchem Prod., Inc. v. Windsor*,
  521 U.S. 591 (1997)..............................................................................12, 13

*Barnes v. AT & T Pension Benefit Plan-Nonbargained Program*,
  270 F.R.D. 488 (N.D. Cal. 2010).....................................................................15

*Champagne*,
  2018 WL 11471583 ...........................................................................................10

*Chen-Oster v. Goldman, Sachs & Co.*,
  449 F. Supp. 3d 216 (S.D.N.Y. 2020)...............................................................15

*Chun-Hoon v. McKee Foods Corp.*,
  2006 WL 3093764 (N.D. Cal. Oct. 31, 2006)....................................................12

*Dilts v. Penske Logistics, LLC*,
  267 F.R.D. 625 (S.D. Cal. 2010) .........................................................................9

*Ellis v. Costco Wholesale Corp.*,
  285 F.R.D. 492 (N.D. Cal. 2012)......................................................................10

*Escalante v. California Physicians' Serv.*,
  309 F.R.D. 612 (C.D. Cal. 2015)........................................................................6

*Etzelberger v. Fisker Automotive, Inc.*,
  300 F.R.D. 378 (C.D. Cal. 2013).......................................................................13

*Gutierrez v. Wells Fargo Bank, NA*,
  889 F.3d 1230 (11th Cir. 2018) .........................................................................15

*Hanlon v. Chrysler Corp.*,
  150 F.3d 1011 (9th Cir. 1998) ..........................................................................12

*Harris v. Palm Springs Alpine Ests., Inc.*,
  329 F.2d 909 (9th Cir. 1964) ..............................................................................6

*In re Ductile Iron Pipe Fittings ("DIPF") Direct Purchaser Antitrust Litig.*,
  2016 WL 5508843 (D.N.J. Sept. 28, 2016) ......................................................16

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
  2011 WL 1753784 (N.D. Cal. May 9, 2011) .....................................................16

*In re Univ. of S. California Tuition & Fees COVID-19 Refund Litig.*,
  --- F.Supp.3d ---, 2023 WL 6453814 (C.D. Cal. Sept. 29, 2023) ....................12

*Jackson v. Aliera Companies*,
    2020 WL 4787990 (W.D. Wash. Aug. 18, 2020) ........................................................... 16

*Jensen v. Cablevision Sys. Corp.*,
    372 F. Supp. 3d 95 (E.D.N.Y. 2019) ........................................................................ 15

*Johnson v. City of Grants Pass*,
    72 F.4th 868 (9th Cir. 2023) ............................................................................ 5, 7

*Jordan v. Los Angeles Cnty.*,
    669 F.2d 1311 (9th Cir.) ....................................................................................... 6

*Kamm v. Cal. City Dev. Co.*,
    509 F.2d 205 (9th Cir. 1975) ............................................................................. 13

*Local Joint Exec. Bd. of Culinary/Bartender Trust Fund v. Las Vegas Sands, Inc.*,
    244 F.3d 1152 (9th Cir. 2001) ........................................................................... 13

*Martin v. Tango's Restaurant, Inc.*,
    969 F.2d 1319 (1st Cir. 1992) ........................................................................... 14

*Mazza v. Am. Honda Motor Co.*,
    666 F.3d 581 (9th Cir. 2012) ............................................................................... 5

*Morton v. Vanderbilt Univ.*,
    2014 WL 4657473 (M.D. Tenn. Sept. 17, 2014) ..................................................... 8, 9, 13

*Mowat v. DJSP Enters., Inc.*,
    2011 WL 13217002 (S.D. Fla. Aug. 23, 2011) ......................................................... 8, 10

*Nitsch v. Dreamworks Animation SKG Inc.*,
    315 F.R.D. 270 (N.D. Cal. 2016) ........................................................................ 15

*O'Connor v. Uber Techs., Inc.*,
    2015 WL 5138097 (N.D. Cal. Sept. 1, 2015) ............................................................ 11

*Overka v. American Airlines, Inc.*,
    265 F.R.D. 14, 24 (D. Mass. 2010) ...................................................................... 14

*Parsons v. Ryan*,
    754 F.3d 657 (9th Cir. 2014) .............................................................................. 9

*Perez v. Safety-Kleen Systems,Inc.*,
    253 F.R.D. 508 (N.D. Cal. 2008) ........................................................................ 14

*Roman v. Jan-Pro Fran. Int'l., Inc.*,
    342 F.R.D. 274 (N.D. Cal. 2022) ........................................................................ 11

*Rushing v. Williams-Sonoma, Inc.*,
    2020 WL 6787135 (N.D. Cal. Oct. 8, 2020)................................................................. 15

*Saleh v. Titan Corp.*,
    353 F. Supp. 2d 1087 (S.D. Cal. 2004)...................................................................... 16

*Smilow v. Southwestern Bell Mobile Systems, Inc.*,
    323 F.3d 32 (1st Cir. 2003)........................................................................................ 12

*Staton v. Boeing Co.*,
    327 F.3d 938 (9th Cir. 2003) ....................................................................................... 9

*Valentino v. Carter-Wallace, Inc.*,
    97 F.3d 1227 (9th Cir. 1996) ....................................................................................... 5

*Villalpando v. Exel Direct Inc.*,
    303 F.R.D. 588 (N.D. Cal. 2014)........................................................................... 6, 12

*Wal-Mart Stores, Inc. v. Dukes*,
    564 U.S. 338 (2011)............................................................................................... 7, 10

*Wang v. Chinese Daily News, Inc.*,
    737 F.3d 538 (9th Cir. 2013) ....................................................................................... 7

**Statutes**

California Labor Code § 201 ............................................................................................ 1

California Labor Code § 203 ............................................................................................ 1

California Labor Code § 227.3 ......................................................................................... 1

California WARN Act,
    Cal. Lab. Code § 1400 *et seq.* ..................................................................................... 1

Worker Adjustment and Retraining Notification Act (the "WARN Act"),
    29 U.S.C. § 2101 *et seq.*............................................................................................. 1

**Other Authorities**

Diana Kapp,
    "Uber's Worst Nightmare," SAN FRANCISCO MAGAZINE (May 18, 2016) ...................... 11

Katie Johnson,
    "Lawyer Fights for Low Wage Workers' Rights," BOSTON GLOBE (Dec. 23,
    2012) .......................................................................................................................... 11

Liane Jackson,
    "America's Top 200 Lawyers," FORBES (March 26, 2024)............................................ 11

Michael Rafalowich,
    "Benchmark US 2020 awards" BENCHMARK LITIGATION (Feb. 27, 2020) ..................... 11

Report: Elon Must Plans to Cut 75% of Twitter Workforce,
    *available at*, https://apnews.com/article/elon-musk-twitter-inc-technology-
    social-media-1a9005b6653b07b5764ed61053554d1f ........................................................ 2

Ryan Mac, Mike Isaac, and Kellen Browning,
    Elon Musk's Twitter Teers on the Edge After Another 1,200 Leave, New York
    Times, https://www.nytimes.com/2022/11/18/technology/elon-musk-twitter-
    workers-quit.html (Nov. 18, 2022 ..................................................................................... 3

**Rules**

Fed. R. Civ. P. 23 ...................................................................................................... passim

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## I.      INTRODUCTION

This case is brought by Plaintiff Eitan Adler on behalf of individuals who worked for Defendant Twitter, Inc.[1], challenging the Company's violation of the federal Worker Adjustment and Retraining Notification Act, 29 U.S.C. § 2101 *et seq.* (the "WARN Act"), the California WARN Act, Cal. Lab. Code § 1400 *et seq.* (the "California WARN Act"), and California Labor Code §§ 201, 203, and 227.3.

Following Elon Musk's acquisition of Twitter in October 2022, Defendants immediately engaged in a global mass layoff, which ultimately resulted in more than 75% of Twitter's workforce being exited from the Company. While Defendants provided WARN Act notice to many employees, others such as Mr. Adler who were allegedly terminated for "cause", did not receive the required 60 days' notice. There are common questions as to whether these employees, who were allegedly terminated for "cause" (either for being "disloyal" to Mr. Musk and/or because of alleged poor performance, such as through failed "code review" exercises), were simply laid off as part of Defendants' general goal of drastically reducing headcount after Mr. Musk's acquisition of the Company. As such, class certification should be granted with respect to Mr. Adler's federal and California WARN Act claims.

Likewise, Mr. Adler seeks to represent a class of former Twitter employees in California who did not receive their final pay, benefits, and expense reimbursements, on the same day that they were terminated, in violation of the California Labor Code §§ 201, 203, and 227.3.  Twitter's violation of this requirement impacted hundreds of employees laid off in California. Mr. Adler was not reimbursed for incurred expenses on the day he was terminated. Moreover, Defendants acknowledge that these reimbursements were generally delayed for

---

[1]      In or about March 2023, Twitter merged with X Corp., and as a result Twitter and X Corp. are a single entity. X Corp. has successor liability for Twitter's unlawful acts. Twitter and X Corp. are referred to herein as "Twitter".

employees terminated in the wake of Mr. Musk's acquisition of Twitter.  Thus, class

certification is also proper for these state law claims.[2]

## II.    BACKGROUND

Plaintiff Eitan Adler worked at Twitter from June 2015, until November 15, 2022. (Dkt. 25 at ¶ 3; Ex. 1 - Email dated 11/15/2022 re termination – LLR_TWITTER_ADLER000193.) Mr. Adler was let go as a part of Twitter's mass layoffs that Elon Musk began shortly after acquiring Twitter in late October 2022; he was selected for layoff for alleged "insubordination". (Ex. 2 - E. Musk Dep. at 35-40, 237; Ex. 3 - J. Musk Dep. at 187; Ex. 1 - Email dated 11/15/2022 re termination – LLR_TWITTER_ADLER000193.)

Before purchasing Twitter, Elon Musk was reported to be planning to lay off 75% of its workforce. (*See* Ex. 2 - E. Musk Dep. at 336; *See also* Report: Elon Must Plans to Cut 75% of Twitter Workforce, *available at*, https://apnews.com/article/elon-musk-twitter-inc-technology-social-media-1a9005b6653b07b5764ed61053554d1f.) Within about a week after he closed on the acquisition, he immediately began laying off more than half of its workforce. (Ex. 4 - Emails between E. Musk and Hayes dated 11/2/2022; Ex. 5 - Executive Overview dated 11/2/2022; Ex. 6 - 30(b)(6) Dep. at 18.) On November 3-4, 2022, Twitter informed 3,789 out of 7,397 employees, about 51% of Twitter's total employee population, that they would be laid off. (Ex. 4 - Email Approving Layoffs dated 11/2/2022; Ex. 5 - Executive Overview dated 11/2/2022.) These layoffs, however, were only one part of Mr. Musk's efforts to reduce Twitter's overall headcount. (Ex. 2 - E. Musk Dep. at 33-40, 334-35; Ex. 6 - 30(b)(6) Dep. at 103-05.) Elon Musk himself, as well as Lauren Wegman (Senior Director on Twitter's People Team), testified that Twitter engaged in at least 10 layoffs that spanned at least until May 2023. (Ex. 2 - E. Musk Dep. at 33-40, 334-35; Ex. 6 - 30(b)(6) Dep. at 103-05.)

---

[2]      Plaintiff requested additional discovery related to class certification. However, Defendants have refused to produce responsive information and documents. Plaintiff's discovery dispute letter remains pending before the Court. (*See* Dkt. 52.)

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Twitter conducted its layoffs through a variety of methods. (Ex. 2 - E. Musk Dep. at 33-35, 263, 275-76; Ex. 7 - Fork in the Road Email dated 11/16/2022; Ex. 8 - Conti Dep. at 129, 133; Ex. 9 - A. Musk Dep. at 183-84, 188; Ex. 10 - Text message from E. Musk to Davis; Ex. 11 - Slack message between Marcotte and Nordeen.)  Following the mass layoff which employees were notified of on November 3-4, 2022, Mr. Musk also gave remaining employees a choice about being laid off on November 16, 2022, by sending them an email that he titled "A Fork in the Road." (Ex. 7 - Fork in the Road Email dated 11/16/2022.) This email gave employees twenty-four hours to indicate whether they would commit to being "extremely hardcore," "working long hours at high intensity," "with excellent performance." *Id.* If the employees did not click "yes" on the email by 5:00 p.m. the following day, they were told they would be exited from the company.[3] Both Elon Musk and Twitter's former head of mergers and acquisitions integration Stacey Conti described the "Fork in the Road" email as being akin to a "voluntary layoff." (Ex. 2 - E. Musk Dep. at 33-34; Ex. 8 - Conti Dep. at 129.)

Employees who were notified of their layoffs on November 3-4, 2022, as well as those who chose to be laid off following the "Fork in the Road" email, received WARN Act notice. (Ex. 8 - Conti Dep. at 87-88, 129.) However, employees laid off through other means did not receive WARN Act notice. (Ex. 8 - Conti Dep. at 102-04.)

Another method Mr. Musk used to cut the workforce was asking his team to find employees who could be exited from the company on the ground of being "insubordinate" or a "security risk." (Ex. 3 - J. Musk Dep. at 187.) As Mr. Musk put it, "[w]e need to be utterly ruthless and clever on costs immediately or Twitter is doomed", and "of course exit anyone disloyal", because "I don't feel comfortable working with disloyal people." (Ex. 2 - E. Musk Dep. at 35-40, 224, 263; Ex. 10 Text message from E. Musk to Davis.) His team identified

---

[3]     The "Fork in the Road" email led to approximately 1,200 employees being notified of their layoff the following day. (Ryan Mac, Mike Isaac, and Kellen Browning, Elon Musk's Twitter Teers on the Edge After Another 1,200 Leave, New York Times, https://www.nytimes.com/2022/11/18/technology/elon-musk-twitter-workers-quit.html (Nov. 18, 2022.)

thirty-seven (37) people to exit from the company on this basis, including Mr. Adler. (Ex. 11 - Slack message between Marcotte and Nordeen.) Elon Musk's cousin James Musk (who was brought on to Twitter to help with the transition and layoffs) testified that Twitter's effort to identify and let go insubordinate employees or employees who posed a security risk were a part of the continued layoffs, which extended beyond the cuts that employees were notified of on November 3-4, 2022. (Ex. 3 - J. Musk Dep. at 187.). These employees, including Mr. Adler, did not receive WARN Act notice. (Ex. 8 - Conti Dep. at 102-04.)

Mr. Musk also exited employees through alleged performance-based terminations (even though these employees had survived the initial rounds of layoffs), such as through "code reviews" that he used to identify engineers who he determined were not "excellent". (Ex. 2 - E. Musk Dep. at 34-35, 275-76; Ex. 8 - Conti Dep. at 133; Ex. 9 - A. Musk Dep. at 183-84, 188.) Mr. Musk described the code review terminations as "a furtherance of the cutting of the workforce." (Ex. 2 - E. Musk Dep. at 34.). Many employees were let go through these code reviews and related alleged performance-based terminations between November 2022 and May 2023, and they also did not receive WARN Act notice. (Ex. 8 - Conti Dep. at 102-04.)

Ultimately, as had been predicted before Musk's purchase of Twitter, more than 75% of Twitter's workforce was exited by the summer of 2023. (*See* Ex. 4 - Email from Hayes to Musk dated 11/2/2022 (identifying then-current Twitter population to be 7,397); Ex. 12 - Emails dated 5/16/2023 (identifying active headcount as 1,349).) By May 2023, there were only about 1,500 employees left out of the 7,397 employees who worked for Twitter at the time of the acquisition. (Ex. 2 - E. Musk Dep. at 334-35, Ex. 4 - Email from Hayes to Musk dated 11/2/2022 (identifying then-current Twitter population to be 7,397); Ex. 12 - Emails dated 5/16/2023.) Mr. Musk explained that, even then, he still felt that there were approximately 500 too many employees. (Ex. 2 E. Musk Dep. at 334-35; Ex. 12 - Emails dated 5/16/2023.)

Twitter admitted that there were delays getting terminated employees their final pay and expenses reimbursed following their terminations. (Ex. 6 - 30(b)(6) Dep. at 112). Mr. Adler did

not receive his final pay or expense reimbursement the day he was terminated. (Ex. 27 - Adler Dep. at 186-187)

## III.   LEGAL STANDARD

Rule 23 provides two steps for certifying a class action. Fed. R. Civ. P. 23. First, the plaintiff must establish the four prerequisites of Rule 23(a). *Valentino v. Carter-Wallace, Inc.*, 97 F.3d 1227, 1234 (9th Cir. 1996). Courts refer to these prerequisites as "numerosity, commonality, typicality and adequacy of representation." *See, e.g.*, *Mazza v. Am. Honda Motor Co.*, 666 F.3d 581, 588 (9th Cir. 2012).

Next, the plaintiff must show that the proposed class is proper under Rule 23(b). *Johnson v. City of Grants Pass*, 72 F.4th 868, 885 (9th Cir. 2023). A class is proper under Rule 23(b)(2) when the defendant "has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate" for the whole class. Fed. R. Civ. P. 23(b)(2). Rule 23(b)(3) allows class treatment when "questions of law or fact common to class members predominate over any questions affecting only individual members," and "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

## IV.   ARGUMENT

Plaintiff seeks to represent three classes:

(1)   All individuals who were employed by Twitter across the United States who were terminated following Elon Musk's purchase of Twitter and did not receive 60 days' notice as required by the federal WARN Act. (Am. Compl. ¶ 4).

(2)   All individuals who were employed by Twitter in California who were terminated following Elon Musk's purchase of Twitter and did not receive 60 days' notice as required by the California WARN Act. (Am. Compl. ¶ 5.)

(3)   All individuals who were employed by Twitter in California who did not receive their full final pay, benefits, and expense reimbursements on the day they were terminated. (Am. Compl. ¶ 5.)

Plaintiff's proposed classes satisfy Rule 23(a)'s prerequisites and are proper under Rule 23(b)(3).

**A.    The proposed classes satisfy Rule 23(a)'s prerequisites.**

**1.    *Numerosity***

To satisfy the numerosity requirement a proposed class must be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). "[I]mpracticability does not mean impossibility, but only the difficulty or inconvenience of joining all members of the class." *Harris v. Palm Springs Alpine Ests., Inc.*, 329 F.2d 909, 913–14 (9th Cir. 1964). "Although the requirement is not tied to any fixed numerical threshold, courts have routinely found the numerosity requirement satisfied when the class comprises 40 or more members." *Villalpando v. Exel Direct Inc.*, 303 F.R.D. 588, 605–06 (N.D. Cal. 2014)

In deciding whether to certify a smaller class, courts have considered "the geographical diversity of class members, the ability of individual claimants to institute separate suits, and whether injunctive or declaratory relief is sought." *Jordan v. Los Angeles Cnty.*, 669 F.2d 1311, 1319 (9th Cir.). For instance, the Central District of California has certified a class with 19 members "in the interests of judicial economy." *Escalante v. California Physicians' Serv.*, 309 F.R.D. 612, 618 (C.D. Cal. 2015).

Here, Defendants acknowledge that approximately forty (40) employees were terminated without receiving WARN Act notice in November 2022, with approximately half of those individuals being located in California. (Ex. 15 - Defs.' Interrog. Ans. Nos. 5, 7.) Yet Defendants' layoffs continued through at least May 2023. (Ex. 2 - E. Musk Dep. at 337-39; Ex. 16 - Emails between E. Musk and Batura dated 5/14/2023-5/15/2023.) Similarly, employees continued to be terminated allegedly for "cause" after November 2022, and they did not receive WARN Act notice. (*See* Ex. 6 - 30(b)(6) Dep. at 107, 121.) Consequently, there is little doubt that the total number of employees who were terminated without receiving WARN Act notice was greater than forty (40). (Ex. 8 - Conti Dep. at 104-05.)  Thus, Plaintiff's proposed class is numerous enough under Rule 23(a).

Similarly, with respect to the Labor Code claims, hundreds, if not thousands, of Twitter employees within California did not receive their final pay and reimbursements on the day of their termination.  Indeed, Defendants admit that there was delay in the reimbursement of expenses for exited employees. (Ex. 6 - 30(b)(6) Dep. at 112.) Moreover, there is no dispute that Defendants terminated hundreds of employees in California following Mr. Musk's acquisition of Twitter. (*See* Ex. 17 - Email dated 11/17/2022 re WARN Notice) Therefore, numerosity is met.[4]

### 2.    *Commonality*

"A class satisfies Rule 23's commonality requirement if there is at least one question of fact or law common to the class." *Johnson*, 72 F.4th at 887 (citing *Wang v. Chinese Daily News, Inc.*, 737 F.3d 538, 544 (9th Cir. 2013)). In assessing commonality, courts ask whether the putative class claims "depend upon a common contention—for example, the assertion of discriminatory bias on the part of the same supervisor." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). "That common contention, moreover, must be of such a nature . . . that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id.*

With respect to Plaintiff's federal and California WARN Act claims there is a common contention that Defendants immediately sought to reduce Twitter's headcount by as much as seventy-five percent (75%) or more after Mr. Musk purchased Twitter. (Ex. 2 - E. Musk Dep. at 262-63; Ex. 18 - Emails dated 10/30/2022 – 10/31/2022; Ex. 19 - X_ARBS_LLR_000000163.) In furtherance of these layoffs, Mr. Musk has acknowledged that employees continued to be terminated past the initial reduction in force that took place on November 4, 2022. (Ex. 2 - E. Musk Dep. at 33-40, 334-35; Ex. 6 - 30(b)(6) Dep. at 103-05.) Following that day (in which approximately half of Twitter's workforce was laid off, Ex. 4 -

---

[4]     As described in footnote 2, Plaintiff requested additional information related to numerosity during discovery, which Defendants have refused to provide.

Email Approving Layoffs dated 11/2/2022; Ex. 5 - Executive Overview dated 11/2/2022), Twitter continued its layoffs through several other methods.

One method was through Mr. Musk sending out an email to the remaining employees on November 16, 2022, in which he gave them a decision about whether to stay with the company or effectively take a voluntary layoff. (Ex. 2 - E. Musk Dep. at 33-34; Ex. 8 - Conti Dep. at 129; Ex. 7 - Fork in the Road Email dated 11/16/2022).  (Those employees *were* given WARN Act notice. (Ex. 8 - Conti Dep. at 100.)

Other methods through which Mr. Musk furthered the layoffs (but for which employees did *not* receive WARN Act notice) included his instructing his advisors that any employee who was not "excellent, critical, and put the company first" should be laid off. (Ex. 20 - Nordeen Dep. at 104-05.) To that end, Mr. Musk explicitly instructed his advisors to "exit anyone disloyal." (Ex. 10 - Text message from E. Musk to Davis; Ex. 2 - E. Musk Dep. at 267, 270-71; Ex. 21 - Davis Dep. at 89-90.) As a result, Defendants searched employees' Slack messages and social media posts for comments that were deemed critical of Mr. Musk. (Ex. 20 - Nordeen Dep. at 94-98; Ex. 3 - J. Musk Dep. at 156-60.) These employees, including Plaintiff, were fired allegedly for cause (Ex. 20 - Nordeen Dep. at 94-98; Ex. 3 - J. Musk Dep. at 156-60), even though Mr. Musk acknowledged during his deposition that employees should not be terminated simply because they questioned or disagreed with him (Ex. 2 - E. Musk Dep. at 270-71). Thus, there is a common question as to whether these individuals should have received WARN Act notice.[5]

Another method through which Mr. Musk furthered the layoffs (but for which employees did *not* receive WARN Act notice) was by using alleged performance issues, such

---

[5]     As noted above, Plaintiff contends that these terminations were part of the larger layoff. Courts have found that a dispute between the parties as to whether employees were terminated for cause or as part of a greater layoff in a WARN Act case does not foreclose class certification. *See e.g., Morton v. Vanderbilt Univ.*, 2014 WL 4657473, at *12-13 (M.D. Tenn. Sept. 17, 2014); *Mowat v. DJSP Enters., Inc.*, 2011 WL 13217002, at *4 (S.D. Fla. Aug. 23, 2011).

as failed "code review" exercises, as a further means of reducing the Company headcount. (Ex. 2 - E. Musk Dep at 34-35, 275-76; Ex. 8 - Conti Dep. at 133; Ex. 9 - A. Musk Dep. at 183-84, 188.) Each of these employees was originally deemed to be "excellent" as part of the initial November 4, 2022, reduction in force and thus were not laid off at that time. However, given that they were terminated shortly thereafter (within a month or two), when viewed in the context of Mr. Musk's larger goal of exiting at least 75% of the company, there is a common question about whether the employees who lost their jobs as a result of these alleged performance issues were part of the larger layoff and thus should have received WARN Act notice. *See Morton*, 2014 WL 4657473, at *12-13.

Finally, with respect to Plaintiff's claim for Twitter's failure to provide full final pay, benefits, and expense reimbursement upon termination, there is a common legal question as to whether employees were indeed entitled to these payments at the time of their termination. *See Dilts v. Penske Logistics, LLC*, 267 F.R.D. 625, 639-40 (S.D. Cal. 2010) (certifying a class of employees who were not reimbursed business expenses); Cal . Lab. Code §§ 201, 203, and 227.3.

### 3.   *Typicality*

Typicality asks whether "the claims or defenses of the representative parties are typical" of the class. Fed. R. Civ. P. 23(a)(3). Typicality is a "permissive standard[ ]." *Staton v. Boeing Co.*, 327 F.3d 938, 957 (9th Cir. 2003) (citation omitted). Courts consider whether class members have the "same or similar injury" caused by "the same course of conduct." *Parsons v. Ryan*, 754 F.3d 657, 685 (9th Cir. 2014) (citation omitted). "Thus, typicality refers to the nature of the claim or defense of the class representative, and not to the specific facts from which it arose or the relief sought." *Id.* (cleaned up).

As the Supreme Court recognized in *Wal–Mart*, Rule 23(a)'s commonality and typicality requirements "tend to merge." 564 U.S. at 350 n.5. "Both serve as guideposts for determining whether under the particular circumstances maintenance of a class action is

economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence." *Id.*

Plaintiff and the putative class members suffered the same injury—60 days pay and delayed final pay and expense reimbursement—resulting from the same course of conduct— Twitter's failure to provide WARN Act notice or to timely pay and reimburse expenses to terminated employees. Thus, the proposed class meets Rule 23(a)'s typicality standard. *See Mowat*, 2011 WL 13217002, at *4 (granting class certification and finding defendants' concerns about potential individualized issues, such as poor work performance, do not destroy typicality).

### 4.    Adequacy

The fourth Rule 23(a) prerequisite requires that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23 (a)(4). "Rule 23(a)(4) is satisfied if the proposed representative plaintiff does not have conflicts of interest with the proposed class and if the proposed class is represented by qualified and competent counsel." *Champagne*, 2018 WL 11471583, at *7 (citing *Ellis v. Costco Wholesale Corp.*, 285 F.R.D. 492, 535 (N.D. Cal. 2012)). Because Plaintiff has no conflicts of interest, and because the proposed class is represented by qualified and competent counsel who are widely recognized as a leading employment class action firm, this requirement is met.

First, there is no potential conflict between the named Plaintiff and the other class members since he is challenging practices applied uniformly to all class members, including himself. As set forth above in the typicality section, the named Plaintiff's interests do not differ from — and instead are entirely in alignment with — those of each class in that he seeks to benefit the proposed class by pursuing their rights to payment for Defendants' violations of the federal and California WARN Acts, as well as payment for unreimbursed expenses.

Plaintiff has also retained counsel with extensive expertise and experience in prosecuting both class actions and mass arbitrations on behalf of employees. In fact, this Court — like other courts across the nation — has previously appointed Plaintiff's counsel, Shannon

Liss-Riordan, as class counsel while extolling her qualifications to serve in such a position. *See, e.g.*, *O'Connor v. Uber Techs., Inc.*, 2015 WL 5138097, at *36 (N.D. Cal. Sept. 1, 2015), *rev'd and remanded on other grounds,* 904 F.3d 1087 (9th Cir. 2018) ("Uber does not even argue that Ms. Liss-Riordan is unqualified to represent these Plaintiffs, and any such argument would be without merit. The Court knows Ms. Liss-Riordan to be a capable advocate, and further notes that she is a leading practitioner in the field of employment [law] both in this District and nationwide….."); *James v. Uber Techs.*, Case No. 3:19-cv-06462, Order re Plaintiffs' Motion for Class Certification (N.D. Cal. Jan. 26, 2021); *Roman v. Jan-Pro Fran. Int'l., Inc.*, 342 F.R.D. 274, 290 (N.D. Cal. 2022) (similarly appointing Liss-Riordan and her firm as Class Counsel) (summary judgment granted in favor of certified class, in case that plaintiffs prevailed on in Ninth Circuit and California Supreme Court); *Gonzales v. Hilton*, Case No. 4:14-cv-01523-JSW, Order re Plaintiffs' Motion for Class Certification (N.D. Cal. Jan. 3, 2022) (certifying class and appointing Plaintiff's counsel as Class Counsel in a case whose dismissal was successfully reversed at the Ninth Circuit); *John Ordono, v. Marriott International Inc.*, CGC-16-550454, Order Re Plaintiffs' Motion for Class Certification (Cal. Sup. Ct. Sept. 17, 2021) (similarly appointing Liss-Riordan and her firm as Class Counsel) (resulting in verdict for certified class following 2023 trial). Moreover, her firm, Lichten & Liss-Riordan, P.C. has been widely recognized as one of the leading plaintiffs' firms representing workers, and Attorney Liss-Riordan has been recognized as one of the top plaintiffs' lawyers nationally for her work on behalf of workers in class actions.[6] Thus, Plaintiff and his counsel have satisfied the requirements of Rule 23(a)(4).

---

[6]     *See, e.g.*, Liane Jackson, "America's Top 200 Lawyers," FORBES (March 26, 2024) (listing Shannon Liss-Riordan as one of the top 200 attorneys in the United States) (attached as Ex. 23); Michael Rafalowich, "Benchmark US 2020 awards" BENCHMARK LITIGATION (Feb. 27, 2020) (naming Shannon Liss-Riordan "Labor & Employment Employee-Side Attorney of the Year") (attached as Ex. 24); Diana Kapp, "Uber's Worst Nightmare," SAN FRANCISCO MAGAZINE (May 18, 2016) (attached as Ex. 25); Katie Johnson, "Lawyer Fights for Low Wage Workers' Rights," BOSTON GLOBE (Dec. 23, 2012) (attached as Ex 26).

**B.      The proposed classes are maintainable under Rule 23(b)(3).**

Two conditions must be met to maintain a class under Rule 23(b)(3). First, "questions of law or fact common to class members [must] predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3). Second, "a class action [must be] superior to other available methods for fairly and efficiently adjudicating the controversy. *Id.*

### 1.      *Common questions predominate over questions affecting individual class members.*

The "predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Anchem Prod., Inc. v. Windsor*, 521 U.S. 591, 623 (1997). The requirement is "merely that common issues predominate, not that all issues be common to the class." *Smilow v. Southwestern Bell Mobile Systems, Inc.*, 323 F.3d 32, 39 (1st Cir. 2003). "Because no precise test can determine whether common issues predominate, the court must pragmatically assess the entire action and the issues involved." *Chun-Hoon v. McKee Foods Corp.*, 2006 WL 3093764, *2 (N.D. Cal. Oct. 31, 2006). "A court evaluating predominance must determine whether the elements necessary to establish liability are susceptible to common proof or, if not, whether there are ways to manage effectively proof of any element that may require individualized evidence." *Villalpando v. Exel Direct Inc.*, 303 F.R.D. 588, 608 (N.D. Cal. 2014). "When common questions present a significant aspect of the case and they can be resolved for all members of the class in a single adjudication, there is clear justification for handling the dispute on a representative rather than on an individual basis." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1022 (9th Cir. 1998) (citation omitted); *see also In re Univ. of S. California Tuition & Fees COVID-19 Refund Litig.*, --- F.Supp.3d ---, 2023 WL 6453814 (C.D. Cal. Sept. 29, 2023) (certifying class of implied contract claims because students had received same promise of in-person education, albeit from different sources).

Here, common questions of law and fact will predominate. Specifically, the case will focus on whether: (1) the class members' terminations were part of Defendants' mass layoffs;

MOTION FOR CLASS CERTIFICATION
Case No. 3:23-cv-01788-JD

(2) Defendants provided the class members with 60 days' notice under the federal and California WARN Acts; and (3) Defendants otherwise adequately compensated the class members in lieu of notice. *See Etzelberger v. Fisker Automotive, Inc.*, 300 F.R.D. 378, 384 (C.D. Cal. 2013); *Morton*, 2014 WL 4657473, at *12-13 (granting certification of class under the WARN Act where the employer fabricated performance issues as a ruse to intentionally avoid the WARN Act's obligations and requirements). Likewise, whether Defendants were required to issue final pay and expense reimbursement to terminated employees in California on their final day of work is a common question for every member of that class. *See Local Joint Exec. Bd. of Culinary/Bartender Trust Fund v. Las Vegas Sands, Inc.*, 244 F.3d 1152, 1163 (9th Cir. 2001) (finding plaintiffs met predominance in part because all class members share a common interest in whether wage payments were timely made). As such, common issues predominate on all of Plaintiff's claims, and class treatment is appropriate.

>    **2.     A class action is the superior mechanism for addressing the drivers' claims.**

The superiority requirement is designed to ensure the "'vindication of the rights of groups of people who individually would be without effective strength to bring their opponents to court at all.'" *Anchem Prods.*, 512 U.S. at 617.  A district court has "broad discretion" in determining whether class treatment is superior.  *Kamm v. Cal. City Dev. Co.*, 509 F.2d 205, 210 (9th Cir. 1975).  The following factors are pertinent to this analysis:

>    (A) the class members' interest in individually controlling the prosecution or defense of separate actions;
>    (B) the extent and nature of any litigation concerning the controversy already begun by or against class members;
>    (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and
>    (D) the likely difficulties in managing a class action.

*See* Fed. R. Civ. P. 23(b)(3).  Here, a class action is clearly a superior method. It would be grossly inefficient to require each employee to bring a case challenging these practices individually, resulting in increased expense, duplication of discovery, and potential for inconsistent results.  Even if damage issues require individualized assessments, the efficiencies

gained by use of a class action for common questions will ultimately benefit all of the class members, and Defendants, by dramatically reducing litigation expenses.  Moreover, the fact that individual employees might not vindicate their statutory rights would undermine the effectiveness of those rights, which protect workers and ensure fair competition. *See Martin v. Tango's Restaurant, Inc.*, 969 F.2d 1319, 1324 (1st Cir. 1992) (recognizing that employment laws are "intended to protect complying competitors of the defendants, in addition to making the employee whole").

Moreover, "class adjudication is superior in the employment context because fear of employer retaliation may have a chilling effect on employees bringing claims on an individual basis." *Overka v. American Airlines, Inc.*, 265 F.R.D. 14, 24 (D. Mass. 2010).  Indeed, numerous courts have held that class actions are superior in employment cases because of the prospect of retaliation. *See e.g., Perez v. Safety-Kleen Systems,Inc.*, 253 F.R.D. 508, 520 (N.D. Cal. 2008).  Here, given Mr. Musk's penchant for attacking employees on social media (*see e.g.,* Ex. 2 - E. Musk Dep. at 323-325), retaliation is a real concern. Permitting Plaintiff to prosecute his claims on behalf of the proposed class meets these challenges and provides a superior method of resolving the claims of the putative class members.

### C. The presence of arbitration agreements among putative class members does not preclude certification.

Twitter may argue that putative class members' agreement to arbitrate their claims precludes certification. To this end, Twitter may cite the Arbitration Agreements that employees sign as part of their onboarding.[7] Twitter may contend, for example, that Plaintiff's

---

[7]     A sample Arbitration Agreement is available at ECF No. 1-1 in *Ma v. Twitter, Inc., et al.*, Case No. 3:23-cv-03301 (N.D. Cal.).  Notably, Plaintiff's counsel filed a petition to compel arbitration in the *Ma* case, since Twitter has failed to participate in most of the 2,000 arbitrations that Plaintiff's counsel have filed against it on behalf of former employees.  Given Twitter's failure to participate in arbitration for so many employees, there is a real question as to whether it has waived its right to compel arbitration – an issue that could be addressed following class certification, should Twitter move to compel arbitration for class members (after they have become part of the case, through class certification).

claims and defenses are not typical of the class because he opted out of arbitration under Twitter's Arbitration Agreement. This argument should be rejected.

To that end, this Court has recognized that the existence of arbitration agreements among putative class members does not defeat typicality if the class representative is not subject to arbitration. *Nitsch v. Dreamworks Animation SKG Inc.*, 315 F.R.D. 270, 284 (N.D. Cal. 2016) (citing other precedent). "More generally, defenses that may bar recovery for some members of the putative class, but that are not applicable to the class representative do not render a class representative atypical under Rule 23." *Barnes v. AT & T Pension Benefit Plan-Nonbargained Program*, 270 F.R.D. 488, 494 (N.D. Cal. 2010), *modified*, 273 F.R.D. 562 (N.D. Cal. 2011).

Moreover, under the caselaw, courts are to consider class certification prior to considering whether to compel arbitration of class members who may be bound by arbitration agreements. Those class members are not even formally before the Court at this time, and so considering the arbitration agreements at this time would be premature. *Chen-Oster v. Goldman, Sachs & Co.*, 449 F. Supp. 3d 216, 234–35 (S.D.N.Y. 2020) (collecting cases); *Rushing v. Williams-Sonoma, Inc.*, 2020 WL 6787135, at *2–3 (N.D. Cal. Oct. 8, 2020) ("[The defendant] could not move to arbitrate claims against [the plaintiff] or against unnamed class members before class certification. Accordingly, it did not have an existing right to compel arbitration and could not have acted inconsistently with that right."); *Jensen v. Cablevision Sys. Corp.*, 372 F. Supp. 3d 95, 123 (E.D.N.Y. 2019) ("This [c]ourt will not compel absent putative class members who are not before this [c]ourt to binding arbitration or issue a ruling regarding the enforceability of the provision. Any such ruling is procedurally improper and analogous to an advisory opinion."); *see also Gutierrez v. Wells Fargo Bank, NA*, 889 F.3d 1230, 1238 (11th Cir. 2018) ("[I]t cannot be said that [the defendant's] failure to seek arbitration with the unnamed class members prior to class certification manifested inconsistency with its arbitration rights, considering that it would have been impossible in practice to compel arbitration against

speculative plaintiffs and jurisdictionally impossible for the [d]istrict [c]ourt to rule on those motions before the class was certified."); *Jackson v. Aliera Companies*, 2020 WL 4787990, at *4 (W.D. Wash. Aug. 18, 2020) ("[D]istrict courts within this [c]ircuit have determined that a party cannot move to compel putative class members to arbitration prior to class certification because putative class members are not parties to the action." (collecting cases)); *In re Ductile Iron Pipe Fittings ("DIPF") Direct Purchaser Antitrust Litig.*, 2016 WL 5508843, at *2 (D.N.J. Sept. 28, 2016) ("The issue should be addressed when all parties to the lawsuit are known and the specific arbitration agreements that [the] [d]efendant wishes to enforce can be identified. It is not appropriate for the [c]ourt to exclude potential class members from this class action and deprive those individuals of their day in court prior to their being made a party in this case."); *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 2011 WL 1753784, at *4 (N.D. Cal. May 9, 2011) ("It does not appear to the [c]ourt that defendants could have moved to compel arbitration against such entities prior to the certification of a class in this case because, as defendants point out, 'putative class members are not parties to an action prior to class certification.' " (quoting *Saleh v. Titan Corp.*, 353 F. Supp. 2d 1087, 1091 (S.D. Cal. 2004)).

## V.    CONCLUSION

For the foregoing reasons, the Court should certify the following classes:

(1)      All individuals who were employed by Twitter across the United States who were terminated following Elon Musk's purchase of Twitter and did not receive 60 days' notice as required by the federal WARN Act;

(2)      All individuals who were employed by Twitter in California who were terminated following Elon Musk's purchase of Twitter and did not receive 60 days' notice as required by the California WARN Act;

(3)      All individuals who were employed by Twitter in California who did not receive their full final pay, benefits, and expense reimbursement the same day they were terminated.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Respectfully submitted,

EITAN ADLER, on behalf of himself and all others similarly situated,

By his attorneys,

/s/ Shannon Liss-Riordan
Shannon Liss-Riordan (SBN 310719)
*sliss@llrlaw.com*
Bradley Manewith (*pro hac vice*)
*bmanewith@llrlaw.com*
LICHTEN & LISS-RIORDAN, P.C.
729 Boylston Street, Suite 2000
Boston, MA 02116
Tel: (617) 994-5800
Fax: (617) 994-5801

Dated: July 12, 2024

1

## **CERTIFICATE OF SERVICE**

I, Shannon Liss-Riordan, hereby certify that a true and accurate copy of this document was served on counsel for Defendants Twitter, Inc. and X Corp. via the CM/ECF system on July 12, 2024.


/s/ Shannon Liss-Riordan
Shannon Liss-Riordan