1  MORGAN, LEWIS & BOCKIUS LLP
   Eric Meckley, Bar No. 168181
2  eric.meckley@morganlewis.com
   Brian D. Berry, Bar No. 229893
3  brian.berry@morganlewis.com
   One Market, Spear Street Tower
4  San Francisco, CA  94105-1596
   Tel:    +1.415.442.1000
5  Fax:    +1.415.442.1001

6  MORGAN, LEWIS & BOCKIUS LLP
   Ashlee N. Cherry, Bar No. 312731
7  ashlee.cherry@morganlewis.com
   Kassia Stephenson, Bar No. 336175
8  kassia.stephenson@morganlewis.com
   1400 Page Mill Road
9  Palo Alto, CA  94304
   Tel:    +1.650.843.4000
10 Fax:    +1.650.843.4001

11 Attorneys for Defendant
   X CORP. f/k/a TWITTER, INC.
12

13              UNITED STATES DISTRICT COURT

14             NORTHERN DISTRICT OF CALIFORNIA

15

16 EITAN ADLER, on behalf of            Case No. 3:23-cv-01788-JD
   himself and all others similarly situated,
17                                       **DEFENDANT'S OPPOSITION TO**
                   Plaintiffs,           **PLAINTIFF'S MOTION FOR CLASS**
18                                       **CERTIFICATION**

19        v.                             Date:     October 10, 2024
                                         Time:     10:00 a.m.
20 TWITTER, INC. and X CORP.,            Judge:    Hon. James Donato

21                 Defendants

22

23

24

25

26

27

28

# TABLE OF CONTENTS

Page

I.     INTRODUCTION .................................................................................................... 1

II.    PLAINTIFF'S CLAIMS ......................................................................................... 2

III.   FACTUAL BACKGROUND .................................................................................. 3

    A.    Reductions In Force ("RIFs") in 2022 and After, and Twitter 2.0 Opt-Outs. ........ 3

    B.    Terminations for Cause .......................................................................... 3

        1.    Plaintiff Adler's Individual Termination ................................... 4

        2.    Other Individualized For-Cause Employee Terminations……………....…6

    C.    Almost All of the Putative Class Members Signed Arbitration Agreements ......... 8

IV.   LEGAL STANDARD ............................................................................................ 8

V.    THE COURT SHOULD NOT CERTIFY THE WARN ACT CLASSES ........................ 9

    A.    Plaintiff Fails to Prove Commonality as to the WARN Act Classes. ................... 10

    B.    Plaintiff Has Failed to Prove Predominance and Superiority. ............................ 12

        1.    Analyses of Individualized Termination Reasons Defeat Predominance. ............................................................................ 12

        2.    Plaintiff Has Failed to Demonstrate that a Class Action Is Superior. ........ 14

    C.    Plaintiff Is Atypical and Inadequate Due to the Above and Due to His DRA Opt-Out. .............................................................................................. 15

    D.    Numerosity Is Lacking Since Nearly the Whole Class Is Bound by DRAs. ......... 17

VI.   PLAINTIFF'S WAITING TIME PENALTY CLASS FAILS UNDER RULE 23.......... 18

    A.    Plaintiff's Class Is Not Ascertainable and Is an Improper Fail-Safe Class........... 18

    B.    Plaintiff and the Class Lack Standing Given the Lack of Proof of Harm............ 19

        1.    Late Expense Reimbursements Are Not Legally Cognizable.................. 20

        2.    Plaintiff Presented No Proof of Any Common Policy of Late Payment. ......................................................................................... 20

    C.    Lack of Proof, Plaintiff's DRA Opt-Out, and "Willfulness" Bar Rule 23(a) Showing. .............................................................................................. 21

        1.    Plaintiff Lacks Proof of Commonality, and Individual Issues Abound. ............................................................................................. 21

        2.    Typicality and Adequacy Fail Along with Commonality. ...................... 23

    D.    Proof Failures and Individual Issues Defeat Predominance and Superiority........ 23

    E.    Plaintiff Fails to Prove Numerosity Given His Lack of Demonstrable Harms. ................................................................................................. 24

VII.  PLAINTIFF CANNOT EXCUSE HIS LACK OF DILIGENCE IN DISCOVERY........ 24

VIII. CONCLUSION ................................................................................................... 25

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**CASES**

*Alvarez v. City of Oxnard*,
  2020 WL 8461470 (C.D. Cal. Dec. 17, 2020) ........................................................................ 19

*Amchem Prod., Inc. v. Windsor*,
  521 U.S. 591 (1997) .............................................................................................................. 12

*Anderson v. Central Refrig. Serv., LLC*,
  2017 WL 11635450 (C.D. Cal. July 6, 2017) ....................................................................... 24

*Avilez v. Pinkerton Government Services, Inc.*,
  596 F. App'x 579 (9th Cir. 2015) ................................................................................... 16, 17

*Berman v. Freedom Fin. Network, LLC*,
  400 F. Supp. 3d 964 (N.D. Cal. 2019) ........................................................................... 16, 17

*Berry v. Baca*,
  226 F.R.D. 398 (C.D. Cal. 2005) .......................................................................................... 18

*Borodaenko, et al. v. Twitter, Inc.*,
  Case No. 4:22-cv-07226-HSG ............................................................................................... 16

*Castillo v. Bank of Am., NA*,
  980 F.3d 723 (9th Cir. 2020) ................................................................................................. 20

*Cleveland v. Groceryworks.com, LLC*,
  2016 WL 4140504 (N.D. Cal. Aug. 4, 2016) ........................................................................ 22

*Comcast Corp. v. Behrend*,
  569 U.S. 27 (2013) .................................................................................................... 9, 11, 15

*Conde v. Open Door Marketing*,
  223 F. Supp. 3d 949 (N.D. Cal. 2017) .................................................................................. 17

*Cordoba v. DIRECTV, LLC*,
  942 F.3d 1259 (11th Cir. 2019) ............................................................................................. 20

*Cornet, et al. v. Twitter, Inc.*,
  Case No. 3:22-cv-06857-JD ................................................................................................... 16

*Delgado v. Marketsource, Inc.*,
  2018 WL 6706041 (N.D. Cal. Dec. 20, 2018) ......................................................... 22, 23, 24

*Dilts v. Penske Logistics, LLC*,
  267 F.R.D. 625 (S.D. Cal. 2010) .......................................................................................... 22

*Drumm v. Morningstar, Inc.*,
   695 F. Supp. 2d 1014 (N.D. Cal. 2010) ................................................................ 20

*Erica P. John Fund, Inc. v. Halliburton Co.*,
   563 U.S. 804 (2011) ............................................................................................... 9

*Etzelberger v. Fisker Automotive, Inc.*,
   300 F.R.D. 378 (C.D. Cal. 2013) ......................................................................... 14

*Feske v. MHC Thousand Trails Ltd. P'ship*,
   2013 WL 1120816 (N.D. Cal. Mar. 18, 2013) ........................................... 15, 16, 23

*Gen. Tel. Co. of Sw. v. Falcon*,
   457 U.S. 147 (1982) ........................................................................................ 9, 15

*Gonzalez v. Millard Mall Serv., Inc.*,
   281 F.R.D. 455 (S.D. Cal. 2012) .................................................................... 22, 23

*Gunderson v. Alta Devices, Inc.*,
   2021 WL 4461569 (N.D. Cal. Sept. 29, 2021) ........................................................ 9

*Hamm v. Mercedes-Benz USA, LLC*,
   2021 WL 1238304 (N.D. Cal. Apr. 2, 2021) ......................................................... 19

*Hanon v. Dataproducts Corp.*,
   976 F.2d 497 (9th Cir. 1992) .......................................................................... 16, 23

*In re Taco Bell Wage and Hour Actions*,
   2011 WL 4479730 (E.D. Cal. Sept. 26, 2011) .................................................. 22, 23

*Jensen v. Cablevision Systems Corp.*,
   372 F. Supp. 3d 95 (E.D.N.Y. Feb. 27, 2019) ...................................................... 17

*Kamar v. RadioShack Corp.*,
   375 F. App'x 734 (9th Cir. 2010) ......................................................................... 19

*Kane v. Chobani, Inc.*,
   973 F. Supp. 2d 1120 (N.D. Cal. 2014) ................................................................ 19

*Lara v. First Nat'l Ins. Co. of Am.*,
   25 F.4th 1134 (9th Cir. 2022) ............................................................. 2, 12, 13, 14

*Leyva v. Medline Industries Inc.*,
   716 F.3d 510 (9th Cir. 2013) ............................................................................... 23

*Mantolete v. Bolger*,
   767 F.2d 1416 (9th Cir. 1985) ............................................................................. 25

*Martin v. Tango's Restaurant, Inc.*,
   969 F.2d 1319 (1st Cir. 1992) ............................................................................. 15

*Mays v. Wal-Mart Stores, Inc.*,
    804 F. App'x 641 (9th Cir. 2020) ........................................................................ 20

*Mazza v. Am. Honda Motor Co., Inc.*,
    666 F.3d 581 (9th Cir. 2012)........................................................................... 8, 20

*Montoya v. City of San Diego*,
    2021 WL 2350927 (S.D. Cal. June 9, 2021) ........................................................ 18

*Morton v. Vanderbilt University*,
    2014 WL 4657473 (M.D. Tenn. Sept. 17, 2014) ............................................ 12, 14

*Mowat v. DJSP Enterprises, Inc.*,
    2011 WL 13217002 (S.D. Fla. Aug. 23, 2011)..................................................... 12

*Naranjo v. Spectrum Sec. Servs., Inc.*,
    15 Cal. 5th 1056 (2024) ....................................................................................... 22

*Nitsch v. Dreamworks Animation SKG, Inc.*,
    315 F.R.D. 270 (N.D. Cal. 2016) ......................................................................... 17

*Nordstrom Comm. Cases*,
    186 Cal. App. 4th 576 (2010).............................................................................. 22

*O'Connor v. Uber Techs., Inc.*,
    904 F.3d 1087 (9th Cir. 2018)............................................................................. 17

*O'Shea v. Littleton*,
    414 U.S. 488 (1974).............................................................................................. 20

*Olean Wholesale Grocery Cooperative, Inc. v. Bumble Bee Foods LLC*,
    31 F.4th 651 (9th Cir. 2022)................................................................................ 20

*Overka v. American Airlines, Inc.*,
    265 F.R.D. 14 (D. Mass. 2010) ........................................................................... 15

*Pace v. PetSmart Inc.*,
    2014 WL 2511297 (C.D. Cal. June 3, 2014) ....................................................... 24

*Paycom Payroll, LLC v. Read*,
    2020 WL 13505041 (S.D. Cal. Feb. 12, 2020) .................................................... 20

*Perez v. Safety-Kleen Systems, Inc.*,
    253 F.R.D. 508 (N.D. Cal. 2008) ......................................................................... 15

*Schwartz v. Upper Deck Co.*,
    183 F.R.D. 672 (S.D. Cal. 1999).......................................................................... 24

*Stiner v. Brookdale Senior Living, Inc.*,
    665 F. Supp. 3d 1150 (N.D. Cal. 2023) ............................................................... 25

*Tan v. Grubhub, Inc.*,
    2016 WL 4721439 (N.D. Cal. July 19, 2016) ......................................................................... 17

*Townsend v. Monster Beverage Corp.*,
    303 F. Supp. 3d 1010 (C.D. Cal. 2018)................................................................................... 25

*TransUnion LLC v. Ramirez*,
    141 S. Ct. 2190 (2021) ............................................................................................................ 20

*Valencia v. VF Outdoor, LLC*,
    2021 WL 5154161 (E.D. Cal. Nov. 5, 2021) ............................................................. 16, 17, 23

*Valentino v. Carter–Wallace, Inc.*,
    97 F.3d 1227 (9th Cir. 1996)............................................................................................ 15, 23

*Vaquero v. Ashley Furniture Industries, Inc.*,
    2013 WL 12172124 (C.D. Cal. June 17, 2013) ..................................................................... 24

*Velasquez v. HSBC Fin. Corp.*,
    2009 WL 112919 (N.D. Cal. Jan. 16, 2009) .................................................................... 10, 19

*Vinole v. Countrywide Home Loans, Inc.*,
    571 F.3d 935 (9th Cir. 2009)................................................................................................... 14

*Wal-Mart Stores, Inc. v. Dukes*,
    564 U.S. 338 (2011) .......................................................................................................... passim

*Walker v. Life Ins. Co. of the Sw.*,
    953 F.3d 624 (9th Cir. 2020)................................................................................................... 18

*Wilson v. Pactiv LLC*,
    2021 WL 5818492 (C.D. Cal. Dec. 3, 2021) ......................................................................... 25

**STATUTES**

29 U.S.C. § 2101(a)(3) ................................................................................................................... 10

29 U.S.C. § 2101(a)(6) ..................................................................................................................... 9

29 U.S.C. § 2101 *et seq.* .................................................................................................................. 2

29 U.S.C. § 2102(a) ......................................................................................................................... 9

29 U.S.C. § 2102(d) ....................................................................................................................... 10

Cal. Lab. Code § 201 ........................................................................................................................ 3

Cal. Lab. Code § 203....................................................................................................................passim

Cal. Lab. Code § 227.3...................................................................................................................... 3

Cal. Lab. Code § 1400 *et seq.* ............................................................................... 2, 9

Cal. Lab. Code § 1400.5(a) ..................................................................................... 10

Cal. Lab. Code § 1400.5(c) ..................................................................................... 10

Cal. Lab. Code § 1400.5(d) ..................................................................................... 10

Cal. Lab. Code § 1400.5(f) ....................................................................................... 9

Cal. Lab. Code § 1402(a) .......................................................................................... 9

Cal. Lab. Code § 2698 *et seq.* .................................................................................. 3

Fed. R. Civ. P. 23 ............................................................................................. passim

Fed. R. Civ. P. 23(b)(3) ............................................................................................. 9

Fed. R. Civ. P. 23(c)(2) ........................................................................................... 19

Freedom of Information Act ....................................................................................... 6

**OTHER AUTHORITIES**

Cornet, NLRB Case No. 20-CA-306745 (2023) ....................................................... 6

Feinman, NLRB Case No. 02-CA-308119 (2023) ..................................................... 6

1   **I.      <u>INTRODUCTION</u>**

2          Plaintiff's Motion for Class Certification ("Motion") seeks to certify three sweeping and ill-

3   defined classes that include *every* employee terminated for cause, for *any* reason, at *any* time over

4   the last 20 months.[1] Faced with the undisputed fact that employees terminated for cause are not

5   entitled to WARN notice under the law, the Motion is premised upon an implausible theory that

6   every employee terminated for cause – regardless of the specific facts and circumstances of their

7   individual termination – was part of a stealth layoff, and thus entitled to WARN notice.

8          However, adjudicating the specific reasons for each employee's termination – and whether

9   they were terminated for cause or not – would require a highly individualized inquiry into the

10  underlying facts of each termination and result in an unwieldy series of minitrials.  This would be

11  antithetical to the very purpose of class certification.  Plaintiff's purported "common question" –

12  *i.e.*, "whether these employees, who were allegedly terminated for 'cause'…were simply laid off

13  as part of Defendants' general goal of drastically reducing headcount" (Mot. at 1) – is not common

14  at all, and in that respect is indistinguishable from questions that the Supreme Court in *Wal-Mart*

15  *Stores, Inc. v. Dukes*, 564 U.S. 338 (2011) held insufficient under Rule 23.  Here, as in *Dukes*, "the

16  crux of the inquiry is 'the reason for a particular employment decision.'"  564 U.S. at 349-50, 352.

17  And, just like the plaintiffs in *Dukes*, 564 U.S. at 352, who had no way to present a common answer

18  to the question, "*[W]hy was I disfavored[?]*," Plaintiff here has no common proof that could resolve

19  the question, "Was I terminated for cause or not?" for each employee in the proposed classes.  This

20  Court recognized this very problem when it noted at the August 24, 2023, CMC:

21          So I'm just – class cert is way down the road.  I'm not going to prejudge
            anything.  But, you know, *typically claims of being fired for cause are quite unique*
22          *and highly individualized*.  I mean, *how are you – what are you thinking about why*
            *this might be a class?*
23

24  *See* ECF No. 37 (Trans. of 8/24/2023 CMC) at 6:5-9 (emphasis added).

25          These myriad individualized inquiries also prevent any showing of predominance and

26

---

27  [1] The putative classes expressly *exclude* the thousands of employees to whom X provided
    compliant notice under the federal and California Worker Adjustment and Retraining Notification
28  ("WARN") Acts in connection with the RIFs it conducted.  The classes include *only* those former
    employees terminated for cause (who thus were not entitled to WARN notice).  *See* Mot. at 5.

superiority.  In addition, the Motion is fatally flawed as to the typicality, adequacy, and numerosity criteria because Plaintiff opted out of arbitration with Defendant X Corp. ("X" or the "Company"), unlike approximately 70% of the putative class who did *not* opt out and remain bound to the arbitration agreement and its class waiver provision (which this Court has already considered and found enforceable).  Setting aside persons with binding arbitration agreements leaves only about 35 putative class members.

Plaintiff's third proposed class consists of every separated California employee (not even limited to for-cause terminations) who was not paid "full final pay, benefits, and expense reimbursements" on their termination date.  *See* Mot. at 5.  This proposed class cannot be certified for several reasons.  *First*, it is an improper "fail-safe" class that requires an adjudication of the merits to determine inclusion in the class.  *Second*, it is not ascertainable and lacks clarity as to what "full" payments he claims were not timely made; whether they are limited to "pay in lieu of WARN notice" (thus entirely derivative of his WARN Act claims) or include other disputed amounts; and how any payment, timing and entitlement issues could be determined for each individual class member, let alone classwide.  *Third*, Plaintiff and the putative class lack Article III standing because there is no evidence that *any* putative class member received *any* late payment(s), much less proof of a uniform policy of late payments.  *Fourth*, Plaintiff's lack of proof as to any injury-in-fact, or any uniform policy, defeats commonality, adequacy, typicality, predominance, superiority, and numerosity.  And his opt-out from his arbitration agreement further renders him atypical and inadequate and negates numerosity.  *Finally*, proving liability for waiting time penalties under California Labor Code § 203 requires individualized inquiries regarding whether X *willfully* made a late payment to each individual employee or had a *good faith dispute*, based in law or fact, as to whether any unpaid amounts were owed.

The Court should deny Plaintiff's Motion in its entirety.

## II.   PLAINTIFF'S CLAIMS

On April 13, 2023, Plaintiff filed an Amended Class Action Complaint alleging: (1) violation of the federal WARN Act, 29 U.S.C. § 2101 *et seq.*; (2) violation of the California WARN Act, Cal. Lab. Code § 1400 *et seq.*; (3) a claim for alleged "failure to provide employees'

final pay and benefits on the same day that they were terminated, in violation of the California Labor Code §§ 201, 203, and 227.3"; and (4) a claim under the Private Attorneys General Act, Cal. Lab. Code §§ 2698 *et seq.* ECF No. 3 at pp. 2, 5-6.

### III.  FACTUAL BACKGROUND

#### A.  Reductions In Force ("RIFs") in 2022 and After, and Twitter 2.0 Opt-Outs.

Upon its acquisition in late October 2022, the Company faced imminent financial peril and implemented cost-saving measures, including significant layoffs.  Declaration of Brian D. Berry ("Berry Decl."), ¶ 3, Ex. 1 (E. Musk Dep. 22:6-25, 26:1-6).  Twitter previously had plans to lay off about 16% of the workforce but put them on hold pending the acquisition.  *Id.*, ¶ 4, Ex. 2 (Hayes Dep. 53:17-57:14).  Initial layoffs occurred on November 4, 2022, with at least 10 more layoff rounds through around May 2023.  Mot. at 2-3; Mot. Ex. 2 (E. Musk Dep.) at 33:18-21; Mot. Ex. 6 (L. Wegman Dep.) at 19:18-22, 102:8-105:18.  ***All employees laid off in these multiple RIFs received compliant WARN Act notices***.  Mot. at 3; Mot. Ex. 6 (Wegman Dep.) at 105:2-7; Mot. Ex. 8 (Conti Dep.) at 102:21-103:6.

On November 16, 2022, Twitter employees received an email from Elon Musk stating that to build a "breakthrough Twitter 2.0 and succeed in an increasingly competitive world," Twitter needed to become more engineering-driven and its employees would need to deliver exceptional performance.  Berry Decl., Ex. 1 (E. Musk Dep.) at 146:22-147:24; Mot. Ex. 7.  Those who wanted to "be part of the new Twitter" could click "yes," and those who did not voluntarily resigned.  Berry Decl., Ex. 1 (E. Musk Dep.) at 146:22-147:24.  The Company also gave those who resigned WARN notices stating: "While it is not clear at this time whether the WARN Act or similar state law applies to you or to the layoff described in this notice, and the Company does not concede that it does, we are giving you this notice to comply with any applicable legal obligations the Company may have."  Mot. at 3; Berry Decl. ¶ 10, Ex. 8 (Wegman Dep.) at 24:5-25:3; *id.*, ¶ 5, Ex. 3 (Twitter 2.0 Opt-Out WARN Act Notice).

#### B.  Terminations for Cause

Between October 27, 2022, and July 28 2024, X fired approximately 115 employees for cause.  Declaration of Aoife Fenelon ("Fenelon Decl.") ¶ 3.  The specific grounds for these "for-

cause" terminations varied widely depending upon the individual and ranged from gross insubordination to insider threat/security risks to simply poor job performance.  *See* Mot. Ex. 3 (J. Musk Dep.) at 159:12-160:16; Mot. Ex. 9 (A. Musk Dep.) at 183:18-184:8, 186:21-187:13; Mot. Ex. 2 (E. Musk Dep.) at 38:19-41:20. The Company did not provide WARN Act notice to these employees because they were terminated for cause, as opposed to being laid off in a RIF, and thus were not entitled to WARN notice.  *See* Mot. Ex. 3 (J. Musk Dep.) at 159:24-160:1 ("those individuals [terminated for cause] weren't laid off.  They were fired."); Mot. Ex. 6 (Wegman Dep.) at 107:21-108:1 (explaining that engineers terminated for poor performance based on coding reviews "were terminated for cause. So there would not be WARN associated with that").

### 1.    Plaintiff Adler's Individual Termination

After the acquisition, new management including Elon Musk faced significant hostility from many legacy Twitter employees, including Engineers with critical systems access:

> We, essentially, were very worried about security at the company because there were many employees who were hostile to Elon and the – or that we believed were hostile to Elon and the new Twitter management and had privileged access to the database and different pieces of the software.

Mot. Ex. 3 (J. Musk Dep.) at 156:17-23; *see id.* 156:11-160:16, 162-172; Berry Decl. ¶ 6, Ex. 4 (C. Stanley Dep.) at 45:9-16, 80:22-81:8, 82:4-84:4, 142:7-11, 142:16-19, 143:6-16, 166:8-14; *id.*, ¶ 7, Ex. 5 (Nordeen Dep.) at 23:16-24:20; 32:19-33:6; *id.*, ¶ 8, Ex. 6 (A. Musk Dep.) at 168:7-175:2. The Company was very concerned about potential insider threats by those who might cause the Twitter platform and users harm, such as by destroying servers, disclosing confidential information, disrupting infrastructure, or hijacking user accounts.  *Id.*, Ex. 4 (Stanley Dep.) at 51:3-52:5, 180:1-4; Mot. Ex. 2 (E. Musk Dep.) at 39:10-25.  The Twitter "Social Watercooler" Slack channel,[2] which was open to all employees and had many members, became especially "toxic[]".  Berry Decl., Ex. 4 (Stanley Dep.) at 166:8-23; *id.* ¶ 11, Ex. 9 (Adler Dep.) at 98:11-99:19.  Given this environment, management tasked the Information Security team with identifying potential insider threats, including by identifying persons with network and system access and reviewing employee Slack

---

[2] Slack is a chat platform for employees that allowed employees to organize messages pertaining to a specific topic in "channels."  *Id.*, Ex. 9 (Adler Dep.) at 97:20-98:7.  Joining a Slack channel allowed employees to post messages to that channel and review posts.  *Id.* at 99:2-4.

messages with a focus on "[p]eople saying things that could destroy company property or disrupt systems[.]". *Id.*, Ex. 4 (Stanley Dep.) at 92:8-18; *id.* at 82:4-84:16, 85:19-86:15, 87:13-92:7; Mot. Ex. 2 (E. Musk Dep.) at 39:10-25, 41:4-9.

Plaintiff was a Staff Software Engineer and a technical lead for the ads core platform, a "business critical" part of Twitter's operations.  Berry Decl., Ex. 9 (Adler Dep.) at 45:25-46:4, 46:5-47:12, Ex. 1.  He had access to sensitive parts of Twitter's infrastructure, including so-called "sudo access" that allowed him to function as a system administrator and run commands within a system.  *Id.* at 60:6-13, 60:22-62:5, 76:8-77:5.  On November 14, 2022, Plaintiff, commenting on a Tweet by Elon Musk about the website, posted on the Social Watercooler Slack channel: "time to kill useless services."  *Id.* at 102:15-103:19, Ex. 11, 104:9-105:20.  Another employee replied: "aurora kill all *, what could go wrong?"  *Id.* at 107:6-9, Ex. 11.  Plaintiff responded, "we tried this before, ended up changing the aurora client because of it."  *Id.* at 108:9-110:1.  Plaintiff's statement to "kill useless services" in reference to Aurora would result in the Twitter website crashing and ceasing to function.[3]  Although Plaintiff downplayed this exchange as a joke (*id.* at 103:12-107:23), it was an extremely "severe" threat that put the operation of the platform at risk.  *Id.*, Ex. 4 (Stanley Dep.) at 102:13-16 ("Q:  Did you consider Mr. Adler to be an internal threat to the company based on his Slack messages?  A:  Absolutely."), 105:1-5; *id.*, Ex. 1 (E. Musk Dep.) at 39:2-43:24 ("[a]t one point, we had some people actually put instructions on how to delete the entire Twitter database on the – on the Slack channel" and "joking about destroying an entire Twitter system is not funny").

Based on insider threat and security risks, the Company terminated Plaintiff's employment the next day, November 15, 2022, notifying him that his "recent behavior violated company policy."  *Id.*, Ex. 9 (Adler Dep.) at 129:12-24, Ex. 17; *see id.* Ex. 4 (Stanley Dep.) at 108:1-9, 108:17-109:11.[4]  Plaintiff admitted that he had reviewed and was required to comply with the

---

[3] Aurora is "a tool used to manage services running at Twitter," and if deployed, the "aurora kill all *" command would render the Aurora services completely non-functional.  *Id.*, Ex. 9 (Adler Dep.) at 107:21-108:8, 108:15-109:21, 110:2-4; *id.*, Ex. 1 (E. Musk Dep.) at 39:2-43:24; *id.*, Ex. 4 (Stanley Dep.) at 99:6-100:5 (recalling Plaintiff "talking [on Slack] about killing services and participating in causing harm to our systems").  A different aurora command previously had been accidentally deployed and "[t]erminated many services at Twitter."  *Id.*, Ex. 9 (Adler Dep.) at 108:15-110:17.

[4] Jesse Feinman, the employee who posted the "aurora kill all *" command on Slack, was also fired.  Request for Judicial Notice ¶¶ 5-8; Berry Decl. ¶¶ 12-15 & Exs. 10-13.  Feinman, as well

Company's written employment policies that expressly prohibited the conduct that resulted in his termination. *Id.*, Ex. 9 (Adler Dep.) at 62:23-63:11 & Ex. 4, 73:20-74:8 & Ex. 6, 174:1-12, 176:16-177:8 & Ex. 25.[5]

### 2.   Other Individualized For-Cause Employee Terminations.

Like any other large employer operating in the usual course of business, X has fired many other employees over the more than one-and-a-half-year putative class period.   For example, Twitter fired Emmanuel Cornet on November 1, 2022—three days *prior* to the November 4 layoffs—because he developed a Google Chrome extension that allowed Twitter employees to download all of their internal company emails from their Twitter email accounts to their personal devices, and on November 1, 2022, posted a link to that extension on an internal employee Slack channel.   Request for Judicial Notice ("RJN") ¶¶ 9-12; Berry Decl. ¶¶ 16-19 & Exs. 14-17.

As another example, on November 10, 2022, Elon Musk told employees at an all-hands meeting, "[i]f you can physically make it to an office and you don't show up, resignation accepted." RJN ¶¶ 13-17; Berry Decl. ¶¶ 20-24 & Ex. 18 (Jt. Ex. 1, Stip. Facts ¶ 6), Ex. 20 (Jt. Ex. 3), Ex. 21 at 123:6-13.[6]   Yao Yue, a manager, made two posts in response:  one to the "Social Water Cooler" Slack channel stating "Don't resign, be fired.   Seriously."; and another on her public Twitter

---

as terminated employee Emmanuel Cornet (discussed below), filed charges with the National Labor Relations Board ("NLRB") challenging their cause terminations (Feinman, NLRB Case No. 02-CA-308119 (2023); Cornet, NLRB Case No. 20-CA-306745 (2023)).   Each was represented by Plaintiff's counsel.   The NLRB Regional Director dismissed each charge, after which Plaintiff's counsel filed appeals, including a brief that admitted the facts cited here. The NLRB's General Counsel affirmed each dismissal.   Exhibits 10-17 to the Berry Declaration are each charge, initial dismissal, excerpts of charging party's appeal brief, and appeal denial, obtained from the NLRB pursuant to the Freedom of Information Act.   *See also* RJN ¶¶ 5-12.

[5] These policies included, *e.g.*, the "Confidential Information" and "Keeping Twitter Safe" policies in the Twitter employee handbook, known as the "Playbook".   *Id.*, Ex. 9 (Adler Dep.) at 62:6-63:1, 70:11-73:10, Ex. 4.   These policies prohibited employees from abusing their "access for reasons unrelated to a legitimate business purpose" and from intentionally destroying or threatening to destroy Twitter's property, among other conduct, and stated that engaging in such conduct could lead to discipline, including termination.   *Id.*   Plaintiff understood that these policies applied to the destruction of Twitter's infrastructure and that under the policy, Twitter made the sole determination of whether threat of property destruction violated a policy.   *Id.* at 72:8-73:10.

[6] Yao Yue also filed a NLRB charge challenging her termination for cause, which was dismissed after a hearing on the merits.   *Id.*, ¶ 25; *see* RJN ¶¶ 13-17.   She was represented by Plaintiff's counsel.   Exhibits 18-22 to the Berry Declaration are three Joint Exhibits and certain facts to which X and Yue, through Plaintiff's counsel, stipulated at the hearing, along with hearing transcript excerpts including sworn testimony by Yue.   *See* RJN ¶¶ 13-17.

account stating "Don't resign, let him fire you.  You gain literally nothing out of a resignation." RJN ¶¶ 13-17; Berry Decl., ¶¶ 20-24 & Ex. 18 (Jt. Ex. 1, Stip. Facts ¶¶ 3-4), Exs. 19-20 (Jt. Exs. 2-3), Ex. 23 at 197:18-22, 198:12-17, 203:18-205:5.  On November 15, 2022, the Company fired Yue for insubordination based on her posts.  RJN ¶¶ 13-17; Berry Decl. ¶¶ 20-24 & Ex. 18 (Jt. Ex.1, Stip Facts ¶ 6), Exs. 19-20 (Jt. Exs. 2-3), Ex. 21 at 123:6-13; Mot. Ex. 3 at 188:4-5 (J. Musk: "I believe she said something to the effect of:  Don't quit.  Make them fire you."); Mot. Ex. 20 at 101:15-16 (R. Nordeen: "she had posted something to the effect of like – wait, wait to be fired.").

Other employees have been fired for misconduct, such as leaking information to the media. *See, e.g.*, Mot. Ex. 2 (E. Musk Dep.) at 39:21-25 ("We had people that were leaking confidential information and, obviously, I don't think you can't *[sic]* trust someone who is leaking confidential information and breaking their NDA"). The Company has also fired employees for insubordination. *See id.* at 235:17-20 ("if there is insubordination and someone is undermining the company publicly while we are in a dire situation, I cannot imagine why one would then retain that person.").  And, as is common with all employers, the Company fired some employees for subpar performance. Mot. Ex. 6 (Wegman Dep.) at 108:2-5.  For example, in November 2022, the Company conducted a code review, which was a "technical assessment[] of the engineering team" to evaluate whether engineers were meeting performance standards.  Berry Decl., Ex. 1 (E. Musk Dep.) at 279:24-280:18; *see id.*, ¶ 9, Ex. 7 (J. Musk Dep.) at 217:5-218:2, 218:25-219:16; Ex. 5 (Nordeen Dep.) at 115:2-5; Mot. Ex. 9 (A. Musk Dep.) at 183:23-184:8. Engineers were asked to submit historical code samples for review.  Berry Decl., Ex. 7 (J. Musk Dep.) at 216:19-22, 218:12-23.  Those who failed or refused to submit their code were fired for cause.  *Id.* at 219:17-220:9.  For those who actually did submit code, the Company analyzed the code on an individualized person-by-person basis to assess its quality, and those engineers whose code was subpar were fired.  *Id.* at 216:14-219:11; Ex. 5 (Nordeen Dep.) at 115:2-116:6, 149:1-151:1; Mot. Ex. 9 (A. Musk) at 183:18-187; Mot. Ex. 6 (L. Wegman Dep.) at 107:15-18 ("Q.  And what was the cause basis for the terminations of employees separated as a result of a code review exercise?  A.  It depends on the employee.").

Still other employees were fired for a variety of different performance deficiencies, including, for example, one employee who "was fired for failing to recognize that the software was

crashing on the system".  Mot. Ex. 2 (E. Musk Dep.) at 234:3-5.

In addition, within the past year, X has terminated at least two employees due to job abandonment, including one on October 23, 2023, and another on May 7, 2024, and another employee as of November 6, 2023, for misconduct due to disclosure of confidential information.  Fenelon Decl. ¶ 7.  X also has terminated employees who did not pass the Company's background checks, as occurred with respect to an employee on November 17, 2023.  *Id.*  This evidence, which represents just a handful of examples from the 115 employees fired for cause, confirms the Court's concern that the questions as to why a particular employee was fired "are quite unique and highly individualized."  ECF No. 37 (Trans. of 8/24/2023 CMC) at 6:5-9.

**C.**     **Almost All of the Putative Class Members Signed Arbitration Agreements**

Most employees whose employment terminated since Musk's acquisition of Twitter had signed a Dispute Resolution Agreement ("DRA") with a class action waiver provision that required arbitration of any disputes on an individual basis.  *See* Fenelon Decl. ¶¶ 3-6; Mot. at 14 n.7 & Ex. 22 ¶ 1.  Employees had the option to opt out of the DRA, which Adler exercised.  Fenelon Decl. ¶¶ 2, 6; Mot. Ex. 22 ¶ 8; Mot. at 14-15.  Of the approximately 115 employees terminated for cause through July 28, 2024, at least 80 – nearly 70% of the putative class – signed a DRA and did not opt out and thus must resolve their claims individually through arbitration.  Fenelon Decl. ¶¶ 3-5.

**IV.**     **LEGAL STANDARD**

A class action is "an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only," and "to justify a departure from that rule, 'a class representative must be part of the class and 'possess the same interest and suffer the same injury' as the class members."  *Dukes*, 564 U.S. at 348 (citation omitted).  The Court "must conduct a 'rigorous analysis' to determine whether the party seeking certification has met the prerequisites of Rule 23."  *Mazza v. Am. Honda Motor Co., Inc.*, 666 F.3d 581, 588 (9th Cir. 2012).  Rule 23 "does not set forth a mere pleading standard."  *Dukes*, 564 U.S. at 350.  Rather, "[a] party seeking class certification must affirmatively demonstrate his compliance with the Rule—that is, he must be prepared to prove that there are in fact sufficiently numerous parties, common questions of law or fact, etc."  *Id.*  The "rigorous analysis" requires a plaintiff to satisfy the Rule 23 elements through

1   evidentiary proof, not speculation. *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013).   The

2   elements of the plaintiff's claim(s) frame the Rule 23 analysis for each proposed class.   *See Gen.*

3   *Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 156 (1982) ("An individual litigant seeking to maintain a

4   class action under Title VII must meet 'the prerequisites of numerosity, commonality, typicality,

5   and adequacy of representation' specified in Rule 23(a).  These requirements effectively 'limit the

6   class claims to those fairly encompassed by the named plaintiff's claims.'" (citations omitted));

7   *Dukes*, 564 U.S. at 348–49 (same); *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 809

8   (2011) ("[c]onsidering whether 'questions of law or fact common to class members predominate'

9   begins, of course, with the elements of the underlying cause of action." (quoting Rule 23(b)(3)).

10  **V.     THE COURT SHOULD NOT CERTIFY THE WARN ACT CLASSES**

11         Plaintiff seeks to certify the following two WARN Act classes:

12         (1) All individuals who were employed by Twitter across the United States who
               were terminated following Elon Musk's purchase of Twitter and did not receive
13             60 days' notice as required by the federal WARN Act;

14         (2) All individuals who were employed by Twitter in California who were
               terminated following Elon Musk's purchase of Twitter and did not receive 60
15             days' notice as required by the California WARN Act;

16         But Plaintiff cannot prove commonality, superiority and predominance. As Plaintiff

17  concedes, his WARN Act claims turn on whether he and *each* class member "were allegedly

18  terminated for 'cause' [and thus not covered by these Acts] …[or] were simply laid off as part of

19  Defendants' [alleged] general goal of drastically reducing headcount after Mr. Musk's acquisition

20  of the Company."[7]  Mot. at 1. This question cannot provide a common answer for these classes,

21  because the highly individualized inquiries needed to determine the reasons for each class

22  member's termination would overwhelm the proceedings and necessitate a series of mini-trials.[8]

---

[7] Plaintiff does not dispute that the WARN Act requires notice be given only to those employees laid off as part of a "mass layoff" (he does not allege that any "plant closing" occurred).  29 U.S.C. § 2102(a); Cal. Lab. Code § 1400 *et seq*.  It is undisputed that terminations "for cause" are explicitly exempted from the federal and California WARN Acts' requirements.  29 U.S.C. § 2101(a)(6) (defining "employment loss" as "an employment termination, other than a discharge for cause…"); Cal. Lab. Code § 1400.5(f) ("'layoff' means a separation from a position for lack of funds or lack of work."); *id.* § 1402(a) (employer may be liable only to an employee "who lost his or her employment"); *Gunderson v. Alta Devices, Inc.*, 2021 WL 4461569, at *3 (N.D. Cal. Sept. 29, 2021) ("The California WARN Act is similar to the federal WARN Act in most respects.")

[8] In addition, even if Plaintiff or a class member was laid off, they *still* would need to prove they

And, because Plaintiff opted out of the DRA, unlike almost 70% of the class, he cannot prove typicality, adequacy and numerosity under Rule 23.[9]

### A.   Plaintiff Fails to Prove Commonality as to the WARN Act Classes.

The entirety of Plaintiff's proposed "common contention" is as follows:

> There are common questions as to whether these employees, who were allegedly terminated for "cause" (either for being "disloyal" to Mr. Musk and/or because of alleged poor performance, such as through failed "code review" exercises), were simply laid off as part of Defendants' general goal of drastically reducing headcount after Mr. Musk's acquisition of the Company.  [Mot. at 1.]

These conclusory allegations fail to "prove that there [is] in fact" a "common contention … of such a nature that it is capable of class-wide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Dukes*, 564 U.S. at 350.  To the contrary: "Quite obviously, the mere claim by employees of the same company that they have suffered a Title VII [or, here, a WARN Act] injury…gives no cause to believe that all their claims can productively be litigated at once." *Id.* at 350.  *Dukes* noted that "in resolving an individual's Title VII claim, the crux of the inquiry is 'the reason for a particular employment decision.'" *Id.* at 352.  The same is precisely true here.

Plaintiff fails to provide *evidence* of "glue holding the alleged *reasons* for all those decisions together." *Id.* (emphasis in original).  He claims Twitter used "a variety of methods" including: (1) involuntary layoffs; (2) Twitter 2.0 "voluntary layoff[s]"; (3) "cause" terminations for "disloyalty," including those deemed "'insubordinate' or a 'security risk'"; and (4) "cause" terminations for "alleged performance issues, such as failed 'code review' exercises." Mot. at 3-4, 7-8.  He further asserts that, between November 2022 and May 2023 – a fraction of his 20-plus-month class period – Twitter terminated 37 employees for insubordination or security risks and "many" others for poor performance.  *Id.* at 3-4.  This hodge-podge of termination reasons itself

---

were part of a "mass layoff" affecting the requisite number of workers at a particular site within the applicable 30- or 90-day period.  29 U.S.C. §§ 2101(a)(3), 2102(d); Cal. Lab. Code § 1400.5(a), (c), (d).  Again, this would necessitate individual inquiries and mini-trials.

[9] These classes are also impermissible fail-safe classes because membership rests on whether Plaintiff proves Defendant failed to give notice "as required by the" WARN Acts.  *See Velasquez v. HSBC Fin. Corp.,* 2009 WL 112919, at *4 (N.D. Cal. Jan. 16, 2009) ("Fail-safe classes" are "defined by the merits of their legal claims, and are therefore unascertainable prior to a finding of liability in the plaintiffs' favor.").

demonstrates the absence of any common question that will generate a common answer for all class members using common proof.  The Supreme Court aptly characterized the problems faced by Plaintiff:  it is "impossible to say that examination of all the class members' claims for relief will produce a common answer to the crucial question *why was I disfavored*."  *Dukes*, 564 U.S. at 352 (emphasis in original).

Plaintiff's speculative assertion that all for-cause terminations over the past 20 months were simply "stealth layoffs" is unsupported by any evidence and insufficient to prove commonality because determining the answer would require investigating the circumstances of each termination.  *See Comcast*, 569 U.S. at 33; *Dukes*, 564 U.S. at 359 (no commonality where "respondents provide no convincing proof of a companywide discriminatory pay and promotion policy").  It also ignores the commonsense fact that terminations for misconduct and poor performance are a regular occurrence in any business. Plaintiff's Motion ignores the fact that for-cause terminations are not converted into WARN triggering "employment losses" simply because layoffs occurred around the same time – a fact that the WARN Act recognizes by carving out "cause" terminations from its notice requirements.  *See supra* note 7.

Plaintiff's own Exhibits rebut his theory of a grand unified subterfuge, and instead reflect individualized grounds for each cause termination that were unrelated to layoffs and not based on cost-cutting.  *See supra* § III.B; *see, e.g.*, Mot. Ex. 2 at 39:21-25 (E. Musk: "We had people that were leaking confidential information and, obviously, I don't think you can't *[sic]* trust someone who is leaking confidential information and breaking their NDA."); Mot. Ex. 3 at 157:16-160:1 (J. Musk:  "Q.  Okay.  So *there were further layoffs* after November 3rd and 4th of individuals who were deemed to be security risks or not sufficiently loyal to Elon?  A.  *These weren't – ... This is not what I said.*  There was an exercise to determine people who were being insubordinate and who were security risks.  Q.  And those individuals were laid off?  A.  *No, those individuals weren't laid off.  They were fired*.") (emphasis added); Mot. Ex. 6 at 109:16-21 (L. Wegman: "Q.  And the code review exercises resulted in a reduction of Twitter's workforce; right?  A.  *I wouldn't say a reduction*, but it did result in a – it did result in employees being terminated and therefore removed from the workforce.") (emphasis added); *id.* at 107:15-18 ("Q.  "…what was the cause basis for the

DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION

terminations of employees separated as a result of a code review exercise?  A.  *It depends on the employee*.") (emphasis added).  Musk's answer of "yes" to Plaintiff counsel's ambiguous question whether code reviews were "a furtherance of the cutting of the workforce" does not demonstrate commonality.  Mot. Ex. 2 at 38:19-39:1.  Rather, it is tautology that terminations for misconduct or poor performance result in fewer employees.

Plaintiff's citation, in a footnote, to two out-of-circuit cases does not help him.  Mot. at 8 n.5.  In *Morton v. Vanderbilt University*, the defendant *agreed* to class certification, and the court's entire discussion simply recited the Rule 23 factors, with no analysis – let alone a "rigorous analysis" – of those factors or the evidence.  2014 WL 4657473 at *7, *13 (M.D. Tenn. Sept. 17, 2014).  Similarly, in *Mowat v. DJSP Enterprises, Inc.,* the defendants *conceded* commonality, which the court deemed met with virtually no analysis, or any discussion of the impact of *cause* terminations.  2011 WL 13217002, at *3-4 (S.D. Fla. Aug. 23, 2011) (emphasis added).  Neither case involved, or analyzed, the many fact-specific cause terminations at issue here.

### B.      Plaintiff Has Failed to Prove Predominance and Superiority.

Predominance is a "far more demanding" burden than commonality, *Amchem Prod., Inc. v. Windsor*, 521 U.S. 591, 624 (1997), and "'asks whether the common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues.'"  *Lara v. First Nat'l Ins. Co. of Am.*, 25 F.4th 1134, 1138 (9th Cir. 2022) (citation omitted).  "An individual question is one where members of a proposed class will need to present evidence that varies from member to member, while a common question is one where 'the same evidence will suffice for each member to make a prima facie showing [or] the issue is susceptible to generalized, class-wide proof."  *Id.* (internal quotation marks and citation omitted).

#### 1.      Analyses of Individualized Termination Reasons Defeat Predominance.

Plaintiff's entire predominance argument is pure *ipse dixit* with no support:

Here, common questions of law and fact will predominate.  Specifically, the case will focus on whether:   (1) the class members' terminations were part of Defendants' mass layoffs; (2) Defendants provided the class members with 60 days' notice under the federal and California WARN Acts; and (3) Defendants otherwise adequately compensated the class members in lieu of notice.

Mot. at 12-13. His first question – "whether the class members' terminations were part of Defendants' mass layoffs" – again requires highly individualized inquiries into the reason for termination of *Plaintiff* and *each* class member. His second and third questions are derivative of the first, and certainly would not predominate. It is undisputed that he and the putative class did *not* receive WARN notice or "pay in lieu," and would have no right to either if fired for "cause".

The evidence, largely from Plaintiff's own submissions, pointedly shows the individualized nature of each termination inquiry. In a climate of significant hostility following the acquisition, Plaintiff confirmed on a Slack channel used by thousands of employees that a specific identified software command would cause the Twitter website to cease functioning. Common sense dictates that such conduct would be a terminable offense in many companies. Plaintiff claims this reason was pretextual, but the key point remains that adjudicating this issue requires an individualized inquiry into his particular circumstances. *Cf. Dukes*, 564 U.S. at 352 ("in resolving an individual's Title VII claim, the crux of the inquiry is "the reason for a particular employment decision'").

The trier of fact would need to conduct this individualized inquiry repeatedly. For example, Yue was terminated for publicly encouraging other employees to wait to be laid off, even if they were inclined to resign; Cornet disseminated to employees an application to mass-download information off Twitter's email system; Feinman posted the "aurora" code that Plaintiff confirmed could crash the entire Twitter website; another employee was "fired for failing to recognize that the software was crashing on the system"; and various others were terminated for poor performance, including engineers who refused to submit their code as requested or whose submitted code was analyzed as subpar. *See supra* § III.B. A finding that *Plaintiff* did or did not commit a terminable offense would not answer (as "representative proof" or otherwise) whether any other termination was "for-cause" or a pretextual layoff, given the many different decisions and circumstances. *See Lara*, 25 F.4th at 1138 ("An individual question is one where 'members of a proposed class will need to present evidence that varies from member to member,'…") (citation omitted).

The fact that some of these employees were not laid off on November 4, 2022, is immaterial. Even good employees may engage in later misconduct, or let their performance slip, particularly after challenging events like a change in ownership, and employees who initially fly under the radar

1  may turn out to be poor performers when subjected to a code review.  In each case, "the crux of the

2  inquiry is 'the reason for a particular employment decision.'"  *Dukes*, 564 U.S. at 352.  These

3  myriad inquiries, necessary to determine if Plaintiff or any class member was even "injured" under

4  the WARN Acts, are the antithesis of a process that "will help achieve judicial economy" and

5  "diminish the need for individual inquiry."  *See Vinole v. Countrywide Home Loans, Inc.,* 571 F.3d

6  935 at 939, 944 (9th Cir. 2009); *Lara*, 25 F.4th at 1138 ("figuring out whether each individual

7  putative class member was harmed would involve an inquiry specific to that person. … Because

8  this would be an involved inquiry for each person, common questions do not predominate.").

9        Plaintiff's cited authorities do not support predominance.  As discussed, the defendant in

10  *Morton* agreed to certification, the court merely recited the Rule 23 elements with no analysis, and

11  the facts did not involve the individualized issues here.  *See supra* at 12; 2014 WL 4657473 at *7,

12  *13.  In *Etzelberger v. Fisker Automotive, Inc.*, the defendant "d[id] not oppose Mr. Etzelsberger's

13  [certification] motion" and raised only common defenses (*e.g.*, that notice was excused under the

14  "faltering company" exception); unlike the present case, there were no individualized "cause"

15  issues and "no evidence or indication that potential class members were treated uniquely with

16  respect to any of these issues."  300 F.R.D. 378, 381-84 (C.D. Cal. 2013)

17        **2.**     **<u>Plaintiff Has Failed to Demonstrate that a Class Action Is Superior.</u>**

18        "Whether a class action will be manageable is, by ... far, the most critical concern in

19  determining whether a class action is a superior means of adjudication."  *Lara*, 25 F.4th at 1138

20  (internal quotation marks omitted).  After finding predominance was not met, the court in *Lara*

21  quickly deemed superiority lacking as well:

> [T]he district court's finding of no superiority was not an abuse of discretion *for the same reason* [as the lack of predominance].  A class action here would involve adjudicating issues specific to each class member's claim, and *that would be unmanageable.  Individual trials would be a better way to adjudicate those issues*.

25  *Id.* at 1140 (emphasis added).  These principles dispose of Plaintiff's conclusory assertions that it

26  "clearly" would be "grossly inefficient" to leave Plaintiff's class claims to individual suits, and that

27  "retaliation is a real concern" given "Mr. Musk's [alleged] penchant for attacking employees on

28  social media."  Mot. at 13-14.  Plaintiff makes no showing of any social media "attack" on Plaintiff,

and his allegations would fall short of overcoming manageability concerns in any event. *See Comcast*, 569 U.S. at 33 (Rule 23 "rigorous analysis" requires evidentiary proof).

Plaintiff's cases again are inapposite. *Martin v. Tango's Restaurant, Inc.,* 969 F.2d 1319, 1324 (1st Cir. 1992), involved a Department of Labor suit under a different law and did not involve Rule 23. Its unremarkable observation that the law protects employees does nothing to show superiority here. Comments about retaliation fears in *Overka v. American Airlines, Inc.*, 265 F.R.D. 14, 18 (D. Mass. 2010), and *Perez v. Safety-Kleen Systems, Inc.*, 253 F.R.D. 508 (N.D. Cal. 2008), are similarly irrelevant. Both cases involved lower-wage workers including many *current* employees, and *uniform* policies completely unlike the individualized terminations here. *See Overka*, 265 F.R.D. at 18 (class challenged "$2 curbside check-in fee that was implemented uniformly in the majority of American's terminals nationwide and affected skycaps working throughout the country in a similar way."); *Perez*, 253 F.R.D. at 518-19 (employer admitted violating meal break record and wage statement laws). The courts independently found commonality and predominance met, and never suggested that "retaliation" concerns can surmount a *lack* of commonality or predominance, or that *former* employees, like those here, reasonably have retaliation concerns. *See Overka*, 265 F.R.D. at 19-24; *Perez*, 253 F.R.D. at 518-21.

C.  **Plaintiff Is Atypical and Inadequate Due to the Above and Due to His DRA Opt-Out.**

Plaintiff fails to prove typicality or adequacy for the same reasons he cannot prove commonality: "'[t]he commonality and typicality requirements of Rule 23(a) tend to merge.'" *Dukes*, 564 U.S. at 349 n.5 (quoting *Falcon*, 457 U.S. at 157-58 n.13). Moreover, "the typicality and adequacy requirements often merge in a class certification analysis because an atypical representative may create conflicts between that representative and the class." *Feske v. MHC Thousand Trails Ltd. P'ship*, 2013 WL 1120816 at *12 & 12 n.89 (N.D. Cal. Mar. 18, 2013) (citing *Valentino v. Carter–Wallace, Inc.*, 97 F.3d 1227, 1234 (9th Cir. 1996) (noting that when plaintiffs' claims are atypical, they may not be adequate representatives)). The fact-specific inquiry required to evaluate Plaintiff's claim, particularly given his extreme threat that could have terminated the entire Twitter website, would both distract from and undermine his representation of the class. *See*

*supra* § III.B.1.  As such, he is atypical and inadequate as a representative: "a named plaintiff's motion for class certification should not be granted if 'there is a danger that absent class members will suffer if their representative is preoccupied with defenses unique to it.'"  *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9ᵗʰ Cir. 1992) (citation omitted); *Feske*, 2013 WL 1120816 at *14 ("in situations where a plaintiff seeks to represent class members who do not face the same defense, the plaintiff may be atypical and thereby an inadequate representative.").

Plaintiff also cannot prove typicality or adequacy because he opted out of the DRA, while nearly 70% of the potential class is bound by a DRA, including its class action waiver provision which states in relevant part: "You and the Company agree to bring any dispute in arbitration on an individual basis only, and not on a class…basis."  *See supra* § III.C; Mot. Ex. 22 ¶ 5.  This Court already found the DRA, and its class waiver, enforceable and binding upon employees who did not opt out.  *See* RJN ¶ 1 & Ex. 1 (Order re Arbitration, ECF No. 52 (filed Jan. 13, 2023), *Cornet, et al. v. Twitter, Inc.*, Case No. 3:22-cv-06857-JD, N.D. Cal.); *id.* ¶ 2 & Ex. 2 (Order Granting Motion to Compel Arbitration and Granting Motion to Dismiss, ECF No. 35 (filed May 5, 2023), *Borodaenko, et al. v. Twitter, Inc.*, Case No. 4:22-cv-07226-HSG, N.D. Cal.).  In *Avilez v. Pinkerton Government Services, Inc*., the Ninth Circuit expressly held "[t]he district court abused its discretion to the extent it certified classes ... that include [members] who signed class action waivers" when the class representative did not.  596 F. App'x 579, 579 (9th Cir. 2015).  It found the plaintiff failed to meet Rule 23(a)(3) and (4) including because class members who sign arbitration agreements with class waivers "have potential defenses that [the class representative] would be unable to argue on their behalf."  *Id.*

The court in *Valencia v. VF Outdoor, LLC* observed that "District courts within this Circuit have consistently relied on *Avilez* to reach a similar result," and denied certification where "a majority" of class members signed an arbitration agreement but plaintiff did not.  2021 WL 5154161, at *3-4 (E.D. Cal. Nov. 5, 2021) (citing cases); *Berman v. Freedom Fin. Network, LLC*, 400 F. Supp. 3d 964, 986-87 (N.D. Cal. 2019) (citing *Avilez* and its progeny and noting, "the Ninth Circuit has suggested, without expressly holding, that a class encompassing members with valid arbitration agreements and others not subject to the arbitration agreements cannot be certified"

1  (citing *O'Connor v. Uber Techs., Inc.*, 904 F.3d 1087, 1094 (9th Cir. 2018))); *Tan v. Grubhub, Inc.*,

2  2016 WL 4721439, at *3 (N.D. Cal. July 19, 2016) (finding *Avilez* "instructive" and denying

3  certification where plaintiff opted out of arbitration agreement, in contrast to class), *aff'd sub nom.*,

4  *Lawson v. Grubhub, Inc.*, 2021 WL 4258826 (9th Cir. Sept. 20, 2021).

5          Plaintiff's lone contrary cite, *Nitsch v. Dreamworks Animation SKG, Inc.* (Mot. at 15), is

6  inapposite because it failed to cite *Avilez*; it involved multiple defendants; the court ruled that

7  plaintiff's arbitration agreement with one defendant did not preclude his claims against other

8  defendants; and the defendant did not pursue arbitration against the plaintiff despite the court

9  finding the agreement enforceable.  315 F.R.D. 270, 284-85, 314 (N.D. Cal. 2016).  Numerous

10  other cases in this Circuit declined to follow *Nitsch*.  *See, e.g.*, *Conde v. Open Door Marketing*, 223

11  F. Supp. 3d 949, 958-62 (N.D. Cal. Apr. 27, 2017); *Valencia*, 2021 WL 5154161, at *5; *Berman*,

12  400 F. Supp. 3d at 985-87.  This Court should not do so either.  Plaintiff's other authority fails to

13  support his arguments.  *Jensen v. Cablevision Systems Corp.*, 372 F. Supp. 3d 95, 121-25 (E.D.N.Y.

14  Feb. 27, 2019), found typicality and adequacy lacking because plaintiff opted out of arbitration,

15  unlike putative class members.  His other cases (1) did not decide class certification and simply

16  stand for the general – and inapposite – proposition that a defendant does not waive the right to

17  compel arbitration by waiting until after class certification (*Chen-Oster*, *Rushing*, *Gutierrez*,

18  *Jackson*, *Ductile*, *TFT-LCD*); or (2) did not involve arbitration agreements at all (*Barnes*, *Saleh*).

19  The DRAs binding almost the entire putative class, but not Plaintiff, defeat typicality and

20  adequacy.[10]

21          **D.      Numerosity Is Lacking Since Nearly the Whole Class Is Bound by DRAs.**

22          With almost 70% of the putative class bound by the DRAs, *see supra* § III.C, the

23  approximately 35 former employees who remain as putative class members are too few to satisfy

24  numerosity.  *See* Mot. at 6 (Plaintiff admitting typical numerosity threshold is at least 40 class

25  members); *Tan*, 2016 WL 4721439, at *4 (finding numerosity not met based on remaining number

26

27  [10] Besides being wrong, Plaintiff's speculation about "whether [Twitter] has waived its right to
compel arbitration" is irrelevant.  *Conde*, 223 F. Supp. 3d at 961 (denying class certification and
28  stating that "the enforceability of the arbitration agreement…[is] not yet properly before the
Court.").

of plaintiffs who *did* opt out of arbitration agreement); *Berry v. Baca*, 226 F.R.D. 398, 403 (C.D. Cal. 2005) (numerosity not met where "plaintiffs have only presented evidence of thirty-three possible class members" and failed to show that joinder of those potential class members was impracticable). Plaintiff's argument that courts sometimes find smaller classes sufficiently numerous where the members are geographically concentrated or unable to file separate suits is irrelevant because he shows neither here as to the few remaining members of his nationwide putative class. Indeed, Plaintiff's counsel currently represents *thousands* of other employees in individual arbitrations against Twitter. *See* Mot. at 14 n.7.

## VI.     PLAINTIFF'S WAITING TIME PENALTY CLASS FAILS UNDER RULE 23.

Plaintiff also seeks to certify the following class: "All individuals who were employed by Twitter in California who did not receive their full final pay, benefits, and expense reimbursements on the day they were terminated." Mot. at 5. The class definition's vague contours render it unascertainable, and its use of the term "full" makes it a fail-safe class. Plaintiff and the class also lack Article III standing because claims for late expense reimbursements are not legally cognizable, and in any event, he offers no proof that he or any class members received any late payments of any kind. Plaintiff also fails to prove commonality, predominance, superiority, typicality, adequacy, and numerosity given his opt-out from the DRA, and because individualized inquiries into willfulness and good faith disputes – necessary to assess liability for waiting time penalties – would overwhelm the proceedings and render class-wide resolution unmanageable.

### A.     Plaintiff's Class Is Not Ascertainable and Is an Improper Fail-Safe Class.

Although there is no standalone administrative feasibility requirement under Rule 23, problems with class member identification are relevant "regardless of whether th[is] concern [is] properly articulated as part of ascertainability, Rule 23(b)(3) predominance, or Rule 23(b)(3) superiority" analysis, and there is no "one-size-fits-all approach to class-member identification." *Walker v. Life Ins. Co. of the Sw.*, 953 F.3d 624, 632 (9th Cir. 2020); *Montoya v. City of San Diego,* 2021 WL 2350927, at *2 (S.D. Cal. June 9, 2021) (refusing to grant certification because the "exact contours of the proposed class" were unknown and noting the Ninth Circuit still addresses ascertainability through analysis of the other Rule 23(b)(3) requirements); *Alvarez v. City of*

1  *Oxnard*, 2020 WL 8461470, at *3 (C.D. Cal. Dec. 17, 2020) ("Rule 23(b)(3) also specifically

2  mandates that the Court consider 'the likely difficulties in managing a class action.'"); *Hamm v.*

3  *Mercedes-Benz USA, LLC*, 2021 WL 1238304, at *5 (N.D. Cal. Apr. 2, 2021).

4       Here, Defendant would not know who to include in the class (if certified) because it is

5  unclear whether Plaintiff (a) contends that all "final pay, benefits, and expense reimbursements"

6  were paid, but paid late, or (b) contends that some, potentially disputed, amounts were never paid

7  at all.  Nor does he propose any objective criteria for identifying members of his proposed class.

8  In addition, he fails to provide any proof that he or any class members experienced a single late

9  payment, foreshadowing myriad individual mini-trials just to determine who may be in the class.

10  Conditioning membership in the proposed class on whether an employee received "full" final

11  payment would require an individualized adjudication to determine what payments, if any, Plaintiff

12  and each putative member were in fact owed but did not receive.  Thus, Plaintiff's third proposed

13  class is an impermissible "fail safe" class.[11]

14       The fail-safe appellation is simply a way of labeling the obvious problems that exist
     when the class itself is defined in a way that precludes membership unless the
15       liability of the defendant is established. When the class is so defined, once it is
     determined that a person, who is a possible class member, cannot prevail against
16       the defendant, that member drops out of the class. That is palpably unfair to the
     defendant, and is also unmanageable-for example, to whom should the class notice
17       be sent? *See* Fed. R. Civ. P. 23(c)(2).

18  *Kamar v. RadioShack Corp.*, 375 F. App'x 734, 736 (9th Cir. 2010); *Velasquez*, 2009 WL 112919,

19  at *4 (The "class is fail-safe because it is "defined by the merits of their legal claims, and …

20  therefore unascertainable prior to a finding of liability in the plaintiffs' favor.").

21      **B.**    **Plaintiff and the Class Lack Standing Given the Lack of Proof of Harm.**

22       Article III standing requires a plaintiff to show, in part, "an injury-in-fact that is concrete

23  and particularized, as well as actual or imminent."  *Kane v. Chobani, Inc.*, 973 F. Supp. 2d 1120,

24  1128 (N.D. Cal. 2014).  "[I]f none of the named plaintiffs purporting to represent a class establishes

25  the requisite of a case or controversy with the defendants, none may seek relief on behalf of himself

26

----

[11] Exacerbating this defect, it is unclear what "full" final pay and benefits includes, *e.g.*, only the
"pay in lieu of notice" that Plaintiff seeks under the WARN Act (*see* Complaint ¶¶ 16-17, ECF
No. 3); base wages for work through the employee's last day; other unspecified amounts that an
employee may assert and Defendant may dispute; or some combination thereof.

1  or any other member of the class."  *O'Shea v. Littleton*, 414 U.S. 488, 494 (1974); *Mays v. Wal-*

2  *Mart Stores, Inc.*, 804 F. App'x 641, 643 (9th Cir. 2020) (holding class certified in error where

3  plaintiff "failed to demonstrate Article III standing.").  Also, "[n]o class may be certified that

4  contains members lacking Article III standing."  *Mazza*, 666 F.3d at 594;[12] *cf. Castillo v. Bank of*

5  *Am., NA*, 980 F.3d 723, 730 (9th Cir. 2020) ("If many class members have no claim whatsoever

6  because they 'were never exposed to the challenged conduct to begin with,' the class does not

7  satisfy Rule 23(b)(3).").  Here, Plaintiff has not presented evidence that the Company paid him or

8  any class member a late payment under applicable law.

9  ### 1.    Late Expense Reimbursements Are Not Legally Cognizable.

10  "[E]xpense reimbursements are not 'amounts for labor performed'… and are not

11  appropriately part of the calculation" for waiting time penalties under Labor Code section 203, and

12  thus Plaintiff and the class have no cognizable claims and no "injury-in-fact" as to such amounts.

13  *Drumm v. Morningstar, Inc.*, 695 F. Supp. 2d 1014, 1021 (N.D. Cal. 2010); *Paycom Payroll, LLC*

14  *v. Read*, 2020 WL 13505041 at *14 (S.D. Cal. Feb. 12, 2020) (employee "not entitled to waiting

15  time penalties for reimbursements paid after her termination"; granting summary judgment); *see*

16  RJN Ex. 3 (Cal. Div. of Lab. Stds. Enf. ("DLSE"), Waiting Time Penalty FAQs ("[T]he

17  reimbursement for business expenses is not wages, [and] the waiting time penalty does not apply

18  to your situation")); *id.* Ex. 4 (DLSE Enf. Man. § 4.3.4 (revised Dec. 2019) ("'Any wages' includes

19  any amount due as wages...but does not include expenses.")).  As a result, to the extent Plaintiff's

20  claim is based on receiving reimbursement for expenses after his termination date, he has no valid

21  claim at all.

22  ### 2.    Plaintiff Presented No Proof of Any Common Policy of Late Payment.

23  Plaintiff includes the term "benefits" in his class definition but provides no evidence that

24

---

25  [12] *Olean Wholesale Grocery Cooperative, Inc. v. Bumble Bee Foods LLC* overruled this
"statement in *Mazza* only insofar as it related a class seeking injunctive or other equitable relief,"
26  but did not overrule it as to classes like Plaintiff's that seek damages.  31 F.4th 651, 682 n.32 (9th
Cir. 2022); *id.* at 668 n.12 ("Because the Supreme Court has clarified that '[e]very class member
27  must have Article III standing in order to recover individual damages,' *TransUnion LLC v.
Ramirez*, 141 S. Ct. 2190, 2208 (2021), Rule 23 also requires a district court to determine whether
28  individualized inquiries into this standing issue would predominate over common questions)
(citing *Cordoba v. DIRECTV, LLC,* 942 F.3d 1259, 1276 (11th Cir. 2019)).

1   any "benefits" were paid late to anyone, much less the entire class, and thus lacks standing as to

2   such amounts.  While he asserts that "hundreds, if not thousands, of Twitter employees within

3   California did not receive their *final pay and reimbursements* on the day of their termination," he

4   cites absolutely no support for this claim.  Mot. at 7 (emphasis added).  Instead, he vaguely asserts:

5       Twitter admitted that there were delays getting terminated employees their final
        pay and expenses reimbursed following their terminations.  (Ex. 6 - 30(b)(6) Dep.
6       at 112).  Mr. Adler did not receive his final pay or expense reimbursement the day
        he was terminated.  (Ex. 27 - Adler Dep. at 186-187).
7

8   Mot. at 4-5.  This citation is highly misleading because the cited testimony involves *only expense*

9   *reimbursements* and does not relate at all to "final pay."  Mot. Ex. 6 at 112:22-25 ("Q. And you

10   said that there was some delay in the reimbursement of expenses for employees who had been laid

11   off; is that right? A. Yes."); Mot. Ex. 27 at 186:1-187:25 (discussing only reimbursements of

12   expenses).  As discussed, reimbursing expenses after an employee terminates is not unlawful.[13]

13   **C.  Lack of Proof, Plaintiff's DRA Opt-Out, and "Willfulness" Bar Rule 23(a) Showing.**

14       **1.   Plaintiff Lacks Proof of Commonality, and Individual Issues Abound.**

15       The only "common question" Plaintiff presents – "whether employees were indeed entitled

16   to these payments at the time of their termination" – begs the ultimate question in the case and does

17   nothing to generate common answers that drive the litigation.  Mot. at 9.  To the extent his late pay

18   claim is premised on "pay in lieu of notice," it is derivative of his WARN Act claims and cannot

19   be certified for the same reasons.  *See supra* § V.  The same is true if his late pay claim relates to

20   other unspecified disputed amounts because no common proof exists to resolve any given

21   employee's "entitlement" to such amounts.  Even if his claims involved only amounts that were

22   paid, but paid late, he has no proof of any uniform policy or practice of late payment.

23       As a result, there is no "common contention…of such a nature that it is capable of classwide

24   resolution."  *Dukes*, 564 U.S. at 350; *Gonzalez v. Millard Mall Serv., Inc.*, 281 F.R.D. 455, 465

25   (S.D. Cal. 2012) ("The Court concludes that the small sampling of termination data [late payments

26

---

27   [13] In any event, Plaintiff did not even know if any of his expense reimbursements were delayed.
    At his deposition, he chose to "defer to [his] attorneys on the details," because he did not "know
    whether [his reimbursement requests] were *submitted* late or not," a critical fact that obviously
28   would explain any delayed expense reimbursement.  Mot. Ex. 27 at 187:9-21 (emphasis added).
    Plaintiff's own doubt precludes any showing of "injury-in-fact."  *See supra* § VI.B.

to 23 of 84 employees] does not show commonality that most or all employees were not paid their wages timely after termination."); *Delgado v. Marketsource, Inc.*, 2018 WL 6706041, at *7 (N.D. Cal. Dec. 20, 2018) (denying certification of waiting time penalty claim, explaining that "because Plaintiff points to no policy or practice that caused any violations of California Labor Code §§ 201 and 203, evaluating Defendant's liability as to each class member would require individualized assessments of each employee's time records, wage statements, and deposition testimony") (internal quotation marks omitted).[14]

Proving liability for waiting time penalties as to any employee would require highly individualized inquiries that preclude certification, because a good faith dispute, based in fact or law, whether the wages were due at termination precludes penalties. *See Naranjo v. Spectrum Sec. Servs., Inc.*, 15 Cal. 5th 1056 (2024) ("an employer cannot incur civil or criminal penalties for the willful nonpayment of wages when the employer reasonably and in good faith disputes that wages are due."); *Nordstrom Comm. Cases*, 186 Cal. App. 4th 576, 584 (2010) (no "willful failure" where "good faith dispute [exists] as to whether and when the wages were due."). "A good faith dispute, based in law or fact, occurs when an employer presents a defense that, if successful, would preclude recovery on the part of the employee, regardless of whether the defense is ultimately successful." *Cleveland v. Groceryworks.com, LLC*, 2016 WL 4140504, at *21-22 (N.D. Cal. Aug. 4, 2016).

Here, determining *what* amounts were owed, *when* such amounts were paid (or not), and *whether* any such amounts were subject to a "good faith dispute" would require individualized inquiries for each employee and a series of mini-trials. In an analogous case, the plaintiffs in *In re Taco Bell Wage and Hour Actions* sought to certify a waiting time penalty class, arguing that "[a]n analysis of Defendants' wage records shows that Defendants did not have a practice of paying timely wages to employees upon discharge." 2011 WL 4479730 at *3 (E.D. Cal. Sept. 26, 2011) (internal quotation marks omitted). The court squarely rejected that argument:

> The willfulness inquiry poses serious problems to Plaintiffs' final pay subclass. *See id.* Willfulness raises an inherently fact intensive inquiry focusing on state of mind and surrounding circumstances. If a final pay subclass is certified, mini-trials would

---

[14] Plaintiff's lone cited case, *Dilts v. Penske Logistics, LLC*, is inapposite because it involved a uniform "policy during the Class Period requiring tools but not reimbursing the costs," not the vague and unsupported violations alleged here. 267 F.R.D. 625, 631, 633 (S.D. Cal. 2010).

1

2

be required for each class member to determine whether waiting time penalties should be imposed, including whether an employer acted willfully and whether there is a good faith dispute that wages are due. *See id.*

3

4

5

6

7

*Id.* at *5, *11; *see also Delgado*, 2018 WL 6706041, at *7 ("evaluating whether Defendant 'willfully' paid final wages late under California Labor Code § 203 also would require individualized inquiries into the circumstances of each employee's final wage payments."); *Gonzalez*, 281 F.R.D. at 465 (holding no commonality for waiting time penalty class claims due to individualized willfulness issues, citing *In re Taco Bell Wage and Hour Actions*).

8

9

10

11

12

13

14

15

Plaintiff's citation to *Leyva v. Medline Industries Inc.*, 716 F.3d 510 (9th Cir. 2013), does not change the analysis.  While the Ninth Circuit reversed the district court's denial of certification for lack of predominance and superiority, neither the court's reasoning nor its description of the district court's holding addressed whether willfulness inquiries can be sufficiently individualized to defeat certification (on any ground).  *Id.* at 513-16.  Rather, it held that the district court "applied the wrong legal standard" by focusing on the alleged difficulty of calculating damages.  *Id.* at 513, 515.  Here, however, the question of willfulness goes to liability, not damages, and *Leyva* does not ameliorate the fatal commonality problems discussed *supra*.

16

### 2.   Typicality and Adequacy Fail Along with Commonality.

17

18

19

20

21

22

23

24

25

Plaintiff fails to prove typicality and adequacy for reasons discussed.  *See supra* § V.C; *Dukes*, 564 U.S. at 349 n.5; *Feske*, 2013 WL 1120816 at *12 & 12 n.89 (citing *Valentino*, 97 F.3d at 1234); *Hanon*, 976 F.2d at 508.  This is particularly true given his lack of proof of any late payment "injury."  Plaintiff also fails to prove typicality and adequacy given that he opted out of his DRA.  *See supra* at § V.C.  While the ambiguity in the class definition prevents any specific analysis, the fact that nearly 70% of employees terminated for cause have binding DRAs is strong proof that a substantial majority of the putative late payment class will be similarly bound.  *See id.*; *Valencia*, 2021 WL 5154161, at *3-4 (denying certification where "a majority" class members signed arbitration agreement, but not plaintiff).

26

### D.   Proof Failures and Individual Issues Defeat Predominance and Superiority.

27

28

Courts recognize that the individualized inquiries into "willfulness" and "good faith" under Labor Code Section 203 defeat predominance and superiority.  In *Vaquero v. Ashley Furniture*

*Industries, Inc.*, the court found both requirements unmet for a "Waiting Time Subclass." 2013 WL 12172124 at *8-9 (C.D. Cal. June 17, 2013). It held that the issue of willfulness and good faith defenses "goes to Defendants' *liability* under the California Civil Code, and not just to a particular Sales Associate's total amount of damages. Thus, Defendants have shown that individual issues as to liability under Cal. Civil Code section 203 will predominate over common ones." *Id.* (emphasis in original); *Delgado*, 2018 WL 6706041, at *7 (finding predominance lacking where "evaluating whether Defendant 'willfully' paid final wages late under California Labor Code § 203 also would require individualized inquiries into the circumstances of each employee's final wage payments."); *Pace v. PetSmart Inc.,* 2014 WL 2511297 at *10-11 (C.D. Cal. June 3, 2014) (finding predominance lacking as to subclass claiming late commission payments where, as with Plaintiff, the plaintiff made broad unsupported claims of "policies and practices" of late payments without evidence).

### E.   Plaintiff Fails to Prove Numerosity Given His Lack of Demonstrable Harms.

Plaintiff fails to prove numerosity given his lack of proof that he or the class received any late payments, and the fact that a significant portion of the putative class is bound by DRAs and thus excluded: "Mere speculation as to satisfaction of th[e] numerosity requirement does not satisfy Rule 23(a)(1)." *Schwartz v. Upper Deck Co.*, 183 F.R.D. 672, 681 (S.D. Cal. 1999); *Anderson v. Central Refrig. Serv., LLC*, 2017 WL 11635450 at *3 (C.D. Cal. July 6, 2017) ("[c]onclusory and unsupported allegations are insufficient to establish numerosity"); *see supra* §§ III.C & V.D.

## VII.   PLAINTIFF CANNOT EXCUSE HIS LACK OF DILIGENCE IN DISCOVERY.

In sum, Plaintiff's Motion fails based on evidence that he himself submitted and/or that is equally available to him. The Parties specifically agreed to permit the use of discovery jointly across the dozen lawsuits and thousands of pending arbitrations between Defendant and employees represented by Plaintiff's counsel. Berry Decl., ¶ 2. To date, Defendant has produced more than 12,000 documents, and Plaintiff's counsel has taken *more than 10 depositions and obtained witness testimony in four arbitration hearings*. *Id.* Plaintiff served interrogatories ("ROGs") and document requests ("RFPs") in this case, to which Defendant provided substantive responses, produced documents, and made good faith objections on January 17, 2024 – nearly six full months before he filed his Motion. *See* Mot. Ex. 15; Berry Decl., ¶ 26, Ex. 23. Plaintiff filed a discovery letter brief

on April 12, 2024; Defendant responded on May 6, 2024; and the Court ordered the parties to confer in person on August 13, 2024.  ECF Nos. 52, 58, 71.

As detailed in Defendant's response (ECF No. 58), none of Plaintiff's requested discovery would cure the fundamental problem with his Motion – the need to individually analyze the reasons for each employee's termination.  *See Mantolete v. Bolger*, 767 F.2d 1416, 1424 (9th Cir. 1985), as amended (Aug. 27, 1985) (to determine whether class-wide discovery is appropriate, "the plaintiff bears the burden of advancing a prima facie showing that the class action requirements of Fed.R.Civ.P. 23 are satisfied or that discovery is likely to produce substantiation of the class allegations.").  As to his late payment claim, Plaintiff knows what *he himself* was paid and reimbursed, and X has produced the information he requested regarding his final pay and expense reimbursement requests.  Berry Decl. ¶ 26, Ex. 23 at 5 (Def.'s Resp. to RFP No. 2); *id.* at 15 (Def.'s Resp. to RFP No. 14).[15]  He cannot deflect from his Motion's multiple failures to satisfy Rule 23.

## VIII.   CONCLUSION

The Court should deny Plaintiff's Motion in its entirety.[16]

Dated: July 29, 2024

MORGAN, LEWIS & BOCKIUS LLP

By:   */s/ Brian D. Berry*
Eric Meckley
Brian D. Berry
Ashlee Cherry
Kassia Stephenson

Attorneys for Defendant
X CORP. f/k/a TWITTER, INC.

---

[15] Plaintiff made no discovery request for "benefits" paid to employees nationwide.  *See generally* Mot. Ex. 15 (Plaintiff's Interrogatories; no request for "benefits" payments); Berry Decl. ¶ 26, Ex. 23 (Plaintiff's RFPs; same); Mot. Ex. 15 at 13 (Pl.'s ROG No. 8, seeking "reimbursement requests" only for California employees); Berry Decl. ¶ 26, Ex. 23 at 5 (RFP No. 2; same).

[16] Plaintiff may not introduce new argument or evidence in his Reply brief to try to satisfy his Rule 23 burden.  *See, e.g.*, *Wilson v. Pactiv LLC,* 2021 WL 5818492, at *7 (C.D. Cal. Dec. 3, 2021) (holding that individualized issues predominate and explaining that "the Court will not consider [plaintiff's] new argument" raised "[f]or the first time in reply"); *Stiner v. Brookdale Senior Living, Inc.*, 665 F. Supp. 3d 1150, 1179 (N.D. Cal. 2023) ("New evidence submitted as part of a reply is improper.") (citing *Townsend v. Monster Beverage Corp*., 303 F. Supp. 3d 1010, 1027 (C.D. Cal. 2018) ("The new evidence presented in the Reply must be stricken.")).