MORGAN, LEWIS & BOCKIUS LLP
Eric Meckley, Bar No. 168181
eric.meckley@morganlewis.com
Brian D. Berry, Bar No. 229893
brian.berry@morganlewis.com
One Market, Spear Street Tower
San Francisco, CA  94105-1596
Tel:    +1.415.442.1000
Fax:    +1.415.442.1001

MORGAN, LEWIS & BOCKIUS LLP
Ashlee N. Cherry, Bar No. 312731
ashlee.cherry@morganlewis.com
1400 Page Mill Road
Palo Alto, CA  94304
Tel:    +1.650.843.4000
Fax:    +1.650.843.4001

Attorneys for Defendant
X CORP. f/k/a TWITTER, INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| EITAN ADLER, | Case No. 3:23-cv-01788-JD |
| Plaintiff, | **DECLARATION OF ERIC MECKLEY IN SUPPORT OF DEFENDANT X CORP.'S MOTION FOR SUMMARY JUDGMENT** |
| vs. | |
| TWITTER, INC. and X CORP., | Date:     August 21, 2025 |
| Defendants. | Time:     10:00 a.m. |
| | Judge:    Hon. James Donato |

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

### DECLARATION OF ERIC MECKLEY

I, Eric Meckley, declare as follows:

1.      I am an attorney duly licensed to practice law in the state of California.  I am an attorney with the law firm of Morgan, Lewis & Bockius LLP, and am counsel for Defendant X. Corp. formerly known as Twitter, Inc. ("Defendant" or "X") in the above-captioned matter.  I submit this Declaration in support of Defendant's Motion for Summary Judgment.  I have personal knowledge of the facts stated in this Declaration and could testify competently to them if asked to do so.

2.      On August 25, 2023, I took the deposition of Plaintiff Eitan Adler before a certified court reporter.  My law firm subsequently received from the court reporter a copy of Plaintiff's deposition transcript.  Attached as **Exhibit 1** are excerpts of this deposition transcript cited in Defendant's Motion.  During Plaintiff's deposition he reviewed and authenticated multiple documents that were marked as exhibits to his deposition.  Also attached hereto within **Exhibit 1** (following the excerpts from the transcript) are the following documents that Plaintiff authenticated during his deposition (with description and deposition exhibit number):

      a.      Plaintiff's resume, marked as Deposition Exhibit 1;

      b.      Plaintiff's offer letter with Defendant, marked as Deposition Exhibit 2;

      c.      Twitter's Playbook, marked as Deposition Exhibit 4;

      d.      Twitter's Code of Business Conduct and Ethics, marked as Deposition Exhibit 6;

      e.      Email correspondence dated November 4, 2022, marked as Deposition Exhibit 8;

      f.      Slack thread in the "social-watercooler" channel dated November 14, 2022, marked as Deposition Exhibit 11;

      g.      Tweet from Elon Musk dated November 13, 2022, marked as Deposition Exhibit 12;

      h.      Email correspondence dated November 15, 2022, marked as

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

-1-

DECLARATION OF ERIC MECKLEY
Case No. 3:23-cv-01788-JD

1    Deposition Exhibit 17;

2        i.    Email correspondence dated December 2, 2022, marked as

3        Deposition Exhibit 21.

4    3.    On January 31, 2024, Plaintiff's counsel deposed James Musk before a certified

5    court reporter.  My law firm subsequently received from the court reporter a copy of James Musk's

6    deposition transcript.  Attached as **Exhibit 2** are excerpts of this deposition transcript cited in

7    Defendant's Motion.

8    4.    On February 2, 2024, Plaintiff's counsel deposed Andrew Musk before a certified

9    court reporter.  My law firm subsequently received from the court reporter a copy of Andrew

10   Musk's deposition transcript.  Attached as **Exhibit 3** are excerpts of this deposition transcript cited

11   in Defendant's Motion.

12   5.    On March 26, 2024, Plaintiff's counsel deposed Ross Nordeen before a certified

13   court reporter.  My law firm subsequently received from the court reporter a copy of Mr. Nordeen's

14   deposition transcript.  Attached as **Exhibit 4** are excerpts of this deposition transcript cited in

15   Defendant's Motion.

16   6.    On May 9, 2024, Plaintiff's counsel deposed Elon Musk before a certified court

17   reporter.  My law firm subsequently received from the court reporter a copy of Elon Musk's

18   deposition transcript.  Attached as **Exhibit 5** are excerpts of this deposition transcript cited in

19   Defendant's Motion.

20   7.    On May 22, 2024, Plaintiff's counsel deposed Christopher Stanley before a certified

21   court reporter.  My law firm subsequently received from the court reporter a copy of Mr. Stanley's

22   deposition transcript.  Attached as **Exhibit 6** are excerpts of this deposition transcript cited in

23   Defendant's Motion.  During Mr. Stanley's deposition, he reviewed and authenticated multiple

24   documents that were marked as exhibits to his deposition.  Also attached hereto within **Exhibit 6**

25   and following the transcript excerpts are the following documents that Mr. Stanley authenticated

26   during his deposition (with description and deposition exhibit number):

27        a.    Text message dated November 10, 2022, marked as Deposition

28        Exhibit 3.

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

-2-

DECLARATION OF ERIC MECKLEY
Case No. 3:23-cv-01788-JD

1    8.    On May 8, 2025, the Court held a hearing regarding Plaintiffs' Motion for Leave to

2  File a Second Amended Complaint.  Attached as **<u>Exhibit 7</u>** is a true and correct copy of the relevant

3  excerpts from the transcript from that hearing.

4    I declare under penalty of perjury under the laws of the State of California and the United

5  States of America that the foregoing is true and correct.  Executed on July 17, 2025, at San

6  Francisco, California.

7

8                                        _/s/ Eric Meckley_____
                                           Eric Meckley

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

-3-                                   DECLARATION OF ERIC MECKLEY
                                        Case No. 3:23-cv-01788-JD

# EXHIBIT 1

**CERTIFIED COPY**

1              UNITED STATES DISTRICT COURT

2              NORTHERN DISTRICT OF CALIFORNIA

3                 SAN FRANCISCO DIVISION

4                      ---oOo---

5

6    EITAN ADLER, on behalf of      )
     himself and all others        )
7    similarly situated,           )
                                   )
8                    Plaintiff,     )    Case No.
                                   )    3:23-CV-01788
9         vs.                       )    -JD
                                   )
10   TWITTER, INC., and X CORP.,    )
                                   )
11                   Defendants.    )
                                   )

12

13

14

15          DEPOSITION OF EITAN ADLER

16              APRIL 25, 2024

17

18

19

20

21

22

23

24   BALINDA DUNLAP, CSR 10710, RPR, CRR, RMR
     1127753

25

SINCE 1972

BARKLEY
Court Reporters
barkley.com

(310) 207-8000 Los Angeles      (415) 433-5777 San Francisco    (949) 955-0400 Irvine           (858) 455-5444 San Diego
(310) 207-8000 Century City     (408) 885-0550 San Jose         (760) 322-2240 Palm Springs     (800) 222-1231 Carlsbad
(916) 922-5777 Sacramento       (800) 222-1231 Martinez         (702) 366-0500 Las Vegas        (800) 222-1231 Monterey
(951) 686-0606 Riverside        (818) 702-0202 Woodland Hills   (702) 366-0500 Henderson        (516) 277-9494 Garden City
(212) 808-8500 New York City    (347) 821-4611 Brooklyn         (518) 490-1910 Albany           (914) 510-9110 White Plains
(312) 379-5566 Chicago          00+1+800 222 1231 Paris         00+1+800 222 1231 Dubai         001+1+800 222 1231 Hong Kong

```
1                 A P P E A R A N C E S

2                      ---oOo---

3    FOR THE PLAINTIFF:

4            LICHTEN & LISS-RIORDAN, P.C.
             729 Boylston Street, Suite 2000
5            Boston, Massechusettes  02116
             BY: SHANNON LISS-RIORDAN, ESQ.
6            (617) 994-5800
             sliss@llrlaw.com
7

8    FOR THE DEFENDANTS:

9            MORGAN, LEWIS & BOCKIUS LLP
             One Market, Spear Street Tower, 28th Floor
10           San Francisco, California  94105-1596
             BY: ERIC MECKLEY, ESQ.
11           (415) 442-1013
             eric.meckley@morganlewis.com
12

13   ALSO PRESENT:

14           Frank Quirarte, Videographer
             Vicki Parker, Quinn Emmanuel (Zoom)
15

16

17

18

19

20

21

22

23

24

25
```

2

INDEX OF EXAMINATION
---oOo---

EITAN ADLER                                             PAGE

BY MR. MECKLEY                                            8

INDEX OF EXHIBITS
---oOo---

NUMBER    DESCRIPTION                                   PAGE

1         LinkedIn Resume of Eitan Adler                 11
          (14 pages)

2         Employment Letter to Eitan Adler               29
          Dated May 27, 2015, Bates Nos.
          E_ADLER_000000075-79 (5 pages)

3         Promotion Letter for Eitan Adler               40
          Dated September 12, 2018, Bates
          Nos. E_ADLER_000000073-74 (2 pages)

4         Twitter Playbook, Bates Nos.                   62
          TWITTER_ARB_000002184-43 (40 pages)

5         Typed Notes by Eitan Adler                     67
          (Pages)

6         Code of Business Conduct &                     73
          Ethics, Bates Nos. TWITTER_ARB_
          000002173-81 (9 pages)

7         Slack Messages, Bates Nos.                     74
          X_CORP_ADLR_000000056 (1 page)

8         Email from Twitter HR to Twitter               77
          HR Dated November 4, 2022, Bates
          No. X_CORP_ADLR_000002111
          (1 page)

EITAN ADLER

```
INDEX OF EXHIBITS
---o0o---
```

| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| 9 | Slack Messages, Bates Nos. X_CORP_ADLR_000000118-19 (2 pages) | 93 |
| 10 | Slack Messages, Bates Nos. X_CORP_ADLR_000000067 (1 page) | 95 |
| 11 | Slack Messages, Bates Nos. SLK_SW_000006680 (1 page) | 102 |
| 12 | Tweet (1 page) | 103 |
| 13 | Slack Messages, Bates Nos. X_CORP_ADLR_000001816-17, 1820 (3 pages) | 113 |
| 14 | Memo to All Full Time Employees, Bates Nos. LLR_TWITTER_ADLER000291 (1 page) | 119 |
| 15 | Slack Messages, Bates Nos. X_CORP_ADLR_000000086-89 (4 pages) | 120 |
| 16 | Email from Elon Musk To Team Dated November 10, 2022, Bates Nos. LLR_TWITTER_ADLER000290 (1 page) | 126 |
| 17 | Email from Twitter HR Dated November 15, 2022, Bates Nos. LLR_TWITTER_ADLER000193 (1 page) | 129 |
| 18 | Social-Watercooler Text Messages Bates Nos. LLR_TWITTER_ADLER 000545-79 (35 pages) | 141 |
| 19 | Various Messages, Bates Nos. LLR_TWITTER_ADLER000351-79 (29 pages) | 148 |

4

EITAN ADLER

```
                       INDEX OF EXHIBITS
                         ---oOo---
```

| NUMBER | DESCRIPTION | PAGE |
|--------|-------------|------|
| 20 | Email from Behnam Rezaei to Eitan Adler Dated November 22, 2022, Bates No. LLR_TWITTER_ADLER 000130 (1 page) | 155 |
| 21 | Email from People Questions to Eitan Adler Dated December 2, 2022, Bates Nos. LLR_TWITTER_ADLER 000191-92 (2 pages) | 161 |
| 22 | Plaintiff's Supplemental Objections and Answers to Defendants' Interrogatories, Set One (7 pages) | 166 |
| 23 | Instant Messages (6 pages) | 167 |
| 24 | Plaintiff's Supplemental Objections and Responses to Requests for Production of Documents to Plaintiff Eitan Adler, Set One (12 pages) | 169 |
| 25 | Twitter Global Travel, Expense And Corporate Card (TEC) Policy, Bates Nos. X_CORP_ADLR_ 000002022-43 (22 pages) | 176 |
| 26 | Expense Report Status Change Dated October 12, 2022, Bates Nos. X_CORP_ADLR_000000007, 17 (2 pages) | 180 |
| 27 | Expense Report Sent Back to Employee Adler, Eitan, Bates Nos. X_CORP_ADLR_000000003 (1 page) | 181 |
| 28 | Deposit Statement, Bates Nos. LLR_TWITTER_ADLER000129 (1 page) | 183 |

EITAN ADLER

1                           INDEX OF EXHIBITS
                                ---oOo---
2
     NUMBER     DESCRIPTION                              PAGE
3
     29         Expense Spreadsheet, Bates Nos.           188
4               LLR_TWITTER_ADLER000580 (1 page)

5    30         Slack Messages, Bates Nos.                200
                X_CORP_ADLR_000000068-75 (8 pages)
6
     31         Slack Messages, Bates Nos.                212
7               X_CORP_ADLR_000000061-66 (6 pages)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                                   6

                             EITAN ADLER

1        SAN FRANCISCO, CALIFORNIA, APRIL 25, 2024

2                    ---o0o---

3            BE IT REMEMBERED that on Thursday, the

4    25th day of April 2024, commencing at the hour of

5    9:07 a.m. thereof, at One Market Street, Spear

6    Street Tower, 28th Floor, San Francisco,

7    California, before me, Balinda Dunlap, a Certified

8    Shorthand Reporter in and for the County of San

9    Francisco, State of California, appeared:

09:08 10            THE VIDEOGRAPHER:  Okay.  Good morning,

11    ladies and gentlemen.  This is the beginning of

12    media labeled No. 1 in the deposition of Eitan

13    Adler in the matter of Eitan Adler, et al., versus

14    Twitter, Inc. and X Corp.  It is being held in the

09:08 15    United States District Court for the Northern

16    District of California, San Francisco Division.

17            Today's date is April 25th, 2024.  The

18    time is approximately 9:07 a.m.  This deposition is

19    taking place at One Market Plaza, Spear Street

09:08 20    Tower in San Francisco, California.

21            My name is Frank Quirarte.  I am your

22    legal videographer today.  I am here from Magna

23    Legal Services.  And our court reporter is Balinda

24    Dunlap, also in association with Magna Legal

09:08 25    Services.

7

1    At this time will counsel and all present
2    please identify yourselves for the record.
3        MS. LISS-RIORDAN:  I'm Shannon
4    Liss-Riordan for the plaintiff.
09:08 5        MR. MECKLEY:  Eric Meckley for defendant.
6        MS. HANSBURY:  Mary Hansbury for X Corp.
7            (Discussion off the record.)
8        MR. MECKLEY:  Oh, and Vicki Parker from
9    Quinn Emanuel is on the Zoom, and we might have
09:09 10    another person, Adam Mehes, join the Zoom as well
11    at some point today.
12        THE VIDEOGRAPHER:  Madam Court Reporter,
13    please swear in the witness.
14                EITAN ADLER
15        called as a witness by the Defense, having
16    been sworn to tell the truth, the whole truth, and
17    nothing but the truth, was examined and testified
18    as follows:
19            EXAMINATION BY MR. MECKLEY
09:09 20    Q.    All right.  Mr. Adler, my name's Eric
21    Meckley.  I represent X Corp, and today is your
22    deposition in the lawsuit in which you're a named
23    plaintiff.
24        Have you ever given testimony before under
09:09 25    oath?

8

EITAN ADLER

1    Q.   Would you agree that particular employees

2  with access to systems be prevented from taking any

3  type of intentional steps to jeopardize the

4  operation of the systems?

09:39  5    A.   Generally speaking, yes.

6    Q.   Would you agree it's reasonable for a tech

7  company to implement measures to limit employees'

8  ability to intentionally harm the functioning of

9  the site or network?

09:40  10    A.   Depending on the measures, generally

11  speaking, yes.

12    MR. MECKLEY:  We are going to look at

13  another document.  This will be Exhibit 2.

14      (Reporter marked Exhibit No. 2 for

09:40  15      identification.)

16    Q.   BY MR. MECKLEY:  So Mr. Adler, Exhibit 2

17  is Bates stamped 75 through 79.  It appears to be

18  an offer letter to you dated May 27, 2015.  Do you

19  recognize Exhibit 2 as your offer letter from

09:41  20  Twitter?

21    A.   Yes.

22    Q.   And on the last page of this you will see

23  there's a signature there.  Did you sign this on

24  May 30, 2015?

09:41  25    A.   Yes.

EITAN ADLER

1     Q.    Is it still operational?

2     A.    Presumably.

3     Q.    Okay.  All right.  So if you could take a

4     look at the page that's stamped 77, there's a

09:42  5     heading entitled "Employment Relationship."

6     A.    Uh-huh.

7     Q.    And the second sentence of that says,

8     "Your employment with the Company will be 'at

9     will,' meaning that either you or the Company may

09:42 10     terminate your employment at any time and for any

11     reason, with or without cause."  Do you see that?

12     A.    I see that.

13     Q.    And did you understand that this provision

14     meant Twitter could fire you at any time?

09:43 15     A.    I defer to my lawyers on that.

16     Q.    I am just asking for your understanding of

17     what this meant to you.

18     A.    It meant that Twitter had to follow the

19     law, but there was no additional requirements on

09:43 20     top of what the law guaranteed.

21     Q.    Right.  So my question was did you

22     understand that this meant Twitter could terminate

23     your employment at any time?

24     A.    Like I said, it is my understanding that

09:44 25     Twitter had to follow the law, but I did not have

31

EITAN ADLER

1    any additional guarantees on top of that.

2        Q.    And the latter part of this sentence that

3    is in your employment agreement says that Twitter

4    could terminate you with or without cause.  Do you

09:44  5    see that?

6        A.    I see that.

7        Q.    And, again, subject to your understanding

8    that Twitter needed to comply with the law, the

9    company could fire you if it had cause or if it

09:44  10    didn't have cause; is that your understanding?

11        A.    Generally speaking, but I defer to my

12    lawyers for the details.

13        Q.    Right.  Again, I am just asking for your

14    understanding.  So your understanding is that the

09:44  15    company, as long as they were following the law,

16    they could terminate you with or without cause; is

17    that right?

18        A.    I am not a lawyer, and I defer to my

19    lawyer for the interpretation of the contract.

09:44  20        Q.    And I am not asking for a legal.  I am

21    just asking about your understanding, for your

22    understanding.

23        A.    Generally speaking, so long as Twitter

24    followed the law, including notice for layoffs and

09:45  25    other such things, that is my understanding.

32

1    Q.    Again, I am not asking about the bonus

2    plan.  I am just asking --

3    A.    Generally speaking, the word

4    "discretionary" means there's some optionality

10:10  5    somewhere.

6    Q.    And your testimony is you don't recall at

7    any point asking anyone at Twitter any questions

8    about the discretionary bonus plan?

9    A.    I don't specifically recall asking that

10:11  10    question.  I am not testifying I didn't ask.

11    Q.    Well, do you have a general memory of

12    asking someone at Twitter about how the performance

13    bonus plan works?

14    A.    It is possible or even probable that I

10:11  15    talked to my managers about it at some point or I

16    talked to peers or even HR.  I cannot tell you

17    when.

18    Q.    And do you remember the substance of any

19    of those communications?

10:11  20    A.    No.

21    Q.    And do you remember when you were employed

22    at Twitter after you got the September 2018 offer

23    letter whether you ever got a performance bonus?

24    A.    I believe I got the bonus every year.

10:12  25    Q.    So you were promoted to senior software

45

1    engineer in 2018.  That's what we looked at.  Then

2    you were promoted again to staff software engineer

3    in approximately July of 2020; is that right?

4         A.   Yes.

10:12    5         Q.   Okay.  Can you look back again at Exhibit

6    1?

7         A.   Yes.

8         Q.   And you list job responsibilities there.

9    In the fourth bullet down it says, "Fixed multiple

10:12    10   business critical cross-microservice issues

11   including operational, privacy, and product

12   issues."  Do you see that?

13        A.   Yes.

14        Q.   What's that phrase mean, "business

10:12    15   critical"?

16        A.   It had a substantial impact to the

17   business in terms of fixing them.

18        Q.   Does "business critical" mean that it is

19   necessary for the business to operate?

10:13    20        A.   No.

21        Q.   So how do you distinguish "business

22   critical" from "business necessary"?

23        A.   I remind you this is a sales document,

24   while accurate for sales, the distinction -- or the

10:13    25   intent of business critical was -- the distinction

46

1    is not formal.  There's no...

2         Q.   There's no what?

3         A.   There's no formal distinction between the

4    two.

10:13  5         Q.   I see.  Okay.  And you were a lead on the

6    ads core platform; is that right?

7         A.   Yes.

8         Q.   Was that a business critical part of the

9    business operations?

10:13 10         A.   Generally, yes.

11         Q.   Okay.  Why?

12         A.   Twitter made most of its money via ads.

13         Q.   Then according to your LinkedIn profile,

14    you were promoted again to senior staff software

10:14 15    engineer.  Do you see that?

16         A.   Yes.

17         Q.   And that says, "Time in position November

18    2022 to November 2022, right?

19         A.   That's what it says.

10:14 20         Q.   All right.  Is that true?

21         A.   Roughly speaking for purposes of

22    interviewing and LinkedIn, yes.

23         Q.   When you say "for purposes of interviewing

24    and LinkedIn," what do you mean?

10:15 25         A.   The process was underway.  Feedback was

47

         1    A.    You can -- yes.

         2    Q.    Well, then, tell me a couple that you

         3  remember.

         4    A.    You can configure it to restrict someone's

10:34    5  access so they can only run specific commands.

         6    Q.    Does sudo access allow you to function as

         7  a system administrator?

         8    A.    Depends on how it's configured.

         9    Q.    But that's one way it could work?

10:34   10    A.    Yes.

        11    Q.    And does sudo access allow you to

        12  basically run commands within a system?

        13    A.    Yes.

        14    Q.    In your role as a lead for the ads core

10:35   15  platform, was the ads core platform part of the

        16  infrastructure of the Twitter site?

        17    A.    Define "infrastructure."  Define "Twitter

        18  site."

        19    Q.    The website that you go to and make

10:35   20  Tweets.

        21    A.    Define "infrastructure."

        22    Q.    Well, as a computer engineer, do you have

        23  a definition of "infrastructure"?

        24    A.    Yes.

10:35   25    Q.    Okay.  What's your definition?

                            60

1    A.    Providing capabilities to the various

2  services that run the site.

3    Q.    Okay.   Was the ads core platform part of

4  the Twitter site infrastructure, based on your

10:35  5  definition?

6    A.    No.

7    Q.    What were the parts of the infrastructure

8  of the Twitter site?

9    A.    I can't speak to all of them.

10:36  10    Q.    Can you tell me what you recall about

11  them?

12    A.    The databases, the numbering layer, the

13  computing layer of the systems.

14    Q.    And did you have access to any of those

10:36  15  things, the networking layer, the datacenter or the

16  numbering layer, or the computing layer, sorry?

17    A.    I had access to what was necessary to do

18  my job.

19    Q.    So I need to go back to my question.   So

10:36  20  when you worked there, did you have access to the

21  computing layer, the databases or the numbering

22  layers?

23    A.    Some of them.

24    Q.    Which ones did you have access to?

10:36  25    A.    I couldn't remember.

61

EITAN ADLER

1     Q.   So given your definition of

2   "infrastructure," it sounds like when you worked at

3   Twitter, you had access to certain parts of the

4   infrastructure?

10:36  5     A.   Yes.

6          MR. MECKLEY:   We are going to look at

7   Exhibit 4.

8          (Reporter marked Exhibit No. 4 for

9           identification.)

10:37  10    Q.   BY MR. MECKLEY:   While you are looking at

11   that, Mr. Adler, I'll describe it.   So Exhibit 4 is

12   a multipage document that's stamped 2184 through

13   2243.   And the fourth page in you'll see it is

14   entitled "Playbook," or "The Playbook"?

10:38  15    A.   Can you give me the page number, please?

16    Q.   Yeah, it's 2187.

17    A.   I see the page.

18    Q.   Do you see where it says "Playbook"?

19    A.   Yes.

10:38  20    Q.   All right.   Was it your understanding that

21   the playbook was Twitter's employee handbook?

22    A.   Generally, yes.

23    Q.   Okay.   Was it your understanding that as

24   an employee of Twitter, you were required to comply

10:38  25   with the policies in the playbook?

62

1      A.    Generally, yes.

2      Q.    Did you ever read the playbook while you

3  were employed at the company?

4      A.    Yeah.

10:38  5      Q.    Okay.  Any particular portions you

6  remember reading?

7      A.    Not specifically.

8      Q.    Do you recall why you read the playbook at

9  any point in time?

10:39  10      A.    I believe I was required to when I first

11  joined the company.

12      Q.    Okay.  Did you ever ask anyone in human

13  resources any questions about any of the policies

14  in the playbook?

10:39  15      A.    Yes.

16      Q.    All right.  Who did you ask and what

17  policy were you asking about?

18      A.    I don't recall who I asked specifically.

19  I asked about multiple parts of the policy over the

10:39  20  time -- I asked about multiple parts of the policy

21  over -- at my -- during my time at Twitter.

22      Q.    Okay.  So multiple different policies?

23      A.    Yes.

24      Q.    Okay.  Can you tell me which policies you

10:39  25  remember asking HR questions about?

63

EITAN ADLER

1      A.    I turned over all my notes to my

2  attorneys.

3      Q.    I'm just asking you regardless whether you

4  turned them over or not, are there more notes of

10:49  5  what you did at Twitter that cover the time frame

6  of 2015 through early 2021?

7      A.    Yes.

8      Q.    Okay.  Effectively what you are saying is

9  you created these contemporaneously with the dates?

10:50  10      A.    Approximately.

11      Q.    Okay.  All right.  Is it your

12  understanding that Twitter's code is the

13  confidential information of Twitter?

14      A.    Generally, yes.

10:50  15      Q.    So Twitter's code is its property?

16      A.    Generally, yes.  I don't know the legal --

17  the legal terminology or anything.

18      Q.    Right.  Would you also read that the

19  infrastructure of Twitter's network and site is its

10:50  20  property as well?

21      A.    I don't know the legal terminology, but it

22  is Twitter's.

23      Q.    It owns it?

24      A.    Yes, theoretically speaking.

10:50  25      Q.    Okay.  Let's take a look.  You have

70

EITAN ADLER

1    Exhibit 4 again before you.  If you could take a

2    look at the page that's stamped 2199, the fourth

3    paragraph from the top it states "In addition,

4    while some of us have access to user or employee

10:51  5    information in the course or scope of our roles, it

6    is never appropriate to abuse that access for

7    reasons unrelated to a legitimate business

8    purpose."  Do you see that?

9         A.   Yes, I see that.

10:51 10         Q.   All right.  Would you agree that that was

11    Twitter's policy?

12         A.   Yes.

13         Q.   Did anyone ever tell you that that was not

14    the policy of the company?

10:52 15         A.   No.

16         Q.   Could you now take a look at Page 2214 of

17    Exhibit 4 and the last sentence before the bullet

18    points at the bottom it says, "Examples of conduct

19    that may violate this and other Twitter policies

10:52 20    include."  Do you see that?

21         A.   Yes.

22         Q.   And then at the top of the very next page

23    the bullet point says, "The intentional destruction

24    or threat of destruction of Twitter or another's

10:52 25    property."  Do you see that?

1      A.    Yes.

2      Q.    Okay.  Would you agree that that's

3  Twitter's policy?

4      A.    Generally, yes.

10:52  5      Q.    Did anyone tell you that it wasn't

6  Twitter's policy?

7      A.    No.

8      Q.    Would you agree that threatening the

9  destruction of Twitter's infrastructure would

10:53  10  violate this policy?

11      A.    Generally, yes.

12      Q.    Would you agree that under the policy in

13  the playbook Twitter had the right to determine

14  whether and to what extent threats to destroy

10:53  15  Twitter's property would violate the policy?

16      A.    I am not a lawyer, so I don't know.

17      Q.    Okay.  Then let's look further down on

18  Page 2215.  Do you see the paragraph that says,

19  "Violations of this policy by an employee will

10:53  20  result in discipline, and could result in immediate

21  termination of employment"?

22      A.    I see that text.

23      Q.    And do you see the next sentence that

24  says, "Twitter will make the sole determination of

10:53  25  whether, and to what extent, threats or acts

72

1    violate this policy based on a reasonable

2    case-by-case analysis and determination"?   Do you

3    see that?

4        A.   I see that text.

10:53   5        Q.   Would you agree that it was Twitter's

6    policy that it would make the sole determination of

7    whether or not a threat of destruction of its

8    property violated a policy?

9        A.   Based on a reasonable case-by-case

10:54  10   analysis, yes.

11            Can I use the bathroom again, please?

12            MR. MECKLEY:   Yes.   Let's take a break.

13            THE VIDEOGRAPHER:   We are off the record.

14   The time is 10:53 a.m.

10:54  15            (Reporter marked Exhibit No. 6 for

16             identification.)

17            (Whereupon a recess was taken.)

18            THE VIDEOGRAPHER:   All right.   We are back

19   on the record.   The time is 11:05 a.m.

11:06  20        Q.   BY MR. MECKLEY:   All right.   Mr. Adler, I

21   am showing you Exhibit 6.   It is a document stamped

22   2173 through 2181.   It is entitled "Code of

23   Business Conduct & Ethics."   Was it your

24   understanding that as an employee of Twitter, you

11:06  25   were subject to the company's code of business

73

EITAN ADLER

1    conduct and ethics?

2        A.    Generally, yes.

3        Q.    Had you read the business code of conduct

4    and ethics?

11:06  5        A.    I believe so.

6        Q.    And was that at the start of your

7    employment or at different points in time?

8        A.    Probably at the start.

9        Q.    Okay.  Did you ever ask anyone at Twitter,

11:06  10   whether in HR or otherwise, any questions about the

11   code of business conduct and ethics?

12       A.    I don't specifically recall doing so.

13             MR. MECKLEY:  Okay.  Exhibit 7.

14             (Reporter marked Exhibit No. 7 for

11:08  15              identification.)

16       Q.    BY MR. MECKLEY:  All right.  Mr. Adler,

17   Exhibit 7 is a one-page document stamped 56.  This

18   appears to be a series of Slack messages between

19   you and another person.  Do you recognize that?

11:08  20       A.    Yes.

21       Q.    Okay.  And that person is Adam Singer.

22   Who is Adam Singer?

23       A.    A peer.

24       Q.    Do you recall whether that person worked

11:08  25   in a particular department or organization?

74

EITAN ADLER

1     A.    I was worried about being laid off.

2     Q.    Were you worried about being fired as

3  opposed to laid off?

4     A.    No.

11:10  5     Q.    So you just used "fired" as a joke?

6     A.    I used the word "fired" generically, yes,

7  and as a joke.

8     Q.    I know we talked before about sudo access.

9  Did you have sudo access at Twitter?

11:10  10     A.    Too generic of a question.

11     Q.    And why is it too generic?

12     A.    There are many types of access -- many

13  types of sudo access you could have.  I have some.

14     Q.    What are the types of sudo access that you

11:11  15  had at Twitter?

16     A.    I don't know if I could remember anymore.

17  I don't specifically recall what I had.

18     Q.    Can you enumerate any of the types of sudo

19  access you had at Twitter?

11:11  20     A.    I had access to operate the ad services,

21  or to manipulate the ad services.  I had access to

22  manipulate some of the other services that were

23  required to operate the ad services.

24     Q.    And did you have sudo access to any other

11:11  25  types of Twitter access or functionality?

76

1    A.    I don't specifically recall everything I
2  had access to.
3    Q.    So there may have been more, you just
4  don't remember?
11:11  5    A.    Correct.
6    Q.    Was there something at Twitter called
7  active directory?
8    A.    I don't specifically recall.
9    MR. MECKLEY:    Have this marked as Exhibit
11:12  10  8.
11    (Reporter marked Exhibit No. 8 for
12    identification.)
13    Q.    BY MR. MECKLEY:    Exhibit 8 is a one-page
14  document stamped 2111 and appears to be an email
11:13  15  from Twitter HR to Twitter HR and bcc to
16  eax@twitter.com dated November 4, 2022, and
17  entitled "Your Role at Twitter."
18    So Mr. Adler, did you get this email?
19    A.    Yes.
11:13  20    Q.    All right.    And the second sentence in
21  this email says, "We are sending this email to
22  confirm that your employment is not," in bold,
23  "impacted by today's workforce reduction."    Do you
24  see that?
11:13  25    A.    I see that text.

77

1    Q.    So you understood that you were not being
2    laid off on November 4th?
3    A.    As of November 4th.
4    Q.    Right.  That was your understanding when
11:13  5    you got this email?
6    A.    As of November 4th when I got the email.
7    Q.    Did you understand that other Twitter
8    employees were subject to a workforce reduction and
9    laid off on November 4th?
11:14  10    A.    Yes.
11    Q.    And how did you come to that
12    understanding?
13    A.    I got this email, which is presumably why
14    others did not, and I saw peers were deactivated.
11:14  15    Q.    Did you hear from any other people,
16    whether managers or coworkers, that there had been
17    a large reduction in force on November 4th?
18    A.    Yes.
19    Q.    What did you hear?
11:14  20    A.    I don't specifically recall.
21    Q.    What do you recall generally?
22    A.    That there was a large reduction in force
23    and that many people were laid off.
24    Q.    Did you hear how many?
11:14  25    A.    No.

78

1    information on social media?

2        A.    No.

3        Q.    And did you ever discuss confidential

4    company information with the press?

11:39   5        A.    No.

6        Q.    Did you ever speak with the press at all

7    about Twitter?

8        A.    No.

9        Q.    Did you ever speak about Twitter on social

11:39  10    media?

11        A.    Sorry.  Repeat the question.

12        Q.    Did you ever speak about Twitter on social

13    media?

14        A.    I don't recall specifically.

11:39  15        Q.    And by "social media," that could be any

16    form of it, like Twitter, Facebook, Instagram, any

17    of those?

18        A.    I don't specifically recall.  I don't

19    think so.

11:39  20        Q.    I know I have asked you questions about

21    some of these exhibits that said "Slack."  But just

22    so we're clear, what is Slack?

23        A.    A chat program.

24        Q.    Is it an internal message app?

11:39  25        A.    An internal chat program for employees to

97

1    discuss, yes.

2        Q.   And at Twitter were there different Slack

3    channels?

4        A.   Yes.

11:40  5        Q.   And what is a channel on Slack?

6        A.   A way to organize messages pertaining to

7    specific topics.

8        Q.   Do you know how many channels there were

9    on Slack at Twitter?

11:40  10        A.   No.

11        Q.   Was one Slack channel called

12    "social-watercooler?

13        A.   Yes.

14        Q.   And were you -- did you have to be a

11:40  15    member of a channel to post and read on it?

16        A.   Sort of.

17        Q.   What do you mean "sort of"?

18        A.   You had to be a member, but there was --

19    unless private, you could just join.  There was no

11:40  20    restrictions on becoming a member.

21        Q.   So anyone could become a member?

22        A.   Yes.

23        Q.   I see.  And in terms of

24    social-watercooler, was that a channel any Twitter

11:40  25    employees could join?

98

1        A.    Yes.

2        Q.    So if they joined, you could either post

3   something or you could read something?

4        A.    Yes.

11:41  5        Q.    Do you know how many Twitter employees

6   were members of social-watercooler?

7        A.    No.

8        Q.    Do you have any sense?

9        A.    A large number.

11:41  10       Q.    Okay.   And you were a member, right?

11       A.    Yes.

12       Q.    And you could tell that there's a large

13   number because by accessing it, you could see all

14   the people that made posts and whatnot, correct?

11:41  15       A.    Yes.

16       Q.    For any channels on Slack at Twitter that

17   you were a member of, did you have to get approval

18   to post something on there?

19        A.    With one exception, I don't believe so.

11:41  20       Q.    And what's the exception?

21        A.    I don't specifically recall, but it is

22   possible the global announcements channel was

23   restricted.

24        Q.    But for all the other ones, you didn't

11:42  25   have to get approval to post?

99

EITAN ADLER

1    A.    Not to my knowledge.

2    Q.    Okay.  And were you aware of there being

3    any type of written rules regarding, you know, the

4    contents of posts on any Slack channel?

11:42  5    A.    Beyond the general policy?  I don't

6    understand.

7    Q.    Right.  So correct?

8    A.    Yes.

9    Q.    So beyond the general -- and by "the

11:42  10    general policy," you're referring to the playbook?

11    A.    Yes.

12    Q.    So apart from whatever exists in the

13    playbook, were you aware of any sort of rules about

14    the content of posts on any Slack channel?

11:42  15    A.    Yes.

16    Q.    Okay.  Tell me what those were.

17    A.    Social-watercooler had a page that

18    contained joking rules about its -- it jokes about

19    its rules.  I don't recall what it was titled.

11:43  20    Q.    And that page when you say "joking rules,"

21    what do you mean by that?

22    A.    As an example, one of the rules was no

23    more than three laughing faces per day.

24    Q.    I see.

11:43  25    A.    Or more specifically, no more than three

100

EITAN ADLER

1      A.    Channels are easy to create and often

2  created for temporary reasons, so no, I cannot.

3      Q.    So as you sit here today, you can't

4  remember a single Slack channel that you created?

11:44  5      A.    That I personally created, I probably

6  created the ads core platform channel that was used

7  for team communication, but I don't specifically

8  recall if that was me or my manager.  So the

9  answer's no, I cannot.

11:45 10      Q.    Okay.  Mr. Adler, how are you doing for

11  continuing at this point?  Do you need a break, or

12  are you able to continue more?

13      A.    Let's go on.  I'll tell you when I'd like

14  the break.

11:45 15          MR. MECKLEY:  Okay.  Let's have this

16  marked next.

17              (Reporter marked Exhibit No. 11 for

18               identification.)

19      Q.    BY MR. MECKLEY:  Mr. Adler, I am showing

11:46 20  you what we marked as Exhibit 11.  It is stamped

21  6680.  It has a heading at the top titled "Thread

22  in social-watercooler starting at November 14,

23  2022."  Do you see that?

24      A.    I see that.

11:46 25      Q.    Okay.  So this is a series of posts in

102

EITAN ADLER

1    social-watercooler?

2        A.    Yes.

3        Q.    Okay.  And the first one, "eax," that's

4    you, and you put in "time to kill useless

11:46  5    services."

6        A.    That's what it says.

7        Q.    Is that what you wrote?

8        A.    Yes.

9        Q.    And were you writing that in response to

11:46 10    something?

11        A.    Yes.

12        Q.    Do you recall what it was that you were

13    writing that in response to?

14        A.    Yes.

11:47 15        Q.    What was it?

16        A.    Elon made a Tweet about there being too

17    many micro-services at Twitter.  This was false,

18    and this was a joke I made referencing that

19    comment.

11:47 20            MR. MECKLEY:  Let's mark this as Exhibit

21    12.

22            THE WITNESS:  What time is it?

23            MR. MECKLEY:  I think it's 11:47.

24        (Reporter marked Exhibit No. 12 for

11:47 25        identification.)

103

EITAN ADLER

1    Q.    BY MR. MECKLEY:    All right.    Exhibit 12 is

2    a one-page document.    It appears to be a Tweet from

3    Elon Musk from November 13, 2022.    It says, "Btw,

4    I'd like to apologize for Twitter being super slow

11:48    5    in many countries.    App is doing greater than 1000

6    poorly batched RPCs just to render a home

7    timeline."    Do you see this Tweet?

8    A.    Yes.

9    Q.    So your post in social-watercooler "time

11:48    10    to kill useless services," was Exhibit 12 Tweet the

11    one you were responding to?

12    A.    The one I was joking about, yes.

13    Q.    You sure it's this one, not a different

14    Tweet?

11:48    15    A.    If I recall correctly, there were many

16    Tweets that responded to this clarifying,

17    correcting, whatever.    I was responding to the

18    global set of them.    I don't recall -- I don't

19    believe I was responding to a single Tweet.

11:48    20    Q.    So you are --

21    A.    But this is substantively it.

22    Q.    So you're recollecting is Mr. Musk made

23    several Tweets, or more than one at least, about

24    micro-services?

11:48    25    A.    And other people also, yes.

104

1    Q.    Okay.  And you said his Tweets generally

2    were referring to the fact that there were too many

3    micro-services at Twitter; is that right?

4    A.    That's what he claimed, yes.

11:49  5    Q.    And what's a micro-service?

6    A.    A service that provides a subset of the

7    functionality required to render -- or run the site

8    or return a response, generally speaking.

9    Q.    So a micro-service is a service that is

11:49  10   required to run the site or return a response?

11   A.    A subset of the functionality.

12   Q.    Part of the functionality; is that right?

13   A.    Yes.

14   Q.    Okay.  Mr. Musk's Tweets, as you

11:50  15   understood them, were saying that there's too many

16   of those?

17   A.    That -- yes.

18   Q.    And your response was "time to kill

19   useless services"?

11:50  20   A.    That was a joke, yes.

21   Q.    And by "useless services," what did you

22   mean?

23   A.    An evident joke.

24   Q.    A what?

11:50  25   A.    An obvious joke.

105

EITAN ADLER

1    Q.   When you were saying "useless," what were
2    you referring to?
3    A.   None.   I was making a joke.
4    Q.   Oh.   Did you ever think of putting like
11:50   5    "J/K" after this, like "just kidding," anything
6    like that?
7    A.   It was in social-watercooler.   That was
8    merely implied.
9    Q.   So you interpreted it because this was in
11:50   10    social-watercooler, it would be implied that this
11    was a joke; is that right?
12    A.   Amongst other reasons.   It's also obvious
13    it's a joke.
14    Q.   And why do you think it's obvious?
11:51   15    A.   There was no specific service to remove.
16    It was in reference to an obviously false Tweet.
17    It was in social-watercooler.   I often made jokes.
18    And if I recall correctly, there were many jokes
19    being made at the time in social-watercooler around
11:51   20    this -- about the same topic.
21    Q.   And why do you say it was an obviously
22    false Tweet?
23    A.   Because there was only one request to get
24    -- because the 1000 poorly batched RTCs is
11:51   25    obviously false.

EITAN ADLER

1      Q.   And you were explaining why it is
2  obviously false?
3      A.   Because there was only one request, as far
4  as I understood, to get data, and they were not
11:52  5  poorly batched.
6      Q.   So in response to your post, then, there's
7  a response from Jesse Feinman that says, "aurora
8  kill all *, what could go wrong?"   Do you see that?
9      A.   Yes.
11:52  10      Q.   And who was Mr. Feinman?
11      A.   Another engineer.
12      Q.   Up here?
13      A.   Yes.
14      Q.   And what group did Mr. Feinman work in?
11:52  15      A.   I don't specifically recall.
16      Q.   Do you have any understanding of like what
17  organization he was in?
18      A.   I don't specifically recall.   If you told
19  me I might recollect, but I don't specifically
11:52  20  recall.
21      Q.   And that phrase "aurora kill all *," is
22  that a command?
23      A.   It is an obvious joke.
24      Q.   I'm asking from a computer language or
11:53  25  programming standpoint, is that a command?

107

1       A.    I guess.    I don't -- I don't know how to

2    answer that.    I guess so.    I don't know.

3       Q.    When you say you guess so, when you do

4    computer engineering, is one of the things that you

11:53    5    do is write commands?

6       A.    Yes.

7       Q.    Okay.    So is this a command?

8       A.    Yes.

9       Q.    Okay.    And you say "we tried this before,"

11:53   10    correct?

11       A.    I said those words.

12       Q.    And then you also wrote "ended up changing

13    the aurora client because of it."    Do you see that?

14       A.    Yes.

11:53   15       Q.    So when you say "we tried this before and

16    ended up changing the aurora client because of it,"

17    what are you referring to?

18       A.    Before my time at Twitter, there was a

19    different command that looked similar -- sorry.

11:53   20    Apologies.    There was a different command that

21    looked similar that would have killed many services

22    at Twitter.

23       Q.    And when you say "we tried this before,"

24    when was it tried?

11:54   25       A.    I don't know the date, but before my time

108

1    at Twitter.

2        Q.    And how did you know it was tried?

3        A.    I read a lot.

4        Q.    Read a lot of what --

11:54  5        A.    Incident reports, history, documentation.

6        Q.    So from your reading of Twitter incident

7    reports and documentation, you had an understanding

8    that at some point there was the aurora kill all *

9    command previously?

11:54  10       A.    No.

11       Q.    Oh.

12       A.    There was a similar-looking in commands

13   that no longer worked that would have killed many

14   services at Twitter.

11:54  15       Q.    And in reading your incident reports or

16   documentation, what did you understand that that

17   similarly-looking command did?

18       A.    Terminated many services at Twitter.

19       Q.    And it is your understanding that that had

11:55  20   happened?

21       A.    Yes.

22       Q.    Okay.  And then you say "ended up changing

23   the aurora client because of it," does that mean

24   that the aurora was changed because the prior

11:55  25   command killed all these services?

EITAN ADLER

1    A.    Yes.

2    Q.    And what's the aurora client?

3    A.    Aurora was a tool used to manage services

4    running at Twitter.

11:55  5    Q.    I see.  And that similar command, do you

6    know how it ended up being run, that it killed all

7    those services?

8    A.    By accident.

9    Q.    And what did you learn about that?  How

11:55 10    did you know it was by accident?

11    A.    The incident report.

12    Q.    What did the incident report say?

13    A.    I don't specifically recall.

14    Q.    And you said "ended up changing."  Did the

11:56 15    changing to the aurora client occur while you were

16    at Twitter or before?

17    A.    Before my time.

18    Q.    Okay.  Then you'll see that there's a

19    response from someone named Clay Haynes that says,

11:56 20    "too close to sudo rm-rf/."  Do you see that?

21    A.    That's a forward slash, but yes.

22    Q.    Forward slash.  Okay.  And is that phrase,

23    "sudo rm-rf/" another command?

24    A.    It is an obvious joke.

11:56 25    Q.    I am just asking is it --

110

EITAN ADLER

1    then your absence is understandable."  Do you see

2    that?

3         A.   Yes.

4         Q.   And you understood that that exception

01:20   5    applied to you; is that right?

6         A.   Yes.  And I'd like to clarify a comment I

7    made earlier.  This must have been the email that

8    referred to the RTO mandate.

9         Q.   Okay.  Thanks for clarifying.

01:20   10        A.   This must have been.

11        Q.   Okay.

12              (Reporter marked Exhibit No. 17 for

13               identification.)

14        Q.   BY MR. MECKLEY:  Mr. Adler, Exhibit 17 is

01:21   15   a one-page document stamped ADLER193.  It is --

16   appears to be an email from Twitter HR dated

17   November 15, 2022, and the subject, "Your Role at

18   Twitter."  So did you receive Exhibit 17?

19        A.   Yes.

01:21   20        Q.   And the first sentence says, "We regret to

21   inform you that your employment is terminated

22   effective immediately.  Your recent behavior has

23   violated company policy."  Do you see that?

24        A.   I see that.

01:21   25        Q.   All right.  This email did not state that

129

1    you were being laid off, did it?

2        A.    Not in those words.

3        Q.    And it did not state that you were losing

4    your job as a result of a reduction in force, did

01:21   5    it?

6        A.    Not in those words.

7        Q.    Did you ever receive any written

8    documentation from Twitter that stated your

9    employment was being terminated as a result of a

01:22  10    layoff?

11        A.    No.

12        Q.    Did you ever get any document from Twitter

13    that said you were laid off?

14        A.    No.

01:22  15        Q.    Did you ever receive any written

16    documentation from Twitter that stated your

17    employment was being terminated as a result of a

18    reduction in force?

19        A.    No.

01:22  20        Q.    Did anyone from Twitter verbally tell you

21    your employment was ending because you were laid

22    off?

23        A.    I am trying to recall.  I can't

24    specifically say yes or no.

01:23  25        Q.    As you sit here today, do you have any

130

1    recollection of a person from Twitter saying that

2    you were laid off?

3        A.    Maybe.

4        Q.    And when you say "maybe," what are you

01:23  5    referring to?

6        A.    After I was terminated, I had a verbal

7    conversation with Murph Finnicum discussing my

8    termination in which we discussed -- in which we --

9    we discussed that there were ongoing layoffs even

01:23  10   after November 4th, and I cannot recall if he

11   specifically mentioned my name in conjunction.

12       Q.    Okay.  So it sounds like you don't have a

13   specific recollection of anyone saying specifically

14   you were laid off?

01:24  15       A.    Correct.

16       Q.    And was there any person from Twitter who

17   verbally told you that your termination was a

18   result of a reduction in force?

19       A.    No.

01:24  20       Q.    Did you receive any type of documentation

21   from Twitter that said were you terminated for lack

22   of work?

23       A.    No.

24       Q.    Was it your understanding at the time you

01:24  25   were terminated that there was a lack of work for

131

EITAN ADLER

1    your services?

2        A.    No.

3        Q.    And did you receive any documentation from

4    Twitter that said you were terminated for lack of

01:24  5    funds?

6        A.    Sorry.  Can you repeat the question?

7        Q.    Did you receive any documentation from

8    Twitter that says you were terminated for lack of

9    funds?

01:24  10        A.    No.

11        Q.    Did anyone tell you you were terminated

12    for lack of work?

13        A.    No.

14        Q.    Did anyone tell you you were terminated

01:24  15    for lack of funds?

16        A.    Not specifically.

17        Q.    Okay.  And you were notified in this email

18    that you were terminated effective immediately

19    because your recent behavior had violated company

01:25  20    policy, right?

21        A.    That's what the text says.

22        Q.    Right.  And you understood that the phrase

23    "your recent behavior" referred to your posts on

24    Slack?

01:25  25        A.    No.

1    Q.    No.    What did you think the phrase "your
2    recent behavior" referred to?
3    A.    I was unable to figure it out.
4    Q.    Were you curious?
01:25    5    A.    Yes.
6    Q.    And did you do anything to find out what
7    the phrase "your recent behavior" referred to?
8    A.    Yes.
9    Q.    What did you do?
01:25    10    A.    I asked Twitter for my entire employee
11    file.
12    Q.    Other than asking Twitter for your
13    employment file, did you anything else to determine
14    what the phrase "your recent behavior" referred to?
01:26    15    A.    There's privilege, I think.    I discussed
16    it with my attorneys.
17    Q.    Okay.    And I don't need to know any
18    conversations with attorneys.
19         Apart from conversations with attorneys
01:26    20    and asking for your employment file, is there
21    anything that you did to find out what the phrase
22    "your recent behavior" referred to?
23    A.    Nothing specific.
24    Q.    Anything general?
01:26    25    A.    No.

133

EITAN ADLER

1    Q.    Okay.    And this email also refers to a

2    violation of company policy.    Were you curious

3    about what that company policy was?

4    A.    Yes.

01:26  5    Q.    And did you do anything to find out what

6    the company policy violation was referring to?

7    A.    Yes.

8    Q.    And what did you do?

9    A.    The same answer as before.

01:26  10    Q.    So asked for your file --

11    A.    Talked to my attorneys.

12    Q.    -- and talked to your attorneys.

13        If you look further down in Exhibit 17 it

14    says, "If you have any follow up questions you can

01:27  15    email alum@twitter.com."    Do you see that?

16    A.    I see that.

17    Q.    And after your termination, did you ever

18    send an email to that email address with any

19    follow-up questions?

01:27  20    A.    If I recall correctly, that's where I

21    asked for my employee file, but I don't

22    specifically recall.

23    Q.    Did you send anything else to

24    alum@twitter.com asking "What was the recent

01:27  25    behavior that I engaged in that violated company

134

EITAN ADLER

1   policy?"

2      A.   No.

3      Q.   Why not?

4      A.   On advice of counsel.

01:27  5      Q.   So any other reason?

6      A.   There was no reason for me to do so.

7      Q.   What about your curiosity?

8      A.   Once it was evident that Twitter had

9   neglected to follow the law, it was more important

01:28 10  for me to follow counsel's advice than to satisfy

11  my curiosity.

12      Q.   So this email address that you could email

13  for any follow-up questions, you elected not to

14  email them about the reasons why you were fired?

01:28 15      A.   I asked for my complete employment file

16  which should have contained that.  So no, I reject

17  your premises.

18      Q.   I am just asking a fact question, which is

19  you never emailed this email address to ask about

01:28 20  the reasons why you were fired; is that true?

21        MS. LISS-RIORDAN:  It is now asked and

22  answered.  It is getting a little argumentative.

23      Q.  BY MR. MECKLEY:  Well, is it true?

24      A.   I asked for everything related to me which

01:29 25  should have included that answer.  So no, it's not

135

EITAN ADLER

1    true.

2        Q.    So you did email alum@twitter.com asking

3    for the reasons for your termination?

4        A.    I refer you to my prior answers.    It's the

01:29    5    same question.

6        Q.    We'll look at an email I think that you're

7    referring to, and we can then drill down on that

8    further.

9              So did you ever attempt to communicate

01:29    10    with anyone in human resources at Twitter about why

11    you were fired?

12        A.    My understanding is that alum@twitter.com

13    is human resources.

14        Q.    Right.    I am asking communicating in any

01:29    15    way.    It could be a Zoom.    It could be a phone

16    call.    Any way --

17        A.    No, I did not specifically -- I did not

18    attempt to communicate with Twitter in any other

19    way.

01:29    20        Q.    And why not?

21        A.    Once it was evident that Twitter had

22    neglected to follow the law, I chose to follow my

23    counsel's advice.

24        Q.    And you're saying your counsel's advice.

01:30    25    What was the date that you first became represented

136

1      Q.    Okay.   Other than this email from

2   Mr. Rezaei that we have looked at here as Exhibit

3   20, was there anyone in Twitter who reached out to

4   you even tangentially around the topic of

02:07  5   potentially coming back?

6      A.    No.

7      Q.    Did you ever receive any type of formal

8   offer to return to the company?

9      A.    No.

02:07 10      Q.    So I asked you, Mr. Adler, whether other

11   people reached out to you from Twitter.   Did you on

12   your own reach-out to anyone at Twitter about

13   coming back to work there?

14      A.    No.

02:08 15           MR. MECKLEY:   Okay.   Can you show him the

16   document?

17           (Reporter marked Exhibit No. 21 for

18            identification.)

19      Q.    BY MR. MECKLEY:   Exhibit 21 is a two-page

02:08 20   document stamped ADLER191-192.   It appears to be a

21   series of emails on December 2nd, 2022, between

22   Mr. Adler and Twitter HR.   So did you send this

23   email to Twitter HR?

24      A.    Yes.

02:08 25      Q.    And you've read it now.   Is it correct

161

EITAN ADLER

1    that there's nowhere in your email to HR where you

2    ask why I was terminated?

3        A.    No.

4        Q.    That's not correct?

02:09  5        A.    I asked for everything that I'm allowed to

6    see.  That would include any documents which would

7    indicate why I was terminated.

8        Q.    But you would agree you didn't

9    specifically put in writing, "Can you explain what

02:09  10   was the company policy that I violated that led to

11   my termination?"

12       A.    This is the email I was advised to send.

13       Q.    Did you write it yourself?

14       A.    This is the email my attorneys advised me

02:09  15   to send.

16       Q.    Did you get this from them?

17            MS. LISS-RIORDAN:  You can answer that.

18            THE WITNESS:  Yes.

19       Q.    BY MR. MECKLEY:  Do you know -- again, I

02:10  20   don't want to know the substance, but which

21   attorney gave you this?

22       A.    I don't specifically recall.

23       Q.    It could have been Jan Johnson?

24       A.    Doubtful.  I don't specifically recall.

02:10  25       Q.    Or your sister?

162

EITAN ADLER

1     A.    I don't specifically recall.

2     Q.    And the response was "Please find your

3     employment documents attached"?

4     A.    Yes.

02:10    5     Q.    After you got this response with the

6     documents attached, did you ever again follow up

7     with Twitter HR regarding any questions related to

8     your employment?

9     A.    I did not get the document attached.

02:10    10     Q.    So the email to you from Twitter says, "Hi

11     Eitan, please find your documents attached."    So

12     was there anything attached?

13     A.    Yes.

14     Q.    After you got the documents that were

02:10    15     attached to this email, did you ever follow up

16     again with Twitter HR or otherwise related to your

17     employment?

18     A.    No.

19     Q.    And you say you got some documents but not

02:11    20     others?

21     A.    Correct.

22     Q.    And can you explain that?

23     A.    I received my arbitration agreement, and

24     that's it.

02:11    25     Q.    When you say the arbitration agreement,

163

EITAN ADLER

1          DEPOSITION OFFICER'S CERTIFICATE

2            (Civ. Proc. § 2025.520(e))

3  STATE OF CALIFORNIA     )

4                  )    Ss

5  COUNTY OF SAN FRANCISCO  )

6        I, BALINDA DUNLAP, CSR #10710, hereby

7  certify:

8        I am a duly qualified Certified Shorthand

9  Reporter, in the State of California, holder of

10  Certificate Number CSR 10710 issued by the Court

11  Reporters Board of California and which is in full

12  force and effect.  (Bus. & Prof. § 8016)

13        I am not financially interested in this

14  action and am not a relative or employee of any

15  attorney of the parties, or of any of the parties.

16  (Civ. Proc. § 2025.320(a))

17        I am authorized to administer oaths or

18  affirmations pursuant to California Code of Civil

19  Procedure, Section 2093(b) and prior to being

20  examined, the deponent was first placed under oath

21  or affirmation by me.  (Civ. Proc. §§ 2025.320,

22  2025.540(a))

23        I am the deposition officer that

24  stenographically recorded the testimony in the

25  foregoing deposition and the foregoing transcript

223

1   is a true record of the testimony given.  (Civ.

2   Proc. § 2025.540(a))

3            I have not, and shall not, offer or

4   provide any services or products to any party's

5   attorney or third party who is financing all or

6   part of the action without first offering same to

7   all parties or their attorneys attending the

8   deposition and making same available at the same

9   time to all parties or their attorneys.  (Civ.

10  Proc. § 2025.320(b))

11           I shall not provide any service or product

12  consisting of the deposition officer's notations or

13  comments regarding the demeanor of any witness,

14  attorney, or party present at the deposition to any

15  party or any party's attorney or third party who is

16  financing all or part of the action, nor shall I

17  collect any personal identifying information about

18  the witness as a service or product to be provided

19  to any party or third party who is financing all or

20  part of the action.  (Civ. Proc. § 2025.320(c))

21  Dated: May 6, 2024

22

23  _____

24

25

                                     224

EITAN ADLER

```
1              DEPOSITION OFFICER'S CERTIFICATE
                    (Civ.Proc. § 2025.520(e))
2
   STATE OF CALIFORNIA     )
3                          )  Ss.
   COUNTY OF SAN FRANCISCO )
4
5                   I, Balinda Dunlap, hereby
6  certify:
7          I am the deposition officer that
8  stenographically recorded the testimony in the
9  foregoing deposition.
10         Written notice pursuant to Code of Civil
11 Procedure, Section 2025.520(a), having been sent,
12 the deponent took the following action within the
13 allotted period with respect to the transcript of
14 the deposition:
15         (  ) In person, at the office of the
16 deposition officer, made the changes set forth on
17 the original of the transcript.  (The parties
18 attending the deposition have been notified of said
19 changes.)
20         (  ) Approved the transcript by signing
21 it.
22         (  ) Refused to approve the transcript by
23 not signing it.
24         (  ) By means of a signed letter, made the
25 changes and approved or refused to approve the
```

225

1    transcript as set forth therein.  (Said letter has

2    been attached to the original transcript and copies

3    thereof mailed to all parties attending the

4    deposition.)

5            (  ) Failed to approve the transcript

6    within the allotted time period.

7    Dated _____.

8

9

10                          _____

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

226

EITAN ADLER

EXHIBIT 2

```
 1                    JAMS ARBITRATION

 2        BEFORE ARBITRATOR MICHAEL LOEB, ESQ.

 3

 4  JESSICA PAN,

 5              Claimant,
                                 Jams No.: 1100115270
 6              v.

 7  TWITTER, INC.,

 8              Respondent.

 9  _____

10

11

12      HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

13

14               DEPOSITION OF JAMES MUSK

15

16                 January 31, 2024

17                    12:13 p.m.

18

19        1 Market Street, Spear Street Tower

20               San Francisco, California

21

22

23  REPORTED BY:

24  Siew G. Ung

25  CSR No. 13994, RPR, CSR
```

2

```
 1   REMOTE APPEARANCES:

 2

 3       For Claimant:

 4           LICHTEN & LISS-RIORDAN, PC
             SHANNON LISS-RIORDAN, ESQ.
 5           729 Boylston Street, Suite 2000
             Boston, Massachusetts 02116
 6           sliss@llrlaw.com
             617.994.5800
 7

 8       For Respondant:

 9           QUINN EMANUEL URQUHART & SULLIVAN, LLP
             JULIA CHOE, ESQ.
10           ERIC MECKLEY, ESQ.
             865 South Figueroa Street, Floor 10
11           Los Angeles, California 90017
             juliachoe@quinnemanuel.com
12           213.443.3000

13           X
             MARY HANSBURY, ESQ. (in-house)
14           ADAM MEHES, ESQ. (in-house, remote)

15       Also Present:

16           Jason Butko, Videographer

17

18

19

20

21

22

23

24

25
```

3

1              INDEX TO EXAMINATIONS

2

3              WITNESS: James Musk

4  EXAMINATION                                              PAGE

5  BY MS. LISS-RIORDAN                                         6

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Jessica Pan vs                        Attorneys Eyes Only                        James Musk
Twitter, Inc. and X Corp.,                                                      January 31, 2024

4

1                              INDEX TO EXHIBITS

2                                 JAMES MUSK

3                              January 31, 2024

4                    Siew G. Ung, CSR No. 13994, RPR

5    MARKED                       DESCRIPTION                          PAGE

6

7    Exhibit 1          Screenshots                                    70

8                       (X_ARBS_LLR_000000018 to

9                       X_ARBS_LLR_000000137)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

5

```
 1          WEDNESDAY, JANUARY 31, 2024, 12:13 P.M.
 2                          ***
 3          THE VIDEOGRAPHER:  This is the start of
 4  Media Number 1 in the deposition of James Musk, in
 5  the matter of Jessica Pan versus Twitter, Inc. and X
 6  Corp.  This is being held -- filed in the JAMS
 7  Arbitration, Number 1100115270.  This deposition is
 8  being taken at One Market Street, Spear Street Tower
 9  in San Francisco, California, on January 31st, 2024.
10  The time is approximately 12:13 p.m.
11          My name is Jason Butko with Magna Legal
12  Services.
13          Counsel, can you please identify
14  yourselves and who you represent, starting with the
15  questioning attorney.
16          MS. LISS-RIORDAN:  I'm Shannon
17  Liss-Riordan, and I represent the claimants and
18  plaintiffs.
19          MS. CHOE:  Julie Choe from Quinn Emanuel
20  on behalf of Twitter, Inc. and X Corp, and also here
21  representing the witness.
22          MR. MECKLEY:  And Eric Meckley, Morgan
23  Lewis, on behalf of Defendants/Respondents.
24          MS. HANSBURY:  Mary Hansbury for the
25  defendants.
```

6

 1           THE VIDEOGRAPHER:  Okay.  And can the
 2    court reporter please swear in the witness.
 3                     JAMES MUSK,
 4      having been first duly sworn, was examined and
 5                  testified as follows:
 6           THE VIDEOGRAPHER:  You may proceed.
 7           MS. LISS-RIORDAN:  Okay, thank you.
 8           EXAMINATION BY MS. LISS-RIORDAN
 9       Q.  Good morning.
10       A.  Morning.
11           MS. LISS-RIORDAN:  Before we get started,
12    I just want to put on the record that although the
13    videographer had the case caption as Jessica Pan
14    versus Twitter, this is a deposition that may be
15    used for multiple arbitrations as well as court
16    cases that our firm, Lichten & Liss-Riordan, is
17    litigating against Twitter and X.
18           MR. MECKLEY:  Per our agreement in the
19    protocol, yes.
20           MS. LISS-RIORDAN:  Okay.  Okay.  All
21    right.  Thank you.
22    BY MS. LISS-RIORDAN:
23       Q.  Good morning, Mr. Musk.
24       A.  Good morning.
25       Q.  Can you please state your full name for

156

1         A.   I was focused on engineering?

2         Q.   Only engineering?

3         A.   For November 3rd and 4th, correct.

4         Q.   Were you involved in other types of

5    employees decisions with respect to other types of

6    employees after November 3rd and 4th?

7              MS. CHOE:  Objection.  Vague.

8              THE WITNESS:  Can you be more specific,

9    please.

10   BY MS. LISS-RIORDAN:

11        Q.   Did you play any role in determining who

12   would be laid off or terminated after November 3rd

13   and 4th with respect to employees outside engineers?

14        A.   There -- there was a -- kind of like

15   insubordination and security review exercise.

16        Q.   What was that?

17        A.   We, essentially, were very worried about

18   security at the company because there were many

19   employees who were hostile to Elon and the -- or

20   that we believed were hostile to Elon and the new

21   Twitter management and had privileged access to the

22   database and different pieces of the software.  So

23   we reviewed people like that.

24        Q.   What database?

25        A.   There are many different databases at --

157

 1   at Twitter.
 2        Q.  You just said that there were people who
 3   had access to the database.  What database are you
 4   talking about?
 5        A.  There are many databases -- so many
 6   databases.
 7        Q.  Okay.  All right.
 8           So were you involved in a process to
 9   eliminate employees who were deemed not loyal to
10   Elon?
11           MS. CHOE:  Objection.  Misstates witness
12   testimony.  Argumentative and objection as to form.
13           THE WITNESS:  I -- I described security
14   review and insubordination.
15   BY MS. LISS-RIORDAN:
16        Q.  Okay.  So there were further layoffs after
17   November 3rd and 4th of individuals who were deemed
18   to be security risks or not sufficiently loyal to
19   Elon?
20        A.  These weren't --
21           MS. CHOE:  Objection.  Argumentative.
22   Again, misstates witness testimony.
23           MS. LISS-RIORDAN:  Please, no speaking
24   objections.  You can just state "objection."  I
25   don't want you coaching the witness or interfering

158

```
 1  with his testimony.
 2          MS. CHOE:  Objections are not interfering
 3  with witness testimony.
 4          MS. LISS-RIORDAN:  Can you please -- can
 5  you please.  They are -- these are improper speaking
 6  objections.  Can you please read back my last
 7  question, court reporter.
 8              (Whereupon, the requested portion of
 9              the transcript was read back as
10              follows:  "Okay.  So there were
11              further layoffs after November 3rd and
12              4th of individuals who were deemed to
13              be security risks or not sufficiently
14              loyal to Elon?")
15          MS. CHOE:  Same objections as before.
16          And we have been going about an hour, so
17  let's take a break after this question.
18          MS. LISS-RIORDAN:  After this series of
19  questions we can take a break.
20          MS. CHOE:  We can do one more question.
21  We have been going over an hour at this point.
22          MS. LISS-RIORDAN:  No, no.  We are not
23  going to stop in the middle of this.  We can take a
24  break in about five minutes.
25          THE WITNESS:  I would appreciate a
```

159

 1  bathroom break.
 2          MS. LISS-RIORDAN:  No, not while a
 3  question is pending.  I'm in a middle of the series
 4  of questions.  In five minutes you can take a break.
 5          Can you please read back the last
 6  question?
 7          MS. CHOE:  You can do one more question.
 8  I mean, I also have to go to the bathroom, to be
 9  honest.  We've been going over an hour and the --
10  the witness has said he wants -- he needs a bathroom
11  break.
12                  (Whereupon, the requested portion of
13                  the transcript was read back as
14                  follows:  "Okay.  So there were
15                  further layoffs after November 3rd and
16                  4th of individuals who were deemed to
17                  be security risks or not sufficiently
18                  loyal to Elon?")
19          MS. CHOE:  Same objections as before.
20          THE WITNESS:  This is not what I said.
21  There was an exercise to determine people who were
22  being insubordinate and who were security risks.
23  BY MS. LISS-RIORDAN:
24      Q.  And those individuals were laid off?
25      A.  No, those individuals weren't laid off.

Jessica Pan vs                    Attorneys Eyes Only                    James Musk
Twitter, Inc. and X Corp.,                                           January 31, 2024

160

1  They were fired.

2      Q.  You were involved in determining who those

3  individuals would be?

4      A.  I helped with that process, yes.

5      Q.  Who else was involved in that process?

6      A.  I don't recall everyone.  But Ross Nordeen

7  is one person.  Andrew Musk, Thomas Dmytryk, Tim

8  Zaman, I believe, Jake Yoni [phonetic],  Chris

9  Stanley, Dhaval.  I don't know if that's

10 comprehensive though.

11     Q.  And what did that group do?

12         MS. CHOE:  This is the last question then

13 we are taking a break to go off the record.

14         THE WITNESS:  There were many factors

15 there were considered.  One factor was looking at

16 who had sudo access to the various systems.

17         MS. CHOE:  All right.  We are taking a

18 break.  Going off the record.  Thank you.

19         MS. LISS-RIORDAN:  All right.  I did not

20 authorize this break.  I still have questions to

21 ask, and then I said we can take a break in five

22 minutes, and it hasn't been five minutes.

23         MS. CHOE:  It's been three minutes.  And

24 the witness said on the record he needed to go to

25 the bathroom, so if you want to litigate that the

162

1        A.  I went to a bathroom break.

2        Q.  And you consulted with your counsel?

3        A.  I spoke to some of them.

4        Q.  You were telling me about this process for

5   reviewing employees after November 3rd and 4th who

6   were seen as some type of a risk?

7        A.  Insubordinate or -- yeah, security risk.

8        Q.  Okay.  How -- what was the process for

9   determining who those employees were?

10            MS. CHOE:  Objection.  Calls for a

11   narrative.

12            THE WITNESS:  There were multiple things

13   there were considered in making that decision.

14   BY MS. LISS-RIORDAN:

15        Q.  What was the process for making that

16   decision?

17        A.  Well, one thing we looked at was who had

18   privileged access to the Twitter back-end system.

19        Q.  Okay.  So anyone who had access to

20   Twitter's back end systems was targeted for

21   termination?

22            MS. CHOE:  Objection to form.

23            THE WITNESS:  No.  That was one thing we

24   looked at because you have to be cognizant of who

25   has sudo access in a software system.

163

1  BY MS. LISS-RIORDAN:

2        Q.   Okay.  But how was it decided who would be

3  let go based on these concerns about risk?

4        A.   There were multiple factors.  We would

5  look at, you know, various -- various public -- or

6  not public, like within the company, it's -- it's a

7  term in Slack, like open to anyone Slack channels,

8  and see if people were posting, you know, messages

9  or remarks that were insubordinate or security

10  risks.

11       Q.   Okay.  Did you look at postings that

12  employees were making to determine if they appeared

13  insubordinate?

14       A.   Yes.

15       Q.   All right.  So what did you look at?

16       A.   We looked at messages in -- in -- in Slack

17  channels, and we would also look at, you know,

18  public statements by the employees on social

19  platforms.

20       Q.   Including Twitter?

21       A.   Including Twitter.

22       Q.   All right.  And then who made the decision

23  about which of these employees would be let go?

24       A.   We gave a recommendation of, you know,

25  who -- who the insubordinate and security risks

164

1  were, and then HR processed that -- that list, I

2  believe.  I don't know what happened after we

3  generated the list.

4      Q.  Did Elon make the decisions about which of

5  these employees would be let go?

6      A.  I don't know.

7      Q.  Do you know who made the decision?

8          MS. CHOE:  Objection.  Asked and answered.

9          THE WITNESS:  I don't know.

10  BY MS. LISS-RIORDAN:

11      Q.  Who were some of these employees who were

12  let go based on this review?

13      A.  I don't recall their names.

14      Q.  Did you determine any of these employees

15  who should be let go because they constituted a

16  risk?

17          MS. CHOE:  Objection as to form and vague.

18          THE WITNESS:  I gave inputs as to whether

19  they were a security risk and whether their messages

20  constituted insubordination or security risk.

21  BY MS. LISS-RIORDAN:

22      Q.  Who were the employees you gave that for?

23      A.  I think they were many on that list.  I

24  don't remember.

25      Q.  Can you tell me any of them?

Jessica Pan vs                    Attorneys Eyes Only                    James Musk
Twitter, Inc. and X Corp.,                                         January 31, 2024

165

 1        A.  I remember one being Jesse Feinman, I
 2   believe.
 3        Q.  All right.  What was the reason for him
 4   being considered a risk?
 5        A.  I can't remember all the reasons, you
 6   know?  But one I do remember, this is why I remember
 7   this particular case, was that he wrote in a public
 8   Slack channel:  Why don't we -- something to the
 9   effect of why don't we Aurora task kill all star.
10            THE REPORTER:  Wait.  Auroric --
11            THE WITNESS:  Aurora task kill all star.
12            THE REPORTER:  Wait, can you say it again?
13            THE WITNESS:  Aurora task.  Kill all star
14   -- like asterisk.
15            THE REPORTER:  Can you spell it?
16            THE WITNESS:  Aurora.  Like A-U-R-O-R-A,
17   task, kill all, and then star -- wildcard.
18   BY MS. LISS-RIORDAN:
19        Q.  Why -- why was that considered a risk?
20        A.  So that terminates all processes running
21   on a Linux system.
22        Q.  Um --
23        A.  It's an -- it's an extremely powerful
24   command that can bring down, you know, what we
25   interpreted at the time -- it's a way to almost,

166

```
 1   like, shut down the website under the correct
 2   circumstances.
 3        Q.  Did you believe that he was serious when
 4   he said that?
 5        A.  That's a serious -- that's a serious
 6   command.
 7            It's --
 8        Q.  Did your --
 9        A.  -- it's equivalent to, you know -- it can
10   be equivalent to a nurse pulling the plug on an ICU
11   kind of patient.  It could bring down a lot of
12   systems.  Lead to data loss.  Yeah.
13        Q.  Did you understand that he might have been
14   joking when he said that?
15            MS. CHOE:  Objection.  Calls for
16   speculation.
17            THE WITNESS:  I don't want to speculate as
18   to what he was doing.
19            At the time, there was heightened, you
20   know, security risk and sensitivity around people
21   being bad actors towards the Twitter system, so we
22   had to take action.
23   BY MS. LISS-RIORDAN:
24        Q.  And you realized that Mr. Feinman was
25   involved in a union that was trying to organize at
```

167

1  Twitter?

2          MS. CHOE:  Objection as to form and

3  assumes facts not in evidence.

4          THE WITNESS:  I -- I have -- I don't -- I

5  didn't know that, no.

6  BY MS. LISS-RIORDAN:

7      Q.  Did you know that there was a union that

8  was trying to organize at Twitter?

9      A.  I didn't know.

10     Q.  Have you ever heard that?

11     A.  Not that I can recall.

12     Q.  As we sit here today, have you ever heard

13  that?

14     A.  Not that I can recall.

15     Q.  What about Adam Treitler?  Is that someone

16  who you -- who was let go because of concern he was

17  a risk?

18     A.  I believe so.

19     Q.  Why was he deemed to be a risk?

20     A.  If -- if I recall correctly, it was

21  because of posts he was making.

22     Q.  What posts?

23     A.  I don't remember.

24     Q.  Were you involved in the decision that he

25  should be let go?

Jessica Pan vs                    Attorneys Eyes Only                    James Musk
Twitter, Inc. and X Corp.,                                        January 31, 2024

168

1        A.  I -- I know of this person.  I -- I
2   didn't -- I believe I spoke to Brian Bjelde about
3   it.
4        Q.  Okay.  And -- and who decided that Adam
5   Trietler should be let go?
6        A.  I don't know.
7        Q.  And do you remember anything about why
8   Adam Trietler was let go?
9        A.  I don't remember all the reasons.  But as
10  I said, one of them was posts he was making, I
11  believe.
12       Q.  Did you recommend his dismissal?
13       A.  I can't recall.
14       Q.  What about Jonah Grant?
15       A.  What about him?
16       Q.  Was he let go?
17       A.  I believe so.
18       Q.  Do you remember why?
19       A.  I don't recall exactly, but I believe
20  because he was a security risk.
21       Q.  Why was he a security risk?
22       A.  I don't know the full details of the
23  investigation.
24       Q.  Were you involved in his investigation?
25       A.  I don't recall.

169

1        Q.  Did you communicate with Jonah --

2             MS. CHOE:  Objection.

3    BY MS. LISS-RIORDAN:

4        Q.  -- regarding the circumstances that led to

5    his dismissal?

6        A.  Jonah was somebody I communicated with

7    because he was identified as a -- a good iOS

8    engineer in terms of his code quality and output and

9    demonstrated so on -- on -- I think the initial blue

10   verified push, but --

11            THE REPORTER:  Wait.  "The initial" --

12            THE WITNESS:  Blue verified push.

13            I know he was -- I believe he -- I don't

14   recall exactly, but I think he may have reached out

15   to me and was like:  You know, what's happening or

16   something.

17   BY MS. LISS-RIORDAN:

18       Q.  All right.  What do you remember

19   communicating with him?

20       A.  I don't -- I don't remember.  I -- like I

21   say, I wasn't -- in terms of Jonah's security risk

22   assessment, it's -- wasn't something that I was like

23   a key decision-maker in.

24       Q.  Why was Jonah considered a security risk?

25       A.  I don't know.

170

1       Q.  Did you play a role in determining that he

2  should be let go?

3            MS. CHOE:  Objection.  Asked and answered.

4            THE WITNESS:  I -- I -- I don't -- I --

5  I -- as I said, it was somebody else -- it was like

6  the security team that was handling Jonah, I

7  believe.

8  BY MS. LISS-RIORDAN:

9       Q.  Okay.  How did you communicate with Jonah?

10      A.  Via the company Slack.  And we may have

11 exchanged emails, yeah.

12      Q.  Okay.  All right.

13           How were you communicating with others

14 regarding this investigation into employees who were

15 considered risks?

16      A.  We were all together in one room looking

17 through the relevant pieces of information.

18      Q.  And how many employees, approximately,

19 were let go based on this investigation that they

20 were risks?

21           MS. CHOE:  Objection as to form.

22           THE WITNESS:  So these employees were

23 fired for insubordination or being security threats.

24 BY MS. LISS-RIORDAN:

25      Q.  Right.  Approximately how many employees?

Jessica Pan vs                    Attorneys Eyes Only                    James Musk
Twitter, Inc. and X Corp.,                                              January 31, 2024

171

1        A.  I don't know the exact number.

2        Q.  More than 10?

3        A.  I believe there were more than 10.

4        Q.  More than 50?

5            THE WITNESS:  I'm not sure if there were

6    more than 50.

7    BY MS. LISS-RIORDAN:

8        Q.  Who was in the room looking at this

9    evidence with you?

10       A.  I think I gave you some of the names I

11   remembered already.

12       Q.  How many people approximately?

13       A.  I believe I answered this question.  It

14   was like Thomas -- I think I answered this question

15   already.

16       Q.  Okay.  How many people?

17       A.  I don't know.  I don't know.  Six to

18   eight, maybe -- I'm -- I'm not sure of the exact

19   number.

20       Q.  All right.  Was there any discussion about

21   whether they should get severance?

22           MS. CHOE:  Objection.  Vague.

23           THE WITNESS:  What -- what we were doing

24   is assessing their security risk and whether they

25   were insubordinate or not.

172

```
 1  BY MS. LISS-RIORDAN:
 2       Q.  Right.  Were you involved in any
 3  discussions about whether these employees who were
 4  being let go based on alleged security risks should
 5  get any severance?
 6       A.  Not that I can recall.
 7       Q.  So the employees who were laid off on
 8  November 3rd and 4th, were they offered severance?
 9       A.  I'm not sure.
10       Q.  As we sit here today, are you aware of
11  whether or not they were offered any severance?
12       A.  I'm not sure.  I -- like I say, my job at
13  the time was engineering and identifying who the
14  critical engineers were and understanding how the
15  software worked.
16       Q.  When the decisions were being made about
17  who would be retained and who would be let go, you
18  started to tell me earlier about what kind of
19  information was accessed.  You said that managers
20  were consulted.  You said something about code being
21  reviewed.  You said, at some point there was some
22  looking at performance, but I'm not quite clear
23  what -- what that means.
24            Was it -- was there any review of
25  employees' records with HR?
```

Jessica Pan vs                    Attorneys Eyes Only                    James Musk
Twitter, Inc. and X Corp.,                                              January 31, 2024

230

1              DEPOSITION OFFICER'S CERTIFICATE

2              I, the undersigned, a Certified Shorthand

3    Reporter of the State of California, do hereby

4    certify:

5              That the foregoing proceedings were taken

6    before me at the time and place herein set forth; that

7    any witnesses in the foregoing proceedings, prior to

8    testifying, were duly sworn; that a record of the

9    proceedings was made by me using machine shorthand,

10   which was thereafter transcribed under my direction;

11   that the foregoing transcript is a true record of the

12   testimony given.

13             Further, that if the foregoing pertains to the

14   original transcript of a deposition in a federal case,

15   before completion* of the proceedings, review of the

16   transcript [ ] was [ ] was not requested.

17             I further certify I am neither financially

18   interested in the action nor a relative or employee of

19   any attorney or party to this action.

20             IN WITNESS WHEREOF, I have this date

21   subscribed my name.

22   *Proceedings were suspended.

23   Dated:    2/1/2024

24             *Siew Ung*

25             Siew Ung, RPR, CSR No. 13994

Jessica Pan vs                    Attorneys Eyes Only                    James Musk
Twitter, Inc. and X Corp.,                                              January 31, 2024

```
                                                                    232
 1  DEPOSITION ERRATA SHEET

 2  Reason Codes:  1. To clarify the record.
                   2. To conform to the facts.
 3                 3. To correct transcription errors.

 4  Page 5_____ Line 19____ Reason _3_____

 5  From _Julie_____ to Julia_____

 6  Page 94____ Line 17____ Reason _3_____

 7  From _Silvioa _____ to Silvio _____

 8  Page 96____ Line 10____ Reason _3_____

 9  From _Migash_____ to Nigesh _____

10  Page 96____ Line 17____ Reason _3_____

11  From __Antonia Smulder_____ to Antonius Mulder

12  Page 165____ Line 9-17__ Reason _3_____

13  From _Aurora task kill all star_ to aurora task killall * _____

14  Page 197____ Line 16____ Reason _3_____

15  From _little_____ to legal_____

16  Page _207___ Line _____24_____ _____
               Reason

17  From Those were_____ to Were those_____

18  Page _____ Line _____ Reason _____

19  From _____ to _____

20  Page _____ Line _____ Reason _____

21  From _____ to _____

22  ___X_____ Subject to the above changes, I certify that
               the transcript is true and correct.
23  _____ No changes have been made.  I certify that the
               transcript is true and correct.
24             _____

25                    James Musk
```

O'Brien & Levine, A Magna Legal Services Company        Page 232
888.825.3376 - production@court-reporting.com

EXHIBIT 3

```
 1                    JAMS ARBITRATION

 2          BEFORE ARBITRATOR MICHAEL LOEB, ESQ.

 3

 4   JESSICA PAN,

 5                Claimant,
                                  Jams No.: 1100115270
 6                v.

 7   TWITTER, INC.,

 8                Respondent.

 9   _____

10

11

12       HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

13

14               DEPOSITION OF ANDREW MUSK

15

16                  February 2, 2024

17                   10:14 a.m.

18

19        1 Market Street, Spear Street Tower

20               San Francisco, California

21

22

23   REPORTED BY:

24   Siew G. Ung

25   CSR No. 13994, RPR, CSR
```

Jessica Pan vs                         Attorneys Eyes Only                         Andrew Musk
Twitter, Inc. and X Corp.,                                                        February 02, 2024

2

```
 1   REMOTE APPEARANCES:

 2

 3        For Claimant:

 4             LICHTEN & LISS-RIORDAN, PC
               SHANNON LISS-RIORDAN, ESQ.
 5             BRADLEY MANEWITH, ESQ. (remote)
               729 Boylston Street, Suite 2000
 6             Boston, Massachusetts 02116
               sliss@llrlaw.com
 7             617.994.5800

 8        For Respondent:

 9             QUINN EMANUEL URQUHART & SULLIVAN, LLP
               VICKI PARKER, ESQ.
10             50 California Street
               San Francisco, California 94111
11             vickiparker@quinnemanuel.com
               415.875.6600
12
               MORGAN LEWIS & BOCKIUS LLP.
13             ERIC MECKLEY, ESQ.
               One Market Spear Street Tower
14             San Francisco, California 94105
               Eric.meckley@morganlewis.com
15             415.442.1013

16             X
               MARY HANSBURY, ESQ. (in-house)
17             ADAM MEHES, ESQ. (in-house)

18        Also Present:

19             Joseph Blea, Videographer

20

21

22

23

24

25
```

Jessica Pan vs                          Attorneys Eyes Only                          Andrew Musk
Twitter, Inc. and X Corp.,                                                    February 02, 2024

3

1                           INDEX TO EXAMINATIONS

2

3                          WITNESS: ANDREW MUSK

4    EXAMINATION                                                      PAGE

5    BY MS. LISS-RIORDAN                                                 6

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

4

```
 1              INDEX TO EXHIBITS
 2                ANDREW MUSK
 3               February 2, 2024
 4          Siew G. Ung, CSR No. 13994, RPR
 5  MARKED            DESCRIPTION              PAGE
 6
 7  Exhibit 1       Document (X_ARBS_LLR_163 to    121
 8                  X_ARBS_LLR_166)  * marked on
 9                  page 161
10
11  Exhibit 2       Documents (X_ARBS_LLR_142  to   133
12                  X_ARBS_LLR_145)  *marked on page
13                  161
14
15  Exhibit 3       Documents (X_ARBS_LLR_181 to    134
16                  X_ARBS_LLR_205)
17
18
19
20
21
22
23
24
25
```

5

```
 1          FRIDAY, FEBRUARY 2, 2024, 10:14 A.M.
 2                        ***
 3          THE VIDEOGRAPHER:  This is the start of
 4   media labeled Nu- -- Number 1 of the video-recorded
 5   deposition of Andrew Musk in the matter:  Jessica
 6   Pan versus Twitter, Inc. and X Corp. in JAMS
 7   Arbitration, JAMS Number 1100115270.
 8          This deposition is being held at One
 9   Market Street in San Francisco, California on
10   February 2nd, 2024, at approximately 10:14 a.m.  My
11   name's Joseph Blea.  I'm the legal video specialist
12   from Magna Legal Services.
13          The court reporter today is Siew Ung, also
14   in association with Magna Legal Services.
15          Counsel, would you please introduce
16   yourselves, including those on Zoom, starting with
17   the questioning attorney.
18          MS. LISS-RIORDAN:  I'm Shannon
19   Liss-Riordan, and I represent Plaintiffs and
20   Claimants in these matters.  And I will state, as we
21   stated on Wednesday, that even though the caption
22   that was used was Jessica Pan versus X and Twitter,
23   by agreement of the parties, this is a deposition
24   that can be used for any of the proceedings,
25   arbitrations, and court cases that our firm, Lichten
```

6

1  & Liss-Riordan, has filed against Twitter and X.

2          MS. PARKER:  Are you introducing your

3  colleague?

4          MS. LISS-RIORDAN:  Oh, and I am joined

5  remotely by Bradley Manewith, who is watching by

6  Zoom.

7          MS. PARKER:  Vicki Parker of Quinn Emanuel

8  on behalf of the witness and Defendants, X Corp. and

9  Twitter.

10          MR. MECKLEY:  Eric Meckley of Morgan &

11  Lewis on behalf of Defendant and Respondent.

12          MS. HANSBURY:  Mary Hansbury and also Adam

13  Mehes for X Corp., representing Defendants.

14          THE VIDEOGRAPHER:  Thank you.  Will the

15  court reporter please swear in the witness and we

16  may proceed.

17                    ANDREW MUSK,

18    having been first duly sworn, was examined and

19                 testified as follows:

20      DIRECT EXAMINATION BY MS. LISS-RIORDAN

21  BY MS. LISS-RIORDAN:

22      Q.  Okay.  All right.  Good morning, Mr. Musk.

23      A.  Good morning.

24      Q.  How you are today?

25      A.  I'm good.  Thanks.  And you?

168

1  testimony.

2          THE WITNESS:  No, I think that some of the

3  work that I was doing could be used as an input, but

4  I wasn't aware of how the layoffs might proceed and

5  how those decisions would be made.

6  BY MS. LISS-RIORDAN:

7          Q.  Okay.  If -- going down to the next -- a

8  couple of topics down on the notes that you are

9  looking at, do you see where it says "sabotage"?

10          A.  Yes.

11          Q.  And it -- then it says, "who holds the

12  keys to all of the infrastructure?"

13              Do you know what that refers to?

14          A.  Yes.  I mean, in cryptography, you have a

15  key which gives you access to private resources, and

16  so it was a question of who holds these keys, where

17  are they stored?

18          Q.  All right.  Why were you taking a note

19  about that?

20          A.  For the heading, which is sabotage, that

21  during this time, someone could -- during any time

22  where there's a lot of commotion, it's a higher

23  security risk.

24          Q.  So was there a concern being discussed

25  among those you were working with that some Twitter

Jessica Pan vs                     Attorneys Eyes Only                     Andrew Musk
Twitter, Inc. and X Corp.,                                          February 02, 2024

169

 1  employees might engage in sabotage against the

 2  company?

 3          MS. PARKER:  Objection.  Vague.

 4          THE WITNESS:  Yes, in general, this was a

 5  concern.

 6  BY MS. LISS-RIORDAN:

 7      Q.  Were you involved in trying to identify

 8  who might engage in sabotage against the company?

 9          MS. PARKER:  Same objection.

10          THE WITNESS:  Can you be more specific

11  about time frames?

12  BY MS. LISS-RIORDAN:

13      Q.  Yeah, at -- at any point?

14      A.  Yes, I was involved.

15      Q.  When was that?

16      A.  Predominantly in November.  In

17  mid-November.

18      Q.  And what did you do?

19      A.  For sabotage?

20      Q.  Yes.

21      A.  I mean, part of it was like -- I said

22  here, was figuring out who --

23          THE REPORTER:  Sorry, "I mean, part of it

24  was like," and then you said something.

25          THE WITNESS:  Figuring out who has

170

1  different access levels to different parts of the

2  infrastructure.  I remember seeing some of that

3  information.

4  BY MS. LISS-RIORDAN:

5       Q.  Did you participate in figuring out which

6  employees might be at risk of potential sabotage

7  against the company?

8            MS. PARKER:  Objection.  Vague.

9            THE WITNESS:  Yes.  In general, I was

10 looking at people who might be at risk or might be a

11 security risk to the company.

12 BY MS. LISS-RIORDAN:

13      Q.  How did you look for those people?

14      A.  I mean, some of -- so also this was part

15 of what I was doing, so it was not fully what I was

16 doing, but I had Slack.  And so there were cases in

17 Slack where people were writing messages that

18 posed -- or showed ideas of security threats,

19 basically.

20      Q.  So were you looking at Slack to see which

21 employees were writing messages that made them look

22 like security threats?

23      A.  Yes.

24      Q.  And what did you do with that information?

25      A.  I wrote down the name of the person.

171

1        Q.  And what did you do with it after you
2    wrote it down?
3        A.  Just that, I wrote down the name.
4        Q.  Did you give it to anybody?
5        A.  I don't remember personally giving that
6    information to anyone.
7        Q.  Did you write it down for anyone to
8    review?
9        A.  I didn't know who was going to be
10   reviewing it, but I took note of it.
11       Q.  Was there one person you wrote down or
12   more than one person?
13       A.  I can't remember the specific number of
14   people that I wrote down.
15       Q.  Did you talk to any of those people?
16       A.  I can't remember talking to anyone who I
17   wrote down, but I can't be sure.  I don't -- I don't
18   think so.
19       Q.  Do you know whether anyone talked with any
20   of those people --
21           MS. PARKER:  Objection.  Calls for
22   speculation.
23   BY MS. LISS-RIORDAN:
24       Q.  -- about the concern that they might be a
25   security risk?

172

1           MS. PARKER:  Objection.  Calls for

2    speculation.

3           THE WITNESS:  I don't know.  That's a

4    broad question.

5    BY MS. LISS-RIORDAN:

6       Q.  All right.  Did you understand that --

7    who -- who told you to look for such people and

8    write their names down?

9           MS. PARKER:  Objection.  Lacks foundation.

10          THE WITNESS:  I don't remember ever being

11   told specifically to look for this.  I do remember

12   Elon mentioning at some point that, in general, it

13   would be better for the site to go down than to have

14   internal sabotage where someone, like, took down the

15   databases of Twitter.

16   BY MS. LISS-RIORDAN:

17      Q.  So did you look for people who might be

18   risks because Elon had indicated that you should be

19   looking for people who could be a risk?

20          MS. PARKER:  Objection.  Misstates

21   testimony.

22          THE WITNESS:  I wouldn't frame it

23   specifically like that.  I don't know when Elon said

24   that, but I remember him making that comment.  I was

25   generally aware of sabotage as a risk, and so I was

173

```
1   taking down notes of people who could be sabotaging
2   the system.
3            And there were also -- I remember there
4   being a security team who was -- whose main concern
5   was around internal threat, basically.
6   BY MS. LISS-RIORDAN:
7        Q.  Who asked you to take you down the list of
8   people who could be a threat?
9            MS. PARKER:  Objection.  Misstates
10  testimony.  Lacks foundation.
11           THE WITNESS:  Like I said, I don't
12  remember anyone specifically telling me to take down
13  a list of names.
14  BY MS. LISS-RIORDAN:
15       Q.  Do you know if anyone else was taking down
16  such a list of names?
17           MS. PARKER:  Objection.  Calls for
18  speculation.
19           THE WITNESS:  I believe James was a part
20  of this.  I don't know about others for sure.
21  BY MS. LISS-RIORDAN:
22       Q.  All right.  Did you discuss this topic
23  with James?
24       A.  Yes, I -- I do remember discussing this
25  with James.
```

174

1        Q.  What do you recall discussing?

2        A.  I remember sending him some Slack messages

3   of something that I thought might be a threat.

4        Q.  All right.  Did you turn those Slack

5   messages over to counsel?

6        A.  I did not, but I was told that Slack

7   messages were all being turned over.

8        Q.  And did you understand that the people who

9   were being identified as potential threats were

10  going to be let go from Twitter?

11       A.  I didn't know when I was taking down their

12  names what was going to be happening -- what would

13  happen to them.

14       Q.  Who was on the security team you just

15  mentioned?

16       A.  I know that Yoni, a security engineer from

17  Tesla, was there.  I know that Chris Stanley from

18  SpaceX who runs security was there.  There was

19  someone from The Boring Company on a security team,

20  but I don't know his name.

21       Q.  So the security team was made up of

22  individuals who had not been from Twitter?

23       A.  I can't -- this was -- in my head, those

24  were security people.  I don't know who they were

25  speaking to.  I don't think -- I don't know if I

175

1  would say they were the security team.  They were a

2  group of security engineers.

3       Q.  Okay.  Do you have access to your Slack

4  account to obtain your messages from October and

5  November of 2022?

6       A.  Do I have access?  Yes, I have access to

7  my Slack account.

8       Q.  Okay.  Going down to the next topic on the

9  document we're looking at, the next thing says

10 "Twitter letter."

11          What does that refer to?

12      A.  I have no idea.

13      Q.  And I --

14      A.  Or I don't recall at the moment.

15      Q.  Okay.  Under that it says "Twitter

16 people."

17          What does that refer to?

18      A.  I believe this is just people who work at

19 Twitter.

20      Q.  Okay.  Do you know why you took a note

21 called "Twitter people"?

22      A.  I mean, I think I made headings and then I

23 was going to fill them in, but it looks like I

24 didn't get very far.

25      Q.  All right.  Do you know why you wrote

Jessica Pan vs                    Attorneys Eyes Only                    Andrew Musk
Twitter, Inc. and X Corp.,                                          February 02, 2024

204

CERTIFICATE OF REPORTER

1

2

3      I, Siew Ung, a Certified Shorthand Reporter, do
4 hereby certify:
5      That prior to being examined, the witness in the
6 foregoing proceedings was by me duly sworn to testify to
7 the truth, the whole truth, and nothing but the truth;
8      That said proceedings were taken before me at the
9 time therein set forth and were taken down by me in
10 shorthand and thereafter transcribed into typewriting
11 under my direction and supervision;
12      I further certify that I am neither counsel for,
13 nor related to, any party to said proceedings, nor in
14 any way interested in the outcome thereof.
15      In witness whereof, I have hereunto subscribed my
16 name.

17

18

19 2/6/2024

20

21

22

23 *Siew Ung*
24 _____
Siew Ung
25 CSR No. 13994, RPR, CSR

Jessica Pan vs
Twitter, Inc. and X Corp.,

Attorneys Eyes Only

Andrew Musk
February 02, 2024

203

1           DEPOSITION ERRATA SHEET

2   Page No. ____ Line No. _____

3   Change:_____

4   Reason for change:_____

5   Page No. _29__ Line No. 17___

6   Change:___decisions -> discussions _____

7   Reason for change:_transcription error _____

8   Page No. 69__ Line No. 5___

9   Change:____them -> then _____

10  Reason for change:__typo      _____

11  Page No. __102_ Line No. _25__

12  Change:__events -> evidence_____

13  Reason for change:____transcription error _____

14  Page No. _121__ Line No. ____20__

15  Change:__? -> . _____

16  Reason for change:__typo _____

17  Page No. 148___ Line No. 3_____

18  Change:_your -> you're _____

19  Reason for change: typo_____

20  Page No. 176___ Line No. 9 ___

21  Change:_____delete "0" _____

22  Reason for Change:_typo _____

23

24  _____          03/14/2024
                                       _____

25  ANDREW MUSK                              Dated

EXHIBIT 4

Eitan Adler vs          Videotaped          Ross Nordeen
Twitter, INC. and X Corp.                  March 26, 2024

```
 1              UNITED STATES DISTRICT COURT

 2         FOR THE NORTHERN DISTRICT OF CALIFORNIA

 3                     ---oOo---

 4

 5   EITAN ADLER, ON BEHALF OF
     HIMSELF AND ALL OTHERS
 6   SIMILARLY SITUATED,

 7                 Plaintiff,

 8      vs.              CASE NO. 3:23-CV-01788-JD

 9   TWITTER, INC. AND X CORP.,

10                 Defendants.
     _____

11

12

13

14   ***CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER***

15      VIDEO-RECORDED DEPOSITION OF ROSS NORDEEN

16            San Francisco, California

17             Tuesday, March 26, 2024

18

19

20

21

22

23   Stenographically Reported by:  Ashley Soevyn,
     CSR No. 12019
24   Magna Job No. 1117400

25   Pages 1 - 179
```

Eitan Adler vs                     Videotaped                  Ross Nordeen
Twitter, INC. and X Corp.                                      March 26, 2024

2

1              UNITED STATES DISTRICT COURT

2          FOR THE NORTHERN DISTRICT OF CALIFORNIA

3                     ---oOo---

4

5   EITAN ADLER, ON BEHALF OF
    HIMSELF AND ALL OTHERS
6   SIMILARLY SITUATED,

7                  Plaintiff,

8      vs.              CASE NO. 3:23-CV-01788-JD

9   TWITTER, INC. AND X CORP.,

10                 Defendants.
    _____

11

12

13

14      ***CONFIDENTIAL PURSUANT TO COURT ORDER***

15

16                 Video-recorded Deposition of

17  ROSS NORDEEN, taken on behalf of the Plaintiff Eitan

18  Adler, Pursuant to Notice, at the offices of Morgan

19  Lewis, One Market Street, 28th Floor, San Francisco,

20  California beginning at 10:01 a.m.  and ending at

21  4:28 p.m. on Tuesday, March 26, 2024, before me,

22  ASHLEY SOEVYN, Certified Shorthand Reporter No.

23  12019.

24

25

3

1    A P P E A R A N C E S:

2

3    For the Plaintiff Eitan Adler:

4            LICHTEN & LISS-RIORDAN, P.C.

5            BY:  BRADLEY MANEWITH

6            BY:  MATTHEW CARRIERI (REMOTE APPEARANCE)

7            Attorneys at Law

8            729 Boylston Street, Suite 2000

9            Boston, Massachusetts 02116

10           bmanewith@llrlaw.com

11           mcarrieri@llrlaw.com

12           (617) 994-5800

13

14

15

16

17

18

19

20

21

22

23

24

25

4

1    A P P E A R A N C E S:

2

3    For the Defendants Twitter, Inc. and X Corp.:

4             QUINN EMANUEL URQUHART & SULLIVAN

5             BY:  VICKI PARKER

6             Attorney at Law

7             50 California Street, 22nd Floor

8             San Francisco, California 94111

9             vickiparker@quinnemanuel.com

10            (415) 875-6503

11

12   -AND-

13            MORGAN LEWIS

14            BY:  ERIC MECKLEY

15            Attorney at Law

16            One Market Street, Spear Street Tower,

17            28th Floor

18            San Francisco, California 94105

19            eric.meckley@morganlewis.com

20            (415) 442-1013

21

22   ALSO PRESENT:

23   MARY HANSBURY, In-House Counsel, X Corp.

24   ADAM MEHES, In-House Counsel, X Corp.

25   Frank Quirarti, Videographer

```
                                                      5
 1               INDEX TO EXAMINATION

 2   WITNESS:  ROSS NORDEEN

 3

 4

 5   EXAMINATION BY:                      PAGE

 6   MR. MANEWITH                      8, 175

 7   MS. PARKER                           173

 8

 9

10   WITNESS INSTRUCTION NOT TO ANSWER

11   PAGE                     LINE

12     11                      24

13     39                      23

14

15

16

17

18

19

20

21

22

23

24

25
```

Eitan Adler vs
Twitter, INC. and X Corp.

Videotaped

Ross Nordeen
March 26, 2024

6

```
 1                      INDEX TO EXHIBITS

 2                       ROSS NORDEEN

 3            ADLER V. TWITTER, INC. AND X CORP.

 4                 Tuesday, March 27, 2024

 5               Ashley Soevyn, CSR No. 12019

 6   EXHIBIT NO.            DESCRIPTION            PAGE

 7   Exhibit 1     Email dated 10/31/2022 from      66
                   David Sacks to Jonathan Chen;
 8                 Bates No. X_ARBS_000021043 -
                   21044
 9
     Exhibit 2     Email dated 11/2/2022 from David  70
10                 Sacks to Ross Nordeen; Bates No.
                   X_ARBS_000021049 - 21050
11
     Exhibit 3     Email dated 10/30/22 from Ross    78
12                 Nordeen; Bates No.
                   X_ARBS_LLR_334 - 344
13
     Exhibit 4     Blind screen shot; Bates No.     128
14                 X_ARBS_LLR_345

15   Exhibit 5     Email titled A Fork in the Road  134
                   dated 11/16/22 from
16                 ermt@twitter.com to
                   team@twitter.com; Bates No.
17                 TWITTER_ARB_2183

18

19

20

21

22

23

24

25
```

7

 1            DEPOSITION PROCEEDINGS

 2               MARCH 26, 2024

 3                 ---oOo---

 4            THE VIDEOGRAPHER:  Good morning, ladies

 5   and gentlemen.  We're on video record.  This begins

 6   Media No. 1 in the deposition of Ross Nordeen in the

 7   matter of Eitan Adler et al. versus Twitter, Inc.

 8   and X Corp. being held in the United States District

 9   Court for the Northern District of California

10   San Francisco division.

11            Today's date is March 26, 2024.  The time

12   is approximately 10:02 a.m.  This deposition is

13   being taken at One Market Plaza, Spear Street Tower

14   in San Francisco, California.

15            My name is Frank Quirarti.  I'm your legal

16   videographer.  I'm here from Magna Legal Services.

17            And our court reporter is Ashley Soevyn,

18   also from Magna Legal Services.  At this time, will

19   counsel and all present please identify yourself for

20   the record.

21            MR. MANEWITH:  Bradley Manewith on behalf

22   of the plaintiff and my colleague Matt Carrieri is

23   viewing via Zoom.

24            MR. CARRIERI:  Good morning.

25            MS. PARKER:  Vicki Parker of Quinn

8

1    Emanuel on behalf of defendants.

2              MR. MECKLEY:  Eric Meckley Morgan Lewis

3    on behalf of defendants.

4              MS. HANSBURY:  Mary Hansbury for X on

5    behalf of defendants.

6              MR. MEHES:  Adam Mehes for X as well.

7              THE VIDEOGRAPHER:  Madam court reporter,

8    will you please swear in the witness.

9              THE STENOGRAPHIC REPORTER:  Sir, can I

10   please have you raise your right hand?  Do you

11   solemnly state that the testimony you are about to

12   give in this deposition will be the truth, the whole

13   truth and nothing but the truth?

14             THE WITNESS:  I do.

15             THE STENOGRAPHIC REPORTER:  Great.  Thank

16   you.

17                       EXAMINATION

18   BY MR. MANEWITH:

19        Q    Good morning, Mr. Nordeen.  My name is

20   Bradley Manewith.  As I said, I represent the

21   plaintiff in this matter.  Just to put on the record

22   and so you understand, although this deposition has

23   been noticed under the Adler versus Twitter case, by

24   agreement of the parties, we're able to use this

25   across all the cases for individuals that my firm is

23

 1            THE STENOGRAPHIC REPORTER:  Sorry?

 2            MR. MANEWITH:  Brian Bjelde.

 3            THE WITNESS:  Not that I'm aware of, no.

 4    BY MR. MANEWITH:

 5        Q    Was Steve Davis there?

 6        A    Not that I remember.

 7        Q    Was Jared Birchall there?

 8        A    Not that I remember.

 9        Q    Do you recall about how many people were

10    there?

11        A    Seemed like a small group initially.

12        Q    Less than ten people?

13        A    Are you talking about this first day?

14        Q    Yes.

15        A    Yeah, maybe.

16        Q    Who led the meeting?

17        A    Which meeting?

18        Q    That first day that you showed up on the

19    second floor of the now uninhabited building.

20        A    So I was there for an insider threat

21    analysis, which I came to find out.  I'm not sure

22    who led the meeting.  They seemed to be meetings

23    that were set up by Twitter.

24        Q    Okay.  You said that you were there for

25    an insider threat analysis?

Eitan Adler vs                    Videotaped                    Ross Nordeen
Twitter, INC. and X Corp.                                       March 26, 2024

24

1        A     Yes.

2        Q     Who told you that you were there for an

3   insider threat analysis?

4        A     My boss.

5        Q     That's Mr. Austin?

6        A     Yes.

7        Q     And what did that mean, that you're there

8   for an insider threat analysis?  What did that

9   entail?

10        A     So basically understanding how the

11   various -- what the various controls are within the

12   company.  Different systems, how they tie together

13   and how one might abuse them if there were a, you

14   know, quote on quote 'rogue insider'.

15        Q     Why were you being asked to do an

16   analysis about rogue insiders?

17              MS. PARKER:  Objection.  Calls for

18   speculation.

19              THE WITNESS:  Well, the company was going

20   to transition hands.

21   BY MR. MANEWITH:

22        Q     So to the best of your knowledge,

23   somebody was worried about a rogue insider and they

24   asked you to do an analysis?

25              MS. PARKER:  Objection.  Calls for

32

1  would be kept at the company and which employees

2  would be laid off as part of the first RIF?

3             MS. PARKER:  Objection.  Lacks

4  foundation.  Assumes facts not in evidence.

5             THE WITNESS:  No.  It was about

6  identifying people that understood the systems.

7  BY MR. MANEWITH:

8        Q    Who told you to sit in at these meetings?

9             MS. PARKER:  Objection.  Lacks

10  foundation.

11             THE WITNESS:  No one.

12  BY MR. MANEWITH:

13        Q    So you just knew to go sit in on these

14  meetings?

15        A    I was just there helping.

16        Q    Did you have any conversations with Elon

17  about these meetings?

18        A    Not that I remember.

19        Q    So that very first meeting in late

20  October 2022 that occurred on the second floor, you

21  said it was sort of an ongoing meeting throughout

22  the day.  One of the topics was the analysis for --

23  the risk analysis for potential rogue individuals.

24  It sounds like another topic was sort of these

25  Twitter employee meetings and identifying who

Eitan Adler vs                     Videotaped                    Ross Nordeen
Twitter, INC. and X Corp.                                     March 26, 2024

33

1   understood the systems; is that right?

2        A    Correct.

3        Q    What else was discussed during that first

4   meeting?

5        A    I think that took up the majority of the

6   time.  It's a lot of stuff.

7        Q    All right.  Were those Twitter employee

8   meetings, were those occurring in that second floor

9   of the same space?  Was that sort of intertwined

10  altogether?

11       A    Yes.

12       Q    And you don't recall for sure whether

13  this was before or after the acquisition closed?

14       A    No.  I don't remember that timing.

15       Q    All right.  When did you first find out

16  that Elon Musk was acquiring Twitter?

17       A    Probably on Twitter.  In the news.

18       Q    So you found out like the rest of the

19  world?

20       A    Yes.

21       Q    Sometime in probably April 2022?

22       A    Yeah.  Probably would have been whenever

23  the news came out.  I think there was news about him

24  acquiring a stake, but I don't think it was a whole

25  thing.  I don't think anyone knew it was going to

Eitan Adler vs                     Videotaped                     Ross Nordeen
Twitter, INC. and X Corp.                                         March 26, 2024

178

1          I, the undersigned, a Certified Shorthand

2    Reporter of the State of California, do hereby

3    certify:

4          That the foregoing proceedings were taken

5    before me at the time and place herein set forth;

6    that any witnesses in the foregoing proceedings,

7    prior to testifying, were duly sworn; that a record

8    of the proceedings was made by me using machine

9    shorthand, which was thereafter transcribed under my

10   direction; further, that the foregoing is a true

11   record of the testimony given.

12         I further certify I am neither financially

13   interested in the action nor a relative or employee

14   of any attorney or party to this action.

15         IN WITNESS WHEREOF, I have this March 29,

16   2024 subscribed my name.

17

18

19

20   *Ashley Soevyn*

21   _____
     ASHLEY SOEVYN
22   CSR No. 12019

23

24

25

Eitan Adler vs
Twitter, INC. and X Corp.

Videotaped

Ross Nordeen
March 26, 2024

179

1          * * *ERRATA SHEET* * *

2     NAME OF CASE:  EITAN ADLER V. TWITTER, INC. AND X

3     CORP.

4     DATE OF DEPOSITION:  3/26/24

5     NAME OF WITNESS:  ROSS NORDEEN

6     Reason codes:

7          1. To clarify the record.
           2. To conform to the facts.
8          3. To correct transcription errors.

9     Page __17__ Line __3__ Reason typographical error
      From __"Had no"__          to __"I had no"__
10

11    Page __17__ Line __6__ Reason typographical error
      From __"End of the day"__    to "At the end of the day"
12

13    Page __24__ Line __14__ Reason typographical error
      From __"on quote"__          to __"unquote"__
14

15    Page __34__ Line __23__ Reason typographical error
      From __"traveling Europe"__   to "traveling in Europe"
16

17    Page __51__ Line __25__ Reason typographical error
      From __"Bernstein"__          to __"Burnstein"__
18

19    Page __105__ Line __14__ Reason typographical error
      From __"Ms. Parker"__        to "The Videographer"
20

21    Page __109__ Line __17__ Reason typographical error
      From __"where they"__          to __"were they"__
22

23

24          _____
                 ROSS NORDEEN
25

Eitan Adler vs                    Videotaped                    Ross Nordeen
Twitter, INC. and X Corp.                                       March 26, 2024

179

1              * * *ERRATA SHEET* * *

2    NAME OF CASE:  EITAN ADLER V. TWITTER, INC. AND X

3    CORP.

4    DATE OF DEPOSITION:  3/26/24

5    NAME OF WITNESS:  ROSS NORDEEN

6    Reason codes:

7         1. To clarify the record.
          2. To conform to the facts.
8         3. To correct transcription errors.

9    Page  114  Line  4   Reason typographical error
     From  "lot people"          to "lot of people"
10

11   Page  117  Line  8   Reason typographical error
     From "personally conversations"  to "personal conversations"
12

13   Page ____ Line ____ Reason____
     From _____ to_____
14

15   Page ____ Line ____ Reason____
     From _____ to_____
16

17   Page ____ Line ____ Reason____
     From _____ to_____
18

19   Page ____ Line ____ Reason____
     From _____ to_____
20

21   Page ____ Line ____ Reason____
     From _____ to_____
22

23

24              _____
                ROSS NORDEEN
25

# EXHIBIT 5

Page 1

                JAMS ARBITRATION
        Before Arbitrator Michael Loeb, Esq.


KEENE NIEMACK,          )
        Claimant,       )
                        )
VS.                     )  JAMS Ref No.: 1601002285
                        )
TWITTER, INC.,          )
        Respondent.     )



   ********************************************
        ORAL AND VIDEOTAPED DEPOSITION OF


                   ELON MUSK


                 MAY 9, 2024


               ***CONFIDENTIAL***
   ********************************************
        ORAL AND VIDEOTAPED DEPOSITION OF ELON
MUSK, produced as a witness at the instance
of the Claimant, and duly sworn, was taken in
the above-styled and numbered cause on May 9,
2024, from 8:39 a.m. to 4:38 p.m., before
Donna Wright, CSR in and for the State of
Texas, reported by machine shorthand, at the
law offices of QUINN EMANUEL URQUHART &
SULLIVAN, LLP, 300 West 6th Street, Suite 2010,
Austin, Texas, pursuant to the Texas Rules of
Civil Procedure and the provisions stated on
the record or attached hereto.



Page 2

```
 1              A P P E A R A N C E S
 2
     FOR THE CLAIMANT:
 3         Ms. Shannon Liss-Riordan
           Mr. Bradley Manewith
 4         Mr. Thomas Fowler
           LICHTEN & LISS-RIORDAN, P.C.
 5         729 Boylston Street
           Suite 2,000
 6         Boston, Massachusetts 02116
           (617) 994-5800
 7         sliss@llrlaw.com
           bmanewith@llrlaw.com
 8         tfowler@llrlaw.com
 9
     FOR ELON MUSK:
10         Mr. Alex Spiro
           Mr. Phillip B. Jobe
11         QUINN EMANUEL URQUHART & SULLIVAN, LLP
           51 Madison Avenue
12         22nd Floor
           New York, New York 10010
13         (212) 849-7000
           alexspiro@quinnemanuel.com
14
15   FOR X:
           Mr. Adam G. Mehes
16         X IN-HOUSE COUNSEL
           5323 Levander Loop
17         Austin, Texas 78702
           (347) 417-4940
18         amehes@x.com
19
     ALSO PRESENT:
20         David Flores - Videographer
           Jeremy Abay (via Zoom)
21         Samuel Davis (via Zoom)
           Matthew Carrieri (via Zoom)
22         Jack Bartholet (via Zoom)
           Mary Hansbury (via Zoom)
23         Eric Meckley (via Zoom)
24
25
```



Page 3

```
 1                    INDEX
 2     Appearances...........................    2
 3
 4     ELON MUSK
 5
       Examination by Ms. Liss-Riordan.........    7
 6     Examination by Mr. Spiro................  363
       Further Examination by.................  366
 7     Ms. Liss-Riordan
       Further Examination by Mr. Spiro........  368
 8     Further Examination by.................  373
       Ms. Liss-Riordan
 9
       Witness' Signature Page.................  378
10     Reporter's Certificate.................  380
11
12                    EXHIBITS
13     NUMBER          DESCRIPTION            PAGE
14     Exhibit 1    .........................    79
                    Excerpt from Merger
15                  Agreement
       Exhibit 2    .........................  111
16                  Excerpt from Merger
                    Agreement
17     Exhibit 3    .........................  146
                    Questionnaire
18     Exhibit 4    .........................  246
                    Twitter Acquisition Tweep
19                  FAQ
       Exhibit 5    .........................  260
20                  E-mail exchange between
                    Elon Musk and David Sacks
21                  with Jehn Balajadia and
                    Steve Davis copied
22     Exhibit 6    .........................  264
                    Text Exchange
23     Exhibit 7    .........................  294
                    Business Insider Article
24     Exhibit 8    .........................  303
                    CNBC Article
25
```



1    Exhibit 9      ..........................  310
           PC Mag Article titled
2          "Elon Musk is a
           Misogynist and it Matters"
3    Exhibit 10     ..........................  315
           Business Insider Article
4    Exhibit 11     ..........................  316
           CNN Article
5    Exhibit 12     ..........................  318
           Rolling Stone Article
6    Exhibit 13     ..........................  321
           Quartz Article
7    Exhibit 14     ..........................  326
           Forbes Article
8    Exhibit 15     ..........................  327
           Fox Business Article
9    Exhibit 16     ..........................  334
           NBC News Article
10   Exhibit 17     ..........................  336
           Tech Monitor Article
11   Exhibit 18     ..........................  337
           E-mail from Dhruv Bataura
12         to Elon Musk dated 5/15/23
     Exhibit 19     ..........................  340
13         Amended Complaint for
           Cornet case
14   Exhibit 20     ..........................  372
           Executive Overview as of
15         11/2/22
     Exhibit 21     ..........................  372
16         Tab 4 - 2022-10-27
     Exhibit 22     ..........................  372
17         Tab 6 - 2022-10-31
     Exhibit 23     ..........................  372
18         Tab 8 - 2022-11-02A
     Exhibit 24     ..........................  372
19         Tab 9 - 2022-11-03A
     Exhibit 25     ..........................  372
20         Tab 11 - 2022-11-04A
     Exhibit 26     ..........................  372
21         Tab 10 - 2022-11-03B
     Exhibit 27     ..........................  372
22         Tab 16 - 2022-11-09
     Exhibit 28     ..........................  372
23         Tab 15 - 2022-11-05
     Exhibit 29     ..........................  372
24         Tab 36 - 2023-02-10
     Exhibit 30     ..........................  372
25         Tab 38 - 2023-02-22



Page 5

1    Exhibit 31   .......................... 372

                 Tab 17 - 2022-11-10

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



Page 6

```
 1                THE VIDEOGRAPHER:  Today is May
 2           9th, 2024, and the time is 8:39 a.m.
 3           We are on the record.
 4                (Discussion off the record)
 5                THE VIDEOGRAPHER:  Will counsel    08:39:21
 6           and all parties present state their
 7           appearances and whom they represent.
 8                MS. LISS-RIORDAN:  For
 9           Claimant, I'm Shannon Liss-Riordan.
10           With me are --
11                MR. MANEWITH:  Bradley Manewith
12           for Claimant.
13                MR. FOWLER:  And Thomas Fowler,
14           also for Claimant.
15                MS. LISS-RIORDAN:  And we have    08:39:35
16           several other attorneys from our firm
17           attending by Zoom.  Jeremy Abay,
18           Samuel Davis, Matthew Carrieri --
19                MR. MANEWITH:  And Jack
20           Bartholet.                             08:39:47
21                THE REPORTER:  And -- pardon?
22                MR. MANEWITH:  Jack Bartholet.
23                THE REPORTER:  Okay.
24                MR. SPIRO:  This is Alex Spiro
25           on behalf of Mr. Musk, and present     08:39:50
```



Page 7

```
 1          with me is Adam Mehes from X.  On the
 2          line is Phil Jobe from Quinn Emanuel
 3          and Mary Hansbury from X.  Thank you.
 4                 THE REPORTER:  Okay.
 5                 MS. LISS-RIORDAN:  Please swear
 6          in the witness.
 7                        ELON MUSK,
 8     having been first duly sworn, testified as
 9     follows:
10                     EXAMINATION
11     BY MS. LISS-RIORDAN:
12          Q.     All right.  Good morning, Mr.
13     Musk.  Nice to meet you.
14          A.     Good morning.
15          Q.     I have heard a lot about you,        08:40:19
16     so nice to meet in person.
17                 As you probably know, I'm going
18     to be asking you questions today about
19     various lawsuits and arbitrations that we
20     have brought against Twitter, now X.        08:40:31
21     Throughout this deposition, I may call
22     Twitter and X, I may use those terms
23     interchangeably.
24                 But you understand that if I
25     refer to Twitter, I'm referring to the        08:40:42
```



Page 22

```
 1   massive debt servicing needs to have layoffs,
 2   then in order for the company to remain
 3   solvent with a large debt burden, the layoffs
 4   would have to be larger, necessarily, or the
 5   company would go bankrupt.                    08:55:01
 6       Q.    Okay.  So after the deal closed
 7   in late October, you did set about doing
 8   layoffs pretty quickly?
 9       A.    Yes.  My -- my rough estimate
10   was that the company, in the absence of any   08:55:11
11   action, would be dead within four, maybe five
12   months.
13       Q.    So what proportion of the
14   workforce needed to be exited, in your view,
15   in order to try to save the company?          08:55:26
16       A.    Well, obviously the company --
17   you know, one learns things progressively
18   because you only have kind of like a limited
19   amount of data before you are actually
20   running the company.                          08:55:44
21           So it wasn't -- as -- you get
22   there, you learn more.  The more I learned,
23   the more dire the situation or the more --
24   the more it was clear that we had a very dire
25   situation.  So the magnitude of the problem   08:56:00
```



Page 24

1    didn't know on day one what proportion of the

2    company needed to be cut?

3          A.     Correct.

4          Q.     Okay.  But the initial -- there

5    were layoffs that happened very shortly after    08:57:34

6    you took over around November 4th, right?

7          A.     Yes.  It was no question that

8    some number of layoffs needed to occur.  It

9    wasn't clear the magnitude on day one, but --

10   but things did get progressively worse.  I      08:57:49

11   mean, the revenue -- there was a significant

12   revenue decline that was much sharper than

13   expected.

14                And then, as I said, the -- the

15   biggest interest rate rise by the Federal        08:58:09

16   Reserve in history, in the entire U.S.

17   history with -- causing the interest burden

18   to be significantly hiring than it would

19   otherwise be.

20         Q.     Okay.  So when you were            08:58:23

21   planning the initial layoffs for November

22   4th, did you know that those weren't going to

23   be the only layoffs, that was just the start?

24         A.     I didn't know that at the time.

25   It simply became -- and just to frame things    08:58:34



Page 39

1           A.     Yes.

2           Q.     Okay.  And there was also an

3    attempt by you to make sure that the people

4    who stayed with the company were very devoted

5    to the company; is that right?              09:14:28

6           A.     Well, I think you want people

7    who are dedicated to -- dedicated to the

8    success of the company in order for the

9    company to succeed.

10          Q.     So did you have your team try    09:14:40

11   to find the people who were not necessarily

12   so dedicated to the company and make sure

13   that they were included as well?

14          A.     Well, if -- if people were sort

15   of openly derogatory about the company on,    09:14:54

16   let's say, open site channels or on Twitter,

17   it's simple to conclude that they aren't

18   dedicated to the company.

19          Q.     So you had people go look and

20   find who those people were?                   09:15:13

21          A.     Yeah.  We had people that were

22   leaking confidential information and,

23   obviously, I don't think you can't trust

24   someone who is leaking confidential

25   information and breaking their NDA.           09:15:25



Page 40

1        Q.        And there were people who were

2    saying negative things about the company

3    online, on Slack or on social media?

4        A.        Yes.  But those -- yes.  Not

5    very many, but there were some.                    09:15:36

6        Q.        Okay.  And so those people were

7    exited?

8        A.        Yes.

9        Q.        If there were people who were

10   challenging you and your leadership in the         09:15:42

11   company, they were exited; is that right?

12       A.        Not so much for challenging.

13   But if they were openly engaged in gross

14   insubordination, then obviously one can't run

15   a company if people are engaged in gross          09:16:01

16   insubordination.

17       Q.        Okay.

18       A.        It's impossible.

19       Q.        So these -- so these were other

20   efforts that were used over those months to        09:16:10

21   figure out who should stay at the company and

22   who should leave the company?

23       A.        Yes.  I don't think very many

24   people were actually exited for gross

25   insubordination or leaking information in          09:16:20



Page 41

1    violation of their NDA.    I think there would

2    have been a fairly small percentage of

3    people, but some were.

4          Q.    Who did you ask to try to find

5    those people?                                    09:16:34

6          A.    I asked the info sec team.

7                THE REPORTER:    The what?

8                THE WITNESS:    The information

9    security team.

10                THE REPORTER:    Okay.

11                THE WITNESS:    I just simply

12    said, "We clearly have people who are

13    violating the nondisclosure --

14    nondisclosure agreement, leaking

15    confidential information."                        09:16:55

16                At one point, we had some

17    people actually put instructions on

18    how to delete the entire Twitter

19    database on the -- on the Slack

20    channel.                                          09:17:11

21                THE REPORTER:    What?

22                THE WITNESS:    How to delete and

23    destroy the company on the public

24    Slack channel.    Now, I'm sure you

25    would agree that such people should        09:17:20



Page 42

1    not continue to be employed.

2    Q.    (BY MS. LISS-RIORDAN)    Is

3    there a --

4    A.    Wouldn't you agree with that?

5    Q.    Is there a -- is there a --    09:17:28

6    A.    If somebody is -- say, were to

7    describe in detail how to plant explosives in

8    this building and blow it to smithereens

9    while you are in it, you would probably

10    conclude that their employment should    09:17:42

11    terminate.

12    Q.    Are you referring to a -- is

13    there a command "aurora killall"?

14    A.    That's correct.

15    Q.    So there was someone who had    09:17:49

16    posted that on a Slack channel?

17    A.    Among other things.

18    Q.    Okay.  All right.  You're aware

19    that some people post things online that

20    are -- that are jokes, right?    09:18:02

21    A.    Does that sound funny to you?

22    Q.    Well, I'm just -- I'm just

23    asking you.  You have posted that you try to

24    be humorous in your posts, right?

25    A.    I don't think being -- making    09:18:12



Page 43

1    jokes about destroying the entire Twitter

2    system on Twitter is super funny.

3            Q.      All right.  But you -- are you

4    aware that there was a Slack channel that

5    employees used that was called "Social          09:18:30

6    Watercooler"?

7            A.      I have heard of it.  I didn't

8    personally look at it.

9            Q.      All right.  And it was a place

10   where employees would let off steam and joke     09:18:38

11   around, sort of like you would at -- around a

12   watercooler in a traditional office?

13           A.      I certainly do not object to

14   humor.  But just like if you go through TSA

15   at the airport and you joke that you've got a    09:18:59

16   bomb in your case, they will not regard that

17   as being very funny.

18           Q.      Okay.  All right.  You have --

19   you have posted things that you thought were

20   funny and other people didn't think were so      09:19:08

21   funny; isn't -- isn't that correct?

22           A.      You know, it depends on the

23   context.  But joking about destroying an

24   entire Twitter system is not funny.

25           Q.      Okay.                            09:19:20



Page 380

```
 1                    JAMS ARBITRATION
              Before Arbitrator Michael Loeb, Esq.
 2
    KEENE NIEMACK,         )
 3         Claimant,       )
                           )
 4  VS.                    )  JAMS Ref No.: 1601002285
                           )
 5  TWITTER, INC.,         )
           Respondent.     )
 6
 7
                   REPORTER'S CERTIFICATION
 8              DEPOSITION OF ELON MUSK
                     MAY 9, 2024
 9
10         I, DONNA WRIGHT, Certified Shorthand
11  Reporter in and for the State of Texas,
12  hereby certify to the following:
13         That the witness, ELON MUSK, was duly
14  sworn by the officer and that the transcript
15  of the oral deposition is a true record of
16  the testimony given by the witness;
17         That the deposition transcript was
18  submitted on _____, 2024, to the
19  witness or to the attorney for the witness
20  for examination, signature and return to me
21  by _____, 2024;
22         That the amount of time used by each
23  party at the deposition is as follows:
24         Ms. Shannon Liss-Riordan - 6 hr. 32 min.
           Mr. Alex Spiro - 3 min.
25
```



Page 381

```
 1        That pursuant to information given to
 2   the deposition officer at the time said
 3   testimony was taken, the following includes
 4   counsel for all parties of record:
 5        Ms. Shannon Liss-Riordan, Mr. Bradley
     Manewith, and Mr. Thomas Fowler, Attorneys
 6   for Claimant;
          Mr. Alex Spiro and Mr. Phillip B. Jobe,
 7   Attorneys for Elon Musk;
          Mr. Adam G. Mehes, Attorney for X;
 8
 9        I further certify that I am neither
10   counsel for, related to, nor employed by any
11   of the parties or attorneys in the action in
12   which this proceeding was taken, and further
13   that I am not financially or otherwise
14   interested in the outcome of the action.
15        Further certification requirements
16   pursuant to Rule 203 of TRCP will be
17   certified to after they have occurred.
18        Certified to by me this _____ of
19   _____, 2024.
20
21
                   __Donna Wright_____
22             DONNA WRIGHT, Texas CSR 1971
               Expiration Date:  11/30/24
23             MAGNA LEGAL SERVICES
               1635 Market Street, 8th Floor
24             Philadelphia, PA  19103
               Firm Registration No. 633
25
```



Page 382

```
 1      FURTHER CERTIFICATION UNDER RULE 203 TRCP
 2          The original deposition was/was not
 3    returned to the deposition officer on
 4    _____;
 5          If returned, the attached Changes and
 6    Signature page contains any changes and the
 7    reasons therefor;
 8          If returned, the original deposition
 9    was delivered to Ms. Shannon Liss-Riordan,
10    Custodial Attorney;
11          That $_____ is the deposition
12    officer's charges to the Claimant for
13    preparing the original deposition transcript
14    and any copies of exhibits;
15          That the deposition was delivered in
16    accordance with Rule 203.3, and that a copy
17    of this certificate was served on all parties
18    shown herein on and filed with the Clerk.
19          Certified to by me this _____ day
20    of _____, 2024.
21
22              _____Donna Wright_____
                MAGNA LEGAL SERVICES
23              1635 Market Street, 8th Floor
                Philadelphia, PA  19103
24              Firm Registration No. 633
25
```



EXHIBIT 6

1                    JAMS ARBITRATION

2          BEFORE ARBITRATOR MICHAEL LOEB, ESQ.

3

4   JESSICA PAN,

5                   Claimant,
                                        Jams No.: 1100115270
6                   v.

7   TWITTER, INC.,

8                   Respondent.

9   _____

10

11

12        HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

13

14           DEPOSITION OF CHRISTOPHER STANLEY

15

16                    May 22, 2024

17                    10:08 a.m.

18

19         1 Market Street, Spear Street Tower

20              San Francisco, California

21

22

23   REPORTED BY:

24   Siew G. Ung

25   CSR No. 13994, RPR, CSR

Eitan Adler vs                    Attorneys Eyes Only              Christopher Stanley
Twitter, INC. and X Corp.                                              May 22, 2024

2

1    REMOTE APPEARANCES:

2

3        For Claimant:

4            LICHTEN & LISS-RIORDAN, PC
             BRADLEY MANEWITH, ESQ.
5            729 Boylston Street, Suite 2000
             Boston, Massachusetts 02116
6            bmanewith@llrlaw.com
             617.994.5800
7

8        For Respondent:

9            QUINN EMANUEL URQUHART & SULLIVAN, LLP
             ERIC MECKLEY, ESQ.
10           VICKI PARKER, ESQ.
             865 South Figueroa Street, Floor 10
11           Los Angeles, California 90017
             eric.meckley@morganlewis.com
12           vickiparker@quinnemanuel.com
             213.443.3000
13
             X
14           MARY HANSBURY, ESQ. (in-house)
             ADAM MEHES, ESQ. (in-house, remote)
15

16        Also Present:

17           Frank Quirarte, Videographer

18

19

20

21

22

23

24

25

Eitan Adler vs
Twitter, INC. and X Corp.

Attorneys Eyes Only

Christopher Stanley
May 22, 2024

3

1           INDEX TO EXAMINATIONS

2

3         WITNESS: CHRISTOPHER STANLEY

4   EXAMINATION                                          PAGE

5   BY MR. MANEWITH                                        6

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Eitan Adler vs                          Attorneys Eyes Only                  Christopher Stanley
Twitter, INC. and X Corp.                                                    May 22, 2024

4

1                    INDEX TO EXHIBITS

2                  CHRISTOPHER STANLEY

3                      May 22, 2024

4          Siew G. Ung, CSR No. 13994, RPR

5   MARKED                 DESCRIPTION                    PAGE

6

7   Exhibit 1          November 16, 2022, Email from     146

8                      Elon Musk to team@twitter.com

9                      bcc paulb@twitter.com, Subject:

10                     A Fork in the Road

11                     (X_ARBS_000000288)

12

13  Exhibit 2          November 17, 2022, Direct         149

14                     Messages between Christopher

15                     Stanley and James Musk (X_CORP

16                     ADLR_000000594 to X_CORP

17                     ADLR_000000598)

18

19  Exhibit 3          Messages (X_ARBS_LLR_000000388    160

20                     to X_ARBS_LLR_000000389)

21

22

23

24

25

5

 1          WEDNESDAY, MAY 22, 2024, 10:08 A.M.

 2                          ***

 3          THE VIDEOGRAPHER:  All right.  This is the

 4   beginning of media labeled Number 1 in the

 5   video-recorded deposition of Christopher Stanley in

 6   the Eitan Adler v. Twitter, Inc., and X Corp. being

 7   held in the United States District Court for the

 8   Northern District of California, San Francisco

 9   Division.  It's case number 3.23-CV-01788.

10          This deposition is being held at 1 Market

11   Street in Spear Street Tower, San Francisco,

12   California, on May 22, 2024, at approximately

13   10:08 a.m.

14          My name is Frank Quirarte; I'm your legal

15   video specialist.  I'm here from Magna Legal

16   Services.  Our court reporter today is Siew Ung also

17   in association with Magna Legal Services.

18          At this time will counsel and all present

19   please identify yourself for the record.

20          MR. MANEWITH:  Sure.  Bradley Manewith on

21   behalf of Plaintiff.

22          MR. MECKLEY:  Eric Meckley of Morgan Lewis

23   on behalf of Defendant.

24          MS. PARKER:  Vicki Parker of Quinn Emanuel

25   also on behalf of Defendant.

Eitan Adler vs                    Attorneys Eyes Only              Christopher Stanley
Twitter, INC. and X Corp.                                              May 22, 2024

6

1          MS. HANSBURY:  Mary Hansbury for X Corp.

2          MR. MEHES:  Adam Mehes for X Corp.

3          THE VIDEOGRAPHER:  Madam Court Reporter,

4    will you please swear in the witness.

5                CHRISTOPHER STANLEY,

6      having been first duly sworn, was examined and

7                testified as follows:

8           EXAMINATION BY MR. MANEWITH

9      Q.  All right.  So good morning, Mr. Stanley.

10   As I said, my name is Bradley Manewith.  I represent

11   the plaintiff in this matter.

12          Just for record, I will state that this

13   deposition, while it's been captioned under the

14   Adler matter, pursuant to the party's agreement,

15   it's going to be used across a host of cases

16   between -- that -- between a number of former

17   Twitter employees and the company, so I just want to

18   put that onto the record.

19          Throughout the course of today's

20   deposition, if I refer to the company as Twitter or

21   X Corp., can we agree you understand we are talking

22   about the same entity?

23          I know there's been a name change.

24      A.  Yes.

25      Q.  Okay.  Have you ever been deposed before?

45

1      Q.   SpaceX?

2      A.   Conversations with -- with Elon about

3  people at SpaceX wishing SpaceX harm?

4      Q.   Correct.  Like an insider threat at

5  SpaceX.

6      A.   Specifically with Elon, I don't recall,

7  but I've had conversations with my team about

8  insider risks at SpaceX.

9      Q.   What types of things would be considered

10 an insider threat?

11     A.   Con- -- conversations with other people

12 about  exfiltrating data is an example,

13 conversations with people about destroying company

14 property is an example.  Things of that nature.

15         Anything that will harm -- could harm the

16 company.

17     Q.   Somebody having conversations about an

18 unfavorable view of Elon Musk, would that be

19 considered a insider threat?

20         MR. MECKLEY:  Let me object.  It's vague,

21 ambiguous.  Incomplete hypothetical.  Calls for

22 speculation.

23         THE WITNESS:  Conversations that can harm

24 the company were things that would be considered

25 like insider threat.

Eitan Adler vs                          Attorneys Eyes Only                    Christopher Stanley
Twitter, INC. and X Corp.                                                      May 22, 2024

51

1    threat.

2    BY MR. MANEWITH:

3        Q.   When you say "harm the company," what do

4    you mean by "harm" specifically?

5        A.   The definition of harm varies, but causing

6    negative implications as it pertains to security

7    and -- so, for instance, you know, destroying a

8    server would be called -- con- -- constituted as

9    harm -- could be one of the things.

10       Q.   Okay.  Disclosing potentially confidential

11   information, would that be another harm?

12       A.   Yes, leaking information is considered

13   harm.

14       Q.   Okay.  Anything more that would be

15   considered harm?

16       A.   I can't think of every single instance in

17   which harm would be classified.  However, those are

18   a couple examples.

19       Q.   Okay.  Are there any other examples, as

20   you're sitting here today, that you can think of?

21       A.   There are many different ways in which you

22   can harm a company.  You can hurt their employees.

23   You can disrupt infrastructure.  There are many ways

24   in which you could -- I can't list every single

25   possible way you can harm a company.

52

1      Q.  Any other examples as we are sitting here
2  today that you can think of?
3      A.  There are many ways in which you can harm
4  a company.  The examples I have given are what I'm
5  thinking of at this moment.
6      Q.  Is there anything that would refresh your
7  recollection as far as any others?
8      A.  If we had unlimited time to discuss harm
9  on companies, I'm sure we could come up with others.
10      Q.  So you mentioned that Steve Davis, who you
11  had helped out at The Boring Company on -- on that
12  security risk, and Mr. Musk approached you about
13  helping at Twitter, do you recall that?
14          Did I have that right?
15      A.  Yes.
16      Q.  Okay.  When did they approach you?
17      A.  I don't recall specifics on the exact
18  date.
19      Q.  Are we talking about a couple weeks before
20  Mr. Musk took over Twitter, a couple months, days?
21      A.  The days following acquisition, but could
22  you please clarify the specific date that you have
23  in mind for acquisition?
24      Q.  Somewhere around October 26th to the 28th,
25  somewhere in that time frame, of 2022.

80

 1  go off the record.  We don't need to have our
 2  conversation about lunch on the record.
 3          THE VIDEOGRAPHER:  We are going off the
 4  record.  The time is 12:18 p.m.
 5                  (Recess taken.)
 6          THE VIDEOGRAPHER:  Okay.  We are back on
 7  the record.  The time is 1:11 p.m.
 8  BY MR. MANEWITH:
 9      Q.  Great, so before the break, you had told
10  me about your four conversations that you had with
11  Mr. Sayler, Mr. MacDonald, Mr. Wilson, and
12  Mr. Wheeler on your first day at Twitter.
13          Do you recall that testimony?
14      A.  Yes.
15      Q.  Okay.  And other than those four
16  conversations, what did you do on your first day at
17  Twitter?
18      A.  I had lunch.  Drank -- you know, talked to
19  the people that I spoke to, and kind of just
20  understanding the -- the building and -- and getting
21  settled, basically.
22      Q.  Okay.  How would you describe the sort of
23  atmosphere that first day that you were there?
24      A.  The first day, the atmosphere was kind
25  of -- well, the first day it was basically just the

81

1  people that I had spoken to.  I didn't get to see a
2  lot of the -- the subsequent days, I think that
3  became more clear about the atmosphere.
4        Q.  Okay.  How would you describe the
5  atmosphere over those subsequent days?
6        A.  Definitely felt there was like a lot of
7  hostility and a lot of people were unhappy.  It
8  wasn't super pleasant.
9        Q.  Okay.  And let me ask you this:  At that
10  point, when you were -- on your first day there, or
11  the next couple days, had there been layoffs at that
12  point yet?
13        A.  I wasn't involved in any layoffs at that
14  point.
15        Q.  Okay.  I understand that you may not have
16  been involved, but -- but had -- are you aware as to
17  whether or not any of the layoffs had taken place
18  yet?
19        A.  I was focused on the security stuff so I
20  don't recall any interaction with any of that stuff.
21        Q.  Okay.  So you were not involved in any way
22  in reviewing employees to determine who should stay
23  and who should go with respect to the November 4
24  layoffs?
25        A.  Correct.

82

1      Q.  Okay.  Had those November 3, November 4

2   layoffs occurred on your first day; do you remember?

3      A.  I don't recall.

4      Q.  All right.  After you first -- after you

5   came to work and you were in San Francisco at

6   Twitter, tell me about your first conversation that

7   you had with Elon about his concerns about security

8   risks.

9      A.  He was of the mindset that it would -- all

10  it took was, you know, one individual to cause

11  havoc, a lot of havoc and that he was concerned that

12  now that he was there, that someone would and could.

13  And so his request to me was to go figure out, like,

14  what are all the ways in which havoc could be

15  caused?

16     Q.  Okay.  And I apologize because I think

17  this is part of the technology.  It sort of got a

18  glitch.

19         At the very beginning, can you just repeat

20  what you had said.  I didn't catch all of it because

21  of a glitch.

22     A.  Elon was concerned that it -- all it took

23  was, like, a single individual to cause harm to the

24  company, and that he wanted me to go figure out what

25  are the ways that people could cause harm, what

83

1   access people had that could cause harm, and to --
2   to deep dive into those types of -- you know, areas.
3       Q.  Okay.  Can you explain that in little bit
4   more detail what -- what he exactly told you and --
5   and what you did with that?
6       A.  I don't know exactly what was said, but it
7   was he was concerned about security, and that he
8   wanted me to go dive into security at Twitter.
9       Q.  Did he say why he was concerned?
10          MR. MECKLEY:  Let me object to the extent
11  it's asked and answered.
12          THE WITNESS:  I don't know why -- what his
13  reasons were for why he was concerned.
14  BY MR. MANEWITH:
15      Q.  Did he tell you, though, why he was
16  concerned?  That was my question.  I understand
17  you...
18          MR. MECKLEY:  And let me object to the
19  extent it's asked and answered.
20          THE WITNESS:  He asked me to dive in
21  because he was concerned.
22  BY MR. MANEWITH:
23      Q.  Okay.  Was there any specific concerns
24  that he outlined other than just individuals -- a
25  single individual could cause harm to the -- to the

84

1  company?

2       A.  No.  He specifically said that he was

3  concerned that all it took was, you know, a single

4  person to -- to cause harm.

5       Q.  Okay.  And so then he asked you to go in

6  and find out who would have access to cause that

7  harm and who -- who might potentially cause harm to

8  the company?

9       A.  I believe that was implied.  I don't think

10 he specifically used the words, "go find who does

11 this and that."  Just that he was concerned and he

12 wanted me to dive in.

13      Q.  All right.  So that's what you understood

14 based on the conversations he wanted you to do?

15      A.  The actions I took were based on how I

16 interpreted his con- -- him saying he was concerned.

17      Q.  Okay.  Was anybody else involved in that

18 conversation?

19      A.  Not to my knowledge.

20      Q.  Okay.  Did you take any notes on that

21 discussion with Elon?

22      A.  Define "notes."

23      Q.  Yeah, did you have a notepad with you,

24 write anything down, take any notes on your

25 computer?

85

```
 1        A.  NO.
 2        Q.  Okay.  How long did that conversation
 3   last?
 4        A.  It was a Signal message.
 5        Q.  Okay.  Did you have any follow-up
 6   discussions with him then?
 7        A.  I don't recall specifics.
 8        Q.  Okay.  So what did you do after Elon asked
 9   you to, you know, outline his concerns, that you
10   then interpreted as being:  You should go in and
11   look and find where the -- the vulnerabilities are
12   and then who might be a potential risk?
13            THE REPORTER:  Can you say that question
14   again.
15            MR. MANEWITH:  I -- I didn't hear that.
16            THE WITNESS:  She said can you say the --
17   repeat the question.
18   BY MR. MANEWITH:
19        Q.  Yeah, so what did you do after Elon about
20   his concerns, that you then interpreted as you need
21   to go in to find the potential risks and who -- who
22   may be a potential risk?
23        A.  I familiarized myself with the access
24   control system, who has access -- like what defines
25   access, which is based off active directory groups
```

86

1  and that sort of thing.

2          Q.  What else did you do?

3          A.  A multitude of things, looks at network

4  access, looking at access to systems, reviewing data

5  within the various systems that we had.

6          Q.  Anything else that you did?

7          A.  Can you be more specific?

8          Q.  Yeah, you have described a number of

9  things that you did, so I just want to make sure

10  we've caught all the different things that you did

11  to sort of do your research and look into, you know,

12  where the potential risks are and who may be a

13  potential risk.

14          A.  I can't think of every single thing I did

15  during that time.

16          Q.  Okay.  Did you get anybody else involved

17  in this process?

18          A.  Yes.

19          Q.  Who?

20          A.  I had Josh Ursenbach from SpaceX help me.

21          Q.  Anybody else?

22          A.  Not that I'm aware of.

23          Q.  Okay.  Why did you get Josh Ursenbach from

24  SpaceX involved on work for Twitter?

25          A.  Josh initially hired me at SpaceX many

87

1  years ago, and he had experience in IT, and so he

2  was helpful in understanding a lot of the IT

3  systems.

4        Q.  Was he then -- at the time that you got

5  him involved, was he working for Twitter?

6        A.  No.

7        Q.  Okay.  Did you ask him then to get

8  involved?

9        A.  I asked him if he wanted to help.

10       Q.  Did you have to run that through anybody

11  first before asking Mr. Ursenbach?

12       A.  I don't recall.

13       Q.  Okay.  What did you find as far as

14  potential threats?

15       A.  I found that a lot of people had a ton of

16  access to things that, in my experience, seemed too

17  verbose, which is problematic.

18       Q.  Why was that problematic?

19       A.  In my line of work, it's important that

20  people have access only to the things in which they

21  need to do their job and nothing more, and that was

22  not the case --

23       Q.  Okay.

24       A.  -- always.

25       Q.  So what did you do at that point then when

88

1  you found out that people had a lot of access that

2  maybe they didn't need?

3       A.  I believe I let various folks know.  I

4  think Elon may be even be one of them.

5       Q.  All right.  So you let Elon know that

6  there's no -- there was too much access for

7  individuals.

8            Who -- who aside from Elon did you talk to

9  about that?

10       A.  I don't recall specifics.

11       Q.  Okay.  Did you discuss that with James

12  Musk?

13       A.  I don't recall.

14       Q.  Ross Nordeen?

15       A.  I believe I had some conversation was Ross

16  about it.

17       Q.  What do you remember about your

18  conversations with Ross?

19       A.  Only that people had a lot of access and

20  that I thought it odd.

21       Q.  Okay.  What about Andrew Musk?  Did you

22  talk to Andrew about level of access for

23  individuals?

24       A.  I believe it may have come up in

25  conversation, but similar to Ross, just --

Eitan Adler vs                        Attorneys Eyes Only                    Christopher Stanley
Twitter, INC. and X Corp.                                                    May 22, 2024

89

1          Q.  What do you --
2          A.  -- just this is odd that all of these
3    people have a lot of access that they, perhaps,
4    don't require.
5          Q.  Okay.  Anything specific other than these
6    general -- general thoughts that you recall in your
7    conversation with Elon about individuals having too
8    much access?
9          A.  Nothing specific other than, like,
10   agreement of, yeah, people should only have access
11   to the things that they are required to do their
12   job.
13         Q.  Did you have a conversation with Steve
14   Davis about this?
15         A.  I don't recall.
16         Q.  Jared Birchall?
17         A.  I don't recall.
18         Q.  Okay.  What was the decision, then, that
19   was made about individuals that have too much
20   access?
21         A.  It then turned into a -- basically like an
22   audit of permissions and credentials to go through
23   and find what levels of access are required and
24   figure out if there's a way to pare it down.
25         Q.  Anything else that you -- was done with

90

 1  that?
 2       A.  If people had access to highly critical
 3  systems, I made, like, mental notes on -- on those
 4  of like if someone had like a super-high level of
 5  access, it was important to understand who those
 6  people are.
 7       Q.  What did you do to understand who those
 8  people are?
 9       A.  Looked at the access.
10       Q.  You looked at their -- okay.
11            So somebody had high-level access, you
12  were just checking to see their access, and
13  that's -- that was your mental notes?
14       A.  I first went in and identified things that
15  I thought were highly critical systems, and then
16  looked at who had access to those systems.
17       Q.  Was that information -- was that
18  information then provided to Elon and others?
19       A.  I don't recall if I had given specific
20  names about who had access other than there are
21  people that have access to things that I don't think
22  that they should or wasn't required for the job.
23       Q.  Okay.  When you identified individuals,
24  then, that had access to things that you didn't
25  believe that they should have access to, did you do

91

1  anything further with respect to those individuals?

2      A.  I likely spoke to folks, but I don't have

3  specific memories or examples of who.

4      Q.  Okay.  Did you go in and check any of

5  their Slack messages?

6      A.  Yes.

7      Q.  Who told you to do that?

8          MR. MECKLEY:  Let me object.  It assumes

9  facts not in evidence.  Lacks foundation.

10         THE WITNESS:  I believe it was just a part

11 of my normal process of discovery.

12 BY MR. MANEWITH:

13     Q.  So you made the decision based on what you

14 understood was needed to be done for the job to go

15 in and check people's Slack messages?

16     A.  I went through and looked at messages in

17 order to understand the layout of the company and

18 what threats might exist.

19     Q.  Did you have anybody else look at Slack

20 messages?

21     A.  I didn't have anybody else look at Slack

22 messages?

23     Q.  Okay.  So you were the only one going

24 through employee Slack messages to see what they

25 were posting?

92

```
 1          MR. MECKLEY:  Let me object.  Lacks
 2   foundation.  Calls for speculation.
 3          THE WITNESS:  I don't know who and who did
 4   not in totality go through Slack messages.
 5   BY MR. MANEWITH:
 6      Q.  Okay.  But you -- you definitely did?
 7      A.  I have looked at Slack messages.
 8      Q.  What were you looking for in the Slack
 9   messages with respect to who would be a potential
10   threat?
11      A.  Looking for instances of likely harm to
12   the company.
13      Q.  And what did you consider to be "likely
14   harm to the company" that would alert -- that would
15   have raised a red flag to you?
16      A.  People saying things that could destroy
17   company property or disrupt systems, those types of
18   information.
19      Q.  If you found somebody that you believed to
20   be a potential threat, what did you do about that?
21      A.  Depending on the context, there are a
22   multitude of things that I could do.
23      Q.  Okay.  So what types of things would you
24   have done?
25      A.  There were times where people said or did
```

99

1          A.   Not to my knowledge.

2          Q.   Did you send any emails to Steve Davis?

3          A.   It's possible that emails were sent

4     because that was a form of communication that I

5     leveraged.

6          Q.   Okay.  Do you know who Eitan Adler is?

7          A.   I know of him.

8          Q.   What -- how do you know Mr. Adler?

9          A.   I know that he's listed on the thing that

10    we're discussing today.

11         Q.   Okay.  Other than in the context that he

12    brought this lawsuit, do you know anything about

13    Mr. Adler?

14         A.   I am aware of the conversations that he

15    participated in within Slack.

16         Q.   Okay.  What communications or

17    conversations did he have in Slack?

18         A.   My understanding is he participated in a

19    conversation talking about having -- sorry -- having

20    harm to the company.

21         Q.   What specifically do you remember about

22    the supposed conversations on Slack?

23         A.   I specifically remember talking about

24    killing services and participating in causing harm

25    to our systems.

100

1        Q.  Was there anything more specifically that
2   you recall about his supposed conversations on
3   Slack?
4        A.  The conversation was around killing aurora
5   services and removing data, basically.
6        Q.  Anything more that you can recall?
7        A.  I believe they were in relation to a post
8   that Elon had made publicly.
9        Q.  What post that Elon made -- made -- excuse
10  me -- made public?
11       A.  I believe it to be -- I -- I don't know
12  exactly verbatim what the post was, however, the
13  context was apologizing for the latency of some of
14  the system and that we need to fix it.
15       Q.  Anything else that you recall about
16  Mr. Adler?
17       A.  No.
18       Q.  And did you then decide to cut his access?
19       A.  I don't think I made that decision.
20       Q.  Who do you understand made the decision to
21  cut Mr. Adler's access?
22       A.  I don't recall who made it or who
23  initiated it.  It's possible that I was given a -- a
24  list to deactivate and he was among them, but I
25  don't remember specifically doing it myself.

Eitan Adler vs                          Attorneys Eyes Only                    Christopher Stanley
Twitter, INC. and X Corp.                                                      May 22, 2024

102

1          A.  Not to my knowledge.

2          Q.  Okay.  You didn't speak to him with

3     respect to his Slack messages, correct?

4          A.  Correct.

5          Q.  And so Ross or James told you to cut off

6     Mr. Adler's access?

7          A.  I don't recall specifics on exactly who

8     did or didn't tell me to cut specifically Eitan

9     Adler's access.

10         Q.  You did cut Mr. Adler's access, though?

11         A.  I don't recall if I did or I didn't.  It

12    is possible that it was in a list.

13         Q.  Okay.  Did you consider Mr. Adler to be an

14    internal threat to the company based on his Slack

15    messages?

16         A.  Absolutely.

17         Q.  So if he was a risk to the company, would

18    you agree that he shouldn't be working there?

19         A.  I don't make decisions on who or who

20    shouldn't be working; however, my recommendation

21    would have been, given that example, to cut access.

22         Q.  Okay.  By "cutting access," does

23    effectively mean terminate somebody?

24         A.  Can you define "terminate"?

25         Q.  Yeah.  Fire them so they're no longer

Eitan Adler vs
Twitter, INC. and X Corp.                Attorneys Eyes Only                Christopher Stanley
May 22, 2024

105

1        Q.  With respect to Mr. Adler, do you believe
2   that he should have been interviewed to find out
3   what his position was on the Slack messages?
4        A.  The messages, as I understand them, were
5   quite severe, so...
6        Q.  Okay.  What -- what Slack channel was
7   this -- were -- were these posted on?
8        A.  I don't recall.
9        Q.  Was it at the social watercooler Slack
10  message?
11       A.  I don't recall.  It's possible.
12       Q.  Are you familiar with the social
13  watercooler Slack message channel?
14       A.  I'm familiar with social watercooler
15  channel.
16       Q.  And isn't it true that the social
17  watercooler Slack message channel is a place that at
18  the very top it basically says this is a channel for
19  joking around?
20       A.  I don't recall whether -- what the
21  description of the channel was.
22       Q.  Okay.  Have you ever looked at it?
23       A.  Looked at what?
24       Q.  The social watercooler Slack message, what
25  the description is?

108

 1  during the very beginning of the acquisition, that
 2  tensions were high.  Many people were not happy.
 3  Many people were very angry at even my presence
 4  being there.  People said many negative things in
 5  passing.  It was a very hostile environment.  So
 6  regardless of whether or not someone may or may not
 7  have been joking, it's not -- it's my job to --
 8  during that kind of environment, to assess real risk
 9  to the actual company.
10  BY MR. MANEWITH:
11      Q.  Okay.  Without talking to the individual
12  to get context?
13          MR. MECKLEY:  Same objections.
14          THE WITNESS:  Depending on the severity,
15  the context matters.
16  BY MR. MANEWITH:
17      Q.  Okay.  And so given what you read about
18  Mr. Adler, you would -- you -- it is your opinion
19  that he should not be working at Twitter; is that
20  right?
21      A.  Based on the information that I read about
22  destroying the company's services and destroying
23  data, my recommendation for anybody posting about
24  that would be to cut their access.
25      Q.  Okay.  Cut their access and you said,

Eitan Adler vs                    Attorneys Eyes Only              Christopher Stanley
Twitter, INC. and X Corp.                                              May 22, 2024

109

 1  then, in your opinion, in your role as a senior
 2  director of security of engineering, that you --
 3  it's your opinion that they should not be working
 4  there because they would be a threat, right?
 5          A.  If people are talking about hurting the
 6  company and I do not -- and I believe that they
 7  should -- and they have the access to do so or even
 8  without it, then, no, they should not -- their
 9  access should be cut and they should not work for
10  the company if they're going to cause the company
11  harm or talking about causing the company harm.
12          Q.  Mr. Adler was, in fact, fired by Twitter,
13  correct?
14          MR. MECKLEY:  Objection.  Calls for
15  speculation.
16          THE WITNESS:  I don't know what happened
17  with him in regards to his employment.
18  BY MR. MANEWITH:
19          Q.  Okay.  Would it surprise you to know that
20  he was fired?
21          A.  If someone is talking about hurting the
22  company, and I -- my recommendation would be to cut
23  access and for them to no longer work at the company
24  because they have caused harm or are talking about
25  causing harm, I would not be surprised.

142

 1    was written in the email.

 2         Q.  Okay.  But employees, to your

 3    understanding, were given 24 hours to say they want

 4    to continue working for the company?

 5              MR. MECKLEY:  Objection.  Asked and

 6    answered.

 7              THE WITNESS:  It's my understanding that

 8    the email was -- if someone wanted to continue to

 9    work at the company, they would click a button.  And

10    by not clicking the button, they were voluntarily

11    withdrawing their interest in being at the company.

12    BY MR. MANEWITH:

13         Q.  Okay.  So your understanding was they had

14    to affirmatively click a button in order to remain

15    employed?

16         A.  Correct.  And by not clicking the button,

17    they were affirming that they did not want to

18    continue working voluntarily here.  They voluntarily

19    did not want to continue working at the company.

20         Q.  Did you know that that email was going to

21    be sent out before it was?

22         A.  No.

23         Q.  Did it catch you by surprise?

24         A.  Define "surprise."

25         Q.  Were you -- were you sort of shocked to

143

1  see that email?

2      A.  I was --

3      Q.  Did it catch you off guard?

4      A.  No.

5      Q.  Why not?

6      A.  I think at the time it was very important

7  and very clear that many people didn't want to be

8  there.  There was a lot of hostility.  The

9  environment was not very friendly.  And so it would

10 make sense to me that if there is a hostile

11 environment, that we should ask people, you know, if

12 they don't want to be here anymore, then they don't

13 have to and we'll -- you know, you can withdraw and

14 we'll give you moneys and you can be on your way and

15 not have to be here anymore.

16          So I wasn't surprised.

17     Q.  It wasn't surprising to you that people

18 were given the option to essentially have a

19 voluntary layoff?

20          MR. MECKLEY:  Objection.  Misstates the

21 witness' testimony.  Vague and ambiguous.  Lacks

22 foundation.

23          THE WITNESS:  I wouldn't use the word --

24 that specific word.  I think more it was a

25 voluntarily -- you know, they -- they understood

166

1          A.   Okay.

2          Q.   Your last message says:  "We will see how

3    it plays out."

4               What do you mean with by that?

5          A.   I don't recall specifics other than if

6    people said that they are leaving, I guess we'll

7    have to see what will happen when they leave.

8          Q.   Okay.  And your next sentence says:  "A

9    lot of toxicity in the #social watercooler channel,"

10   right?

11         A.   Correct.

12         Q.   And so that's the social watercooler Slack

13   channel that you're referring to?

14         A.   That's correct.

15         Q.   So at that point, as of November 10, 2022,

16   you were -- you were monitoring the social

17   watercooler Slack channel?

18         A.   I was reading messages that were being

19   sent to that channel, yes.

20         Q.   And you were determining whether people

21   were being critical or toxic?

22         A.   I was reading it and making an assessment

23   based on what was being said.

24         Q.   And it looks like there's a missed voice

25   call at 1:15 p.m.

177

1        Q.  Okay.  In the period of, let's say,

2   between December of 2022 until May of 2023, how

3   often were you talking to Elon or communicating with

4   him?

5        A.  It really varies.

6        Q.  Was it daily?

7        A.  Sometimes daily, sometimes every other

8   day, sometimes once a week.  Just depended on the

9   context or if there was something that had come up.

10       Q.  Okay.  Are there any particular security

11  risks post-November 2022 that you recall having

12  conversations or communications with Elon about at

13  Twitter?

14       A.  Can you be more specific about what

15  events?

16       Q.  Yeah.  I'm just curious, are there

17  other -- is there anything -- as you sit here today,

18  after November of 2022, can you think of a specific

19  conversation or communication that you had with Elon

20  where he was discussing and you were discussing

21  concerns about security at Twitter?

22       A.  I had many conversations about concerns I

23  had around Twitter with Elon post November of 2022.

24       Q.  Okay.  Are there any ones in particular

25  that you can recall?

178

1          A.  We had conversations around leaks and

2    where a lot of that information's coming from and

3    how to prevent that kind of -- of attack vector.

4    Things like that.

5          Q.  Okay.  And let's -- let's -- let's focus

6    in with respect to security risks and things related

7    to the internal threats, those -- those people

8    threats that -- that we've sort of been focusing,

9    not -- not external types of things.

10             Tell me about any conversations,

11   communications that you can recall about leaks or

12   other sort of direct people threats.

13         A.  I remember having a conversation with him

14   around Slack and it being used to leak information.

15         Q.  And what specifically about Slack was

16   being used to leak information?

17         A.  It was my assessment that at the time of

18   me coming into Twitter, that the majority of the

19   44,000 Slack channels that existed, around that

20   number, were mostly public and that anybody from any

21   team in any organization could join any channel in

22   the company to read about any of the topics that any

23   team was discussing and how that was problematic.

24         Q.  Why was that problematic?

25         A.  Because, as I mentioned in the previous

Eitan Adler vs                    Attorneys Eyes Only              Christopher Stanley
Twitter, INC. and X Corp.                                         May 22, 2024

179

 1  testimony here, that it is important to have the
 2  least privileged amount of information such that you
 3  only need to know what you need to know to do your
 4  job.
 5       Q.  Okay.  So what did you discuss with Elon
 6  about that?
 7       A.  It was my recommendation that we should
 8  not have many, many, many public channels where
 9  people were discussing privileged and confidential
10  topics and that we should create more locked-down
11  channels for -- to include only the people that
12  needed to discuss the things that they needed to
13  discuss.
14       Q.  When did that conversation take place?
15       A.  I don't recall specific dates.
16       Q.  Was that at the end of 2022?  Early 2023?
17  Later in 2023?
18       A.  I think it was in 2023.
19       Q.  Okay.  Early part or later on?
20       A.  I don't recall specifics.
21       Q.  Okay.  What was done based on -- on your
22  conversation with Elon related to the open Slack
23  channels?
24       A.  I wrote a piece of software that went
25  through and turned the -- each channel off of public

180

1  to private, removed the members from them, and then,

2  as we went forward, we ensured that only the people

3  that needed to have access to the channels were

4  added to the channels.

5      Q.  Okay.  Is there still a social watercooler

6  Slack channel on Twitter?

7      A.  Not to my knowledge.

8      Q.  Is that something that you decided to get

9  rid of?

10     A.  I think it was one of the channels of many

11 other channels that was archived --

12     Q.  Why --

13     A.  -- and determined not needed for business

14 purposes.

15     Q.  Okay.  Do you recall when the social

16 watercooler was turned off and archived?

17     A.  I don't recall specific dates.

18     Q.  Was it, again, early 2023?

19     A.  I don't recall.

20     Q.  Sometime in 2023?

21     A.  Yes.

22     Q.  Okay.  Other than the conversation about

23 the public Slack channels, any other conversation

24 that you recall related to internal threats that you

25 had with Elon?

181

1          A.  Yes.

2          Q.  What's that?

3          A.  There is vulnerabilities that I discovered

4   in the systems that would allow particular engineers

5   the ability to -- to do some pretty crazy things as

6   it pertains to tweeting as other people and

7   discussing what is required to ensure that we

8   architect the system in such a way that that was not

9   possible.

10         Q.  Okay.  So that's highly technical for me.

11  Is that essentially saying an employee could pretend

12  to be a user of Twitter and -- and sort of hijack

13  their account and -- and send something out?

14         A.  Yes.

15         Q.  Okay.  Is that something that you found to

16  have actually happened?

17         A.  Can you clarify what -- what do you mean

18  by found to happen?

19         Q.  Yeah.  In your investigation, you

20  obviously saw this as being a potential risk.  Are

21  you aware of any instances that that actually

22  happened?

23         A.  No.

24         Q.  Okay.  What did you do with that?

25         A.  I told Elon.

182

1        Q.  And what did Elon tell you to do?

2        A.  Fix it.

3        Q.  Okay.  Have you fixed it based on your

4   understanding that he wanted you to fix it then?

5        A.  Yes.

6        Q.  Is it safe to say you wrote some sort of a

7   code, then, to fix that?

8        A.  We deployed a -- a fix to it; however,

9   depending on -- there's still nuance to this where

10  people with high levels of access can still abuse

11  the system, and it's a harder thing to fix in

12  totality.

13       Q.  Okay.  Is that an ongoing thing that you

14  continue to monitor then?

15       A.  Yes.

16       Q.  Okay.  Other than the, what I will deem

17  the hijacking a user's Twitter account and the open

18  Slack channels, any other conversations or -- or

19  communications with Elon that you can recall related

20  to security threats internal?

21       A.  Yes.

22       Q.  What is that?

23       A.  One other conversation we had was

24  around -- he made a statement, basically, that was

25  saying "It should require three people to do a bad

183

 1  thing," and so he wanted me to implement a system

 2  such that in the event an engineer wanted to put

 3  malicious code into a system, it would require three

 4  people in total to sign off on it.

 5      Q.  Okay.  When was this conversation?

 6      A.  I don't recall specifics on timing.

 7      Q.  Was this in 2022 or 2023?

 8      A.  I don't recall specifics.

 9      Q.  Okay.  Was anybody else involved in

10  this -- in this conversation?

11      A.  When you say "involved," what do you mean?

12      Q.  Anybody -- let's take a step back.  Was

13  this a verbal conversation or was this a written

14  communication?

15      A.  I believe there were some verbal and --

16  and written.

17      Q.  Okay.  With respect to the verbal

18  communication, was anybody else witnessing or -- or

19  partaking in the discussion?

20      A.  No one was in -- no one was partaking in

21  that particular conversation with me and Elon.

22      Q.  Okay.  Safe to say you took what -- your

23  conversation from Elon and then further discussed

24  that with people on your team.  Is that what you're

25  thinking?

Eitan Adler vs                           Attorneys Eyes Only                    Christopher Stanley
Twitter, INC. and X Corp.                                                       May 22, 2024

184

1        A.   Correct.  And people on other teams that
2   were involved in gaining access to certain systems.
3        Q.   Okay.  So you took the direction from Elon
4   and then based on your understanding of what he
5   wanted, you went ahead and spoke with others on your
6   team and others in the -- in the organization to
7   implement a fix?
8        A.   I wouldn't call it a fix more than just
9   more guardrails to prevent malicious activity from
10  happening.
11       Q.   Okay.  You said that there were also some
12  written communications.  Were other people copied on
13  those communications?
14       A.   No.  I believe that to be direct to Elon.
15       Q.   Okay.  Was that through Slack or -- was
16  that through Signal?
17       A.   Signal.
18       Q.   Would there have also been emails about
19  that?
20       A.   I don't recall.
21       Q.   Were most of your written communications
22  with Elon through Signal?
23            MR. MECKLEY:  Objection.  Vague.
24            THE WITNESS:  I use Signal to communicate
25  with Elon as well as email.

185

 1   BY MR. MANEWITH:
 2        Q.  And I think you also said text messages,
 3   too?
 4        A.  Possibly.
 5        Q.  Okay.  With respect to the conversation
 6   about the open Slack channels, were others similarly
 7   involved in -- in that conversation in the sense
 8   that you spoke directly with Elon.  Based on your
 9   conversation with Elon, you then went ahead and
10   spoke with others?
11        A.  No, I actually went ahead and did the work
12   to lock down that myself.
13        Q.  Okay.  What about with respect to the --
14   you know, what I said, the -- the hijacked user
15   accounts, is that something that you did yourself or
16   got others involved based on your understanding of
17   what Elon wanted?
18        A.  That involved other people.
19        Q.  Okay.  Any other conversations,
20   discussions that you can recall having with Elon
21   related to internal threats?
22        A.  Nothing more at this time.
23        Q.  Okay.  Anything that would refresh your
24   recollection to any other conversations?
25        A.  No.

Eitan Adler vs                    Attorneys Eyes Only              Christopher Stanley
Twitter, INC. and X Corp.                                              May 22, 2024

198

CERTIFICATE OF REPORTER

1

2

3      I, Siew Ung, a Certified Shorthand Reporter, do

4  hereby certify:

5      That prior to being examined, the witness in the

6  foregoing proceedings was by me duly sworn to testify to

7  the truth, the whole truth, and nothing but the truth;

8      That said proceedings were taken before me at the

9  time therein set forth and were taken down by me in

10  shorthand and thereafter transcribed into typewriting

11  under my direction and supervision;

12      I further certify that I am neither counsel for,

13  nor related to, any party to said proceedings, nor in

14  any way interested in the outcome thereof.

15      In witness whereof, I have hereunto subscribed my

16  name.

17

18

19  5/30/2024

20

21

22

23  *Siew Ung*

24  _____

25  Siew Ung
    CSR No. 13994, RPR, CSR



X_ARBS_LLR_000000388



X_ARBS_LLR_000000389

EXHIBIT 7

**PAGES 1 - 10**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable James Donato, Judge

EITAN ADLER,                          )
                                      )
          Plaintiff,                  )
                                      )
VS.                                   ) **NO. 3:23-cv-01788**
                                      )
TWITTER, INC.,                        )
                                      )
          Defendants.                 )
_____)


San Francisco, California

Thursday, May 8, 2025


**TRANSCRIPT OF PROCEEDINGS**


**APPEARANCES:**

For Plaintiff:
                    Lichten & Liss-Riordan, P.C.
                    729 Boylston Street, Suite 2000
                    Boston, MA 02116
               BY:  **SHANNON LISS-RIORDAN, ATTORNEY AT LAW**

For Defendant:

                    Morgan, Lewis & Bockius LLP
                    One Market, Spear Street Tower, 28th Floor
                    San Francisco, CA 94105
               BY:  **ERIC MECKLEY, ATTORNEY AT LAW**


REPORTED BY:  April Wood Brott, CSR No. 13782
Official United States Reporter

```
 1    putative class --

 2            MS. LISS-RIORDAN:  There's no class certified.  We

 3    haven't been able to get to moving for a class certification.

 4            THE COURT:  Well, you plan to ask for a class

 5    certification?

 6            MS. LISS-RIORDAN:  Oh, we'll seek it when he rules on

 7    the motion to dismiss, which has been pending for more than two

 8    years.

 9            THE COURT:  I just can't pull the rug out from a judge

10    in Delaware just because, you know -- I wouldn't actually say

11    things like the Court's moving like molasses on the record, but

12    I'll leave it up to you.

13            MS. LISS-RIORDAN:  Well, I just meant a class action

14    is -- everyone understands class actions move more slowly than

15    individual actions.  The Court there -- the case got changed

16    through several judges, so the Court there has recognized it's

17    moved slowly because he's the third judge on the case.

18            THE COURT:  Well, third time's the charm.

19            MS. LISS-RIORDAN:  Yes.

20            THE COURT:  Listen, I'll deny it without prejudice,

21    and you can come back some other time.  Okay?  But right now, I

22    just can't -- it's a Pandora's box to start letting putative

23    class members opt out and file their own suits, and then it's

24    just whole mess.

25            MS. LISS-RIORDAN:  Well, there are already a lot of
```

1    date so we can take care of this.

2         **THE COURT:**  So the only issue is whether he was fired

3    for cause or should have gotten the Warren Act --

4         **MS. LISS-RIORDAN:**  Correct.

5         **THE COURT:**  -- notice?

6         **MS. LISS-RIORDAN:**  Yes.

7         **MR. MECKLEY:**  If there's no pending class claims, I'm

8    happy with that.  That just wasn't clear on the record before.

9         **THE COURT:**  Well, it is now.  Okay?  That's it?  So --

10        **MS. LISS-RIORDAN:**  Yes.

11        **THE COURT:**  Well, is it a day maybe?  How long will it

12   take?

13        **MS. LISS-RIORDAN:**  A day or two.

14        **THE COURT:**  Two days?

15        **MS. LISS-RIORDAN:**  Yes.

16        **THE COURT:**  How about July?  Do you want to do it in

17   July?

18        **MS. LISS-RIORDAN:**  I can't do July.

19        **THE COURT:**  August?

20        **MS. LISS-RIORDAN:**  I could do August.

21        **THE COURT:**  Ms. Clark, can you put August up?  What

22   date is that?

23        **THE COURTROOM DEPUTY:**  That's August 11th.

24        **MS. LISS-RIORDAN:**  Oh, I'm sorry.  The week of August

25   11th, I can't do.  I can do any other time in August.

1                    CERTIFICATE OF REPORTER

2         I certify that the foregoing is a correct transcript from

3    the record of proceedings in the above-entitled matter.

4

5    DATE:  Tuesday, May 13, 2025

6

7    _____

8              April Wood Brott, CSR No. 13782

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25