# Exhibit 1

**CERTIFIED COPY**

1          UNITED STATES DISTRICT COURT

2        NORTHERN DISTRICT OF CALIFORNIA

3           SAN FRANCISCO DIVISION

4              ---o0o---

5

6   EITAN ADLER, on behalf of        )
    himself and all others          )
7   similarly situated,             )
                                     )
8              Plaintiff,            )   Case No.
                                     )   3:23-CV-01788
9        vs.                         )   -JD
                                     )
10  TWITTER, INC., and X CORP.,      )
                                     )
11             Defendants.           )
                                     )
12

13

14

15       DEPOSITION OF EITAN ADLER

16          APRIL 25, 2024

17

18

19

20

21

22

23

24  BALINDA DUNLAP, CSR 10710, RPR, CRR, RMR
    1127753

25

**BARKLEY**
*Court Reporters*
barkley.com

(310) 207-8000 Los Angeles      (415) 433-5777 San Francisco      (949) 955-0400 Irvine           (858) 455-5444 San Diego
(310) 207-8000 Century City     (408) 885-0550 San Jose           (760) 322-2240 Palm Springs      (800) 222-1231 Carlsbad
(916) 922-5777 Sacramento       (800) 222-1231 Martinez           (702) 366-0500 Las Vegas         (800) 222-1231 Monterey
(951) 686-0606 Riverside        (818) 702-0202 Woodland Hills     (702) 366-0500 Henderson         (516) 277-9494 Garden City
(212) 808-8500 New York City    (347) 821-4611 Brooklyn           (518) 490-1910 Albany            (914) 510-9110 White Plains
(312) 379-5566 Chicago          00+1+800 222 1231 Paris           00+1+800 222 1231 Dubai          001+1+800 222 1231 Hong Kong

SINCE 1972

1                UNITED STATES DISTRICT COURT

2              NORTHERN DISTRICT OF CALIFORNIA

3                  SAN FRANCISCO DIVISION

4                      ---o0o---

5

6

7

   EITAN ADLER, on behalf of        )
8  himself and all others           )
   similarly situated,              )
9                                    )
                   Plaintiff,        )   Case No.
10                                   )   3:23-CV-01788
        vs.                          )   -JD
11                                   )
   TWITTER, INC., and X CORP.,       )
12                                   )
                   Defendants.       )
13                                   )

14

15

16

17                     ---o0o---

18         THURSDAY, APRIL 25, 2024

19     VIDEOTAPED DEPOSITION OF EITAN ADLER

20                     ---o0o---

21

22

23

24

   REPORTER: BALINDA DUNLAP, CSR 10710, RPR, CRR, RMR
25

                          1

1                     A P P E A R A N C E S

2                         ---o0o---

3    FOR THE PLAINTIFF:

4              LICHTEN & LISS-RIORDAN, P.C.
               729 Boylston Street, Suite 2000
5              Boston, Massechusettes  02116
               BY: SHANNON LISS-RIORDAN, ESQ.
6              (617) 994-5800
               sliss@llrlaw.com
7

8    FOR THE DEFENDANTS:

9              MORGAN, LEWIS & BOCKIUS LLP
               One Market, Spear Street Tower, 28th Floor
10             San Francisco, California  94105-1596
               BY: ERIC MECKLEY, ESQ.
11             (415) 442-1013
               eric.meckley@morganlewis.com
12

13   ALSO PRESENT:

14             Frank Quirarte, Videographer
               Vicki Parker, Quinn Emmanuel (Zoom)
15

16

17

18

19

20

21

22

23

24

25

                           2

```
 1                    INDEX OF EXAMINATION
                          ---o0o---
 2

 3   EITAN ADLER                               PAGE

 4   BY MR. MECKLEY                              8

 5

 6
                      INDEX OF EXHIBITS
 7                        ---o0o---

 8   NUMBER    DESCRIPTION                     PAGE

 9   1         LinkedIn Resume of Eitan Adler    11
               (14 pages)
10
     2         Employment Letter to Eitan Adler  29
11             Dated May 27, 2015, Bates Nos.
               E_ADLER_000000075-79 (5 pages)
12
     3         Promotion Letter for Eitan Adler  40
13             Dated September 12, 2018, Bates
               Nos. E_ADLER_000000073-74 (2 pages)
14
     4         Twitter Playbook, Bates Nos.      62
15             TWITTER_ARB_000002184-43 (40 pages)

16   5         Typed Notes by Eitan Adler        67
               (Pages)
17
     6         Code of Business Conduct &        73
18             Ethics, Bates Nos. TWITTER_ARB_
               000002173-81 (9 pages)
19
     7         Slack Messages, Bates Nos.        74
20             X_CORP_ADLR_000000056 (1 page)

21   8         Email from Twitter HR to Twitter  77
               HR Dated November 4, 2022, Bates
22             No. X_CORP_ADLR_000002111
               (1 page)
23

24

25
```

EITAN ADLER

```
                          INDEX OF EXHIBITS
                             ---oOo---

     NUMBER    DESCRIPTION                              PAGE
```

| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| 9 | Slack Messages, Bates Nos. X_CORP_ADLR_000000118-19 (2 pages) | 93 |
| 10 | Slack Messages, Bates Nos. X_CORP_ADLR_000000067 (1 page) | 95 |
| 11 | Slack Messages, Bates Nos. SLK_SW_000006680 (1 page) | 102 |
| 12 | Tweet (1 page) | 103 |
| 13 | Slack Messages, Bates Nos. X_CORP_ADLR_000001816-17, 1820 (3 pages) | 113 |
| 14 | Memo to All Full Time Employees, Bates Nos. LLR_TWITTER_ADLER000291 (1 page) | 119 |
| 15 | Slack Messages, Bates Nos. X_CORP_ADLR_000000086-89 (4 pages) | 120 |
| 16 | Email from Elon Musk To Team Dated November 10, 2022, Bates Nos. LLR_TWITTER_ADLER000290 (1 page) | 126 |
| 17 | Email from Twitter HR Dated November 15, 2022, Bates Nos. LLR_TWITTER_ADLER000193 (1 page) | 129 |
| 18 | Social-Watercooler Text Messages Bates Nos. LLR_TWITTER_ADLER 000545-79 (35 pages) | 141 |
| 19 | Various Messages, Bates Nos. LLR_TWITTER_ADLER000351-79 (29 pages) | 148 |

4

```
                         INDEX OF EXHIBITS
                            ---o0o---

      NUMBER    DESCRIPTION                              PAGE

      20        Email from Behnam Rezaei to Eitan        155
                Adler Dated November 22, 2022,
                Bates No. LLR_TWITTER_ADLER
                000130 (1 page)

      21        Email from People Questions to           161
                Eitan Adler Dated December 2,
                2022, Bates Nos. LLR_TWITTER_ADLER
                000191-92 (2 pages)

      22        Plaintiff's Supplemental                 166
                Objections and Answers to
                Defendants' Interrogatories, Set
                One (7 pages)

      23        Instant Messages (6 pages)               167

      24        Plaintiff's Supplemental                 169
                Objections and Responses to
                Requests for Production of
                Documents to Plaintiff Eitan
                Adler, Set One (12 pages)

      25        Twitter Global Travel, Expense           176
                And Corporate Card (TEC) Policy,
                Bates Nos. X_CORP_ADLR_
                000002022-43 (22 pages)

      26        Expense Report Status Change             180
                Dated October 12, 2022, Bates
                Nos. X_CORP_ADLR_000000007, 17
                (2 pages)

      27        Expense Report Sent Back to              181
                Employee Adler, Eitan, Bates Nos.
                X_CORP_ADLR_000000003 (1 page)

      28        Deposit Statement, Bates Nos.            183
                LLR_TWITTER_ADLER000129 (1 page)
```

5

EITAN ADLER

```
                    INDEX OF EXHIBITS
                       ---o0o---
```

| NUMBER | DESCRIPTION | PAGE |
|--------|-------------|------|
| 29 | Expense Spreadsheet, Bates Nos. LLR_TWITTER_ADLER000580 (1 page) | 188 |
| 30 | Slack Messages, Bates Nos. X_CORP_ADLR_000000068-75 (8 pages) | 200 |
| 31 | Slack Messages, Bates Nos. X_CORP_ADLR_000000061-66 (6 pages) | 212 |

6

EITAN ADLER

Q.    Would you agree that particular employees
with access to systems be prevented from taking any
type of intentional steps to jeopardize the
operation of the systems?

A.    Generally speaking, yes.

Q.    Would you agree it's reasonable for a tech
company to implement measures to limit employees'
ability to intentionally harm the functioning of
the site or network?

A.    Depending on the measures, generally
speaking, yes.

MR. MECKLEY:  We are going to look at
another document.  This will be Exhibit 2.

(Reporter marked Exhibit No. 2 for
identification.)

Q.    BY MR. MECKLEY:  So Mr. Adler, Exhibit 2
is Bates stamped 75 through 79.  It appears to be
an offer letter to you dated May 27, 2015.  Do you
recognize Exhibit 2 as your offer letter from
Twitter?

A.    Yes.

Q.    And on the last page of this you will see
there's a signature there.  Did you sign this on
May 30, 2015?

A.    Yes.

29

```
          1         Q.    What was the procedure?
          2         A.    I had to make a change to the site's
          3    functioning.  I don't remember specifically what
          4    the change was.  That change needed to be reviewed
10:04     5    by people.  It was reviewed by people, and then it
          6    had to be rolled out to the site.  That change had
          7    an error which caused a minor malfunction.  I am
          8    being vague because I don't specifically recall.
          9         Q.    And did you see any type of written
10:04    10    communication, whether letter, email or otherwise,
         11    from Dropbox informing you that your employment was
         12    terminated?
         13         A.    Yes.
         14         Q.    And what did that communication state was
10:04    15    the reason why?
         16         A.    I don't specifically recall.
         17         Q.    Is that something you retained?
         18         A.    Probably.  I don't specifically recall.
         19              MR. MECKLEY:  Okay.  All right.  So let's
10:05    20    have this marked as Exhibit 3.
         21              (Reporter marked Exhibit No. 3 for
         22               identification.)
         23         Q.    BY MR. MECKLEY:  Exhibit 3 is a two-page
         24    document dated September 12th, 2018, stamped 73-74.
10:05    25    Appears to be a letter to Mr. Adler regarding
```

                                  40

EITAN ADLER

1   promotion.

2        Do you recognize Exhibit 3, Mr. Adler?

3   A.    Yes.

4   Q.    Okay.  And what is this?

10:05 5   A.    What you said.  It appears to be my

6   promotion letter.

7   Q.    Okay.  And this was a promotion in October

8   2018 to a senior software position, correct?

9   A.    Correct.

10:06 10  Q.    You'll see under your name it says, "Via

11  email to eax@twitter.com."  Do you see that?

12  A.    Yes.

13  Q.    And that was your Twitter email address?

14  A.    Yes.

10:06 15  Q.    Was that your Twitter email address during

16  the entirety of your employment?

17  A.    Yes.

18  Q.    All right.  And in this offer letter --

19  strike that.

10:06 20       You'll see on Page 2 of this exhibit you

21  signed this September 12, 2018, correct?

22  A.    That's what it says.

23  Q.    And above your signature it says, "I have

24  read, understood and accept all the provisions in

10:06 25  this letter."  Do you see that?

41

1      Q.   Again, I am not asking about the bonus

2  plan.  I am just asking --

3      A.   Generally speaking, the word

4  "discretionary" means there's some optionality

10:10  5  somewhere.

6      Q.   And your testimony is you don't recall at

7  any point asking anyone at Twitter any questions

8  about the discretionary bonus plan?

9      A.   I don't specifically recall asking that

10:11 10  question.  I am not testifying I didn't ask.

11      Q.   Well, do you have a general memory of

12  asking someone at Twitter about how the performance

13  bonus plan works?

14      A.   It is possible or even probable that I

10:11 15  talked to my managers about it at some point or I

16  talked to peers or even HR.  I cannot tell you

17  when.

18      Q.   And do you remember the substance of any

19  of those communications?

10:11 20      A.   No.

21      Q.   And do you remember when you were employed

22  at Twitter after you got the September 2018 offer

23  letter whether you ever got a performance bonus?

24      A.   I believe I got the bonus every year.

10:12 25      Q.   So you were promoted to senior software

45

EITAN ADLER

1    engineer in 2018.  That's what we looked at.  Then
2    you were promoted again to staff software engineer
3    in approximately July of 2020; is that right?
4        A.   Yes.
10:12  5        Q.   Okay.  Can you look back again at Exhibit
6    1?
7        A.   Yes.
8        Q.   And you list job responsibilities there.
9    In the fourth bullet down it says, "Fixed multiple
10:12 10   business critical cross-microservice issues
11   including operational, privacy, and product
12   issues."  Do you see that?
13       A.   Yes.
14       Q.   What's that phrase mean, "business
10:12 15   critical"?
16       A.   It had a substantial impact to the
17   business in terms of fixing them.
18       Q.   Does "business critical" mean that it is
19   necessary for the business to operate?
10:13 20       A.   No.
21       Q.   So how do you distinguish "business
22   critical" from "business necessary"?
23       A.   I remind you this is a sales document,
24   while accurate for sales, the distinction -- or the
10:13 25   intent of business critical was -- the distinction

46

EITAN ADLER

1    is not formal.  There's no...

2        Q.    There's no what?

3        A.    There's no formal distinction between the

4    two.

10:13  5        Q.    I see.  Okay.  And you were a lead on the

6    ads core platform; is that right?

7        A.    Yes.

8        Q.    Was that a business critical part of the

9    business operations?

10:13  10        A.    Generally, yes.

11        Q.    Okay.  Why?

12        A.    Twitter made most of its money via ads.

13        Q.    Then according to your LinkedIn profile,

14    you were promoted again to senior staff software

10:14  15    engineer.  Do you see that?

16        A.    Yes.

17        Q.    And that says, "Time in position November

18    2022 to November 2022, right?

19        A.    That's what it says.

10:14  20        Q.    All right.  Is that true?

21        A.    Roughly speaking for purposes of

22    interviewing and LinkedIn, yes.

23        Q.    When you say "for purposes of interviewing

24    and LinkedIn," what do you mean?

10:15  25        A.    The process was underway.  Feedback was

47

```
 1  social-watercooler?
 2      A.   Yes.
 3      Q.   Okay.  And the first one, "eax," that's
 4  you, and you put in "time to kill useless
 5  services."
 6      A.   That's what it says.
 7      Q.   Is that what you wrote?
 8      A.   Yes.
 9      Q.   And were you writing that in response to
10  something?
11      A.   Yes.
12      Q.   Do you recall what it was that you were
13  writing that in response to?
14      A.   Yes.
15      Q.   What was it?
16      A.   Elon made a Tweet about there being too
17  many micro-services at Twitter.  This was false,
18  and this was a joke I made referencing that
19  comment.
20          MR. MECKLEY:  Let's mark this as Exhibit
21  12.
22          THE WITNESS:  What time is it?
23          MR. MECKLEY:  I think it's 11:47.
24          (Reporter marked Exhibit No. 12 for
25          identification.)
```

103

1       Q.   BY MR. MECKLEY:  All right.  Exhibit 12 is

2   a one-page document.  It appears to be a Tweet from

3   Elon Musk from November 13, 2022.  It says, "Btw,

4   I'd like to apologize for Twitter being super slow

11:48  5   in many countries.  App is doing greater than 1000

6   poorly batched RPCs just to render a home

7   timeline."  Do you see this Tweet?

8       A.   Yes.

9       Q.   So your post in social-watercooler "time

11:48  10   to kill useless services," was Exhibit 12 Tweet the

11   one you were responding to?

12       A.   The one I was joking about, yes.

13       Q.   You sure it's this one, not a different

14   Tweet?

11:48  15       A.   If I recall correctly, there were many

16   Tweets that responded to this clarifying,

17   correcting, whatever.  I was responding to the

18   global set of them.  I don't recall -- I don't

19   believe I was responding to a single Tweet.

11:48  20       Q.   So you are --

21       A.   But this is substantively it.

22       Q.   So you're recollecting is Mr. Musk made

23   several Tweets, or more than one at least, about

24   micro-services?

11:48  25       A.   And other people also, yes.

104

1      Q.    Okay.  And you said his Tweets generally

2  were referring to the fact that there were too many

3  micro-services at Twitter; is that right?

4      A.    That's what he claimed, yes.

11:49  5      Q.    And what's a micro-service?

6      A.    A service that provides a subset of the

7  functionality required to render -- or run the site

8  or return a response, generally speaking.

9      Q.    So a micro-service is a service that is

11:49  10 required to run the site or return a response?

11      A.    A subset of the functionality.

12      Q.    Part of the functionality; is that right?

13      A.    Yes.

14      Q.    Okay.  Mr. Musk's Tweets, as you

11:50  15 understood them, were saying that there's too many

16 of those?

17      A.    That -- yes.

18      Q.    And your response was "time to kill

19 useless services"?

11:50  20      A.    That was a joke, yes.

21      Q.    And by "useless services," what did you

22 mean?

23      A.    An evident joke.

24      Q.    A what?

11:50  25      A.    An obvious joke.

105

1    Q.    When you were saying "useless," what were
2    you referring to?

3    A.    None.    I was making a joke.

4    Q.    Oh.    Did you ever think of putting like
11:50 5    "J/K" after this, like "just kidding," anything
6    like that?

7    A.    It was in social-watercooler.    That was
8    merely implied.

9    Q.    So you interpreted it because this was in
11:50 10    social-watercooler, it would be implied that this
11    was a joke; is that right?

12    A.    Amongst other reasons.    It's also obvious
13    it's a joke.

14    Q.    And why do you think it's obvious?

11:51 15    A.    There was no specific service to remove.
16    It was in reference to an obviously false Tweet.
17    It was in social-watercooler.    I often made jokes.
18    And if I recall correctly, there were many jokes
19    being made at the time in social-watercooler around
11:51 20    this -- about the same topic.

21    Q.    And why do you say it was an obviously
22    false Tweet?

23    A.    Because there was only one request to get
24    -- because the 1000 poorly batched RTCs is
11:51 25    obviously false.

106

1          Q.    And you were explaining why it is

2    obviously false?

3          A.    Because there was only one request, as far

4    as I understood, to get data, and they were not

11:52    5    poorly batched.

6          Q.    So in response to your post, then, there's

7    a response from Jesse Feinman that says, "aurora

8    kill all *, what could go wrong?"   Do you see that?

9          A.    Yes.

11:52   10          Q.    And who was Mr. Feinman?

11          A.    Another engineer.

12          Q.    Up here?

13          A.    Yes.

14          Q.    And what group did Mr. Feinman work in?

11:52   15          A.    I don't specifically recall.

16          Q.    Do you have any understanding of like what

17    organization he was in?

18          A.    I don't specifically recall.   If you told

19    me I might recollect, but I don't specifically

11:52   20    recall.

21          Q.    And that phrase "aurora kill all *," is

22    that a command?

23          A.    It is an obvious joke.

24          Q.    I'm asking from a computer language or

11:53   25    programming standpoint, is that a command?

107

EITAN ADLER

1    A.    I guess.   I don't -- I don't know how to
2  answer that.   I guess so.   I don't know.
3    Q.    When you say you guess so, when you do
4  computer engineering, is one of the things that you
11:53  5  do is write commands?
6    A.    Yes.
7    Q.    Okay.   So is this a command?
8    A.    Yes.
9    Q.    Okay.   And you say "we tried this before,"
11:53 10  correct?
11    A.    I said those words.
12    Q.    And then you also wrote "ended up changing
13  the aurora client because of it."   Do you see that?
14    A.    Yes.
11:53 15    Q.    So when you say "we tried this before and
16  ended up changing the aurora client because of it,"
17  what are you referring to?
18    A.    Before my time at Twitter, there was a
19  different command that looked similar -- sorry.
11:53 20  Apologies.   There was a different command that
21  looked similar that would have killed many services
22  at Twitter.
23    Q.    And when you say "we tried this before,"
24  when was it tried?
11:54 25    A.    I don't know the date, but before my time

108

EITAN ADLER

1    at Twitter.

2         Q.    And how did you know it was tried?

3         A.    I read a lot.

4         Q.    Read a lot of what --

11:54  5    A.    Incident reports, history, documentation.

6         Q.    So from your reading of Twitter incident

7    reports and documentation, you had an understanding

8    that at some point there was the aurora kill all *

9    command previously?

11:54  10    A.    No.

11        Q.    Oh.

12        A.    There was a similar-looking in commands

13   that no longer worked that would have killed many

14   services at Twitter.

11:54  15    Q.    And in reading your incident reports or

16   documentation, what did you understand that that

17   similarly-looking command did?

18        A.    Terminated many services at Twitter.

19        Q.    And it is your understanding that that had

11:55  20   happened?

21        A.    Yes.

22        Q.    Okay.  And then you say "ended up changing

23   the aurora client because of it," does that mean

24   that the aurora was changed because the prior

11:55  25   command killed all these services?


                          109

EITAN ADLER

```
 1        A.    Yes.

 2        Q.    -- a computer command?

 3        A.    Yes.

 4        Q.    Okay.   And what does that command do?

11:56  5  A.    It will do nothing.   It will error out.

 6        Q.    And why is that?

 7        A.    Because rm has a specific check to make

 8   sure you don't do that.

 9        Q.    What is rm?

11:57 10  A.    A way to remove files.

11        Q.    A way to remove files.  Was the aurora

12   kill all * something that was similar to the sudo

13   rm?

14        A.    No.

11:57 15  Q.    So --

16        A.    Um, sort of.

17        Q.    Can you explain?

18        A.    Sudo rm-rf/ is a very common joke among

19   software engineers.  Whenever you're like "Here is

11:57 20  something funny I want to tell you to do."  That is

21   highly obvious and every software engineer seeing

22   this will know it's a joke.  Aurora kill all * is

23   similar in that way.  It doesn't do the same thing.

24        Q.    Those commands do different things --

11:57 25  A.    It --
```

111

1    your services?

2        A.    No.

3        Q.    And did you receive any documentation from

4    Twitter that said you were terminated for lack of

01:24  5    funds?

6        A.    Sorry.  Can you repeat the question?

7        Q.    Did you receive any documentation from

8    Twitter that says you were terminated for lack of

9    funds?

01:24  10       A.    No.

11       Q.    Did anyone tell you you were terminated

12   for lack of work?

13       A.    No.

14       Q.    Did anyone tell you you were terminated

01:24  15   for lack of funds?

16       A.    Not specifically.

17       Q.    Okay.  And you were notified in this email

18   that you were terminated effective immediately

19   because your recent behavior had violated company

01:25  20   policy, right?

21       A.    That's what the text says.

22       Q.    Right.  And you understood that the phrase

23   "your recent behavior" referred to your posts on

24   Slack?

01:25  25       A.    No.


                                132

1    Q.    No.    What did you think the phrase "your

2    recent behavior" referred to?

3    A.    I was unable to figure it out.

4    Q.    Were you curious?

01:25    5    A.    Yes.

6    Q.    And did you do anything to find out what

7    the phrase "your recent behavior" referred to?

8    A.    Yes.

9    Q.    What did you do?

01:25    10    A.    I asked Twitter for my entire employee

11    file.

12    Q.    Other than asking Twitter for your

13    employment file, did you anything else to determine

14    what the phrase "your recent behavior" referred to?

01:26    15    A.    There's privilege, I think.    I discussed

16    it with my attorneys.

17    Q.    Okay.    And I don't need to know any

18    conversations with attorneys.

19    Apart from conversations with attorneys

01:26    20    and asking for your employment file, is there

21    anything that you did to find out what the phrase

22    "your recent behavior" referred to?

23    A.    Nothing specific.

24    Q.    Anything general?

01:26    25    A.    No.

133

1    Q.    Okay.    And this email also refers to a

2    violation of company policy.    Were you curious

3    about what that company policy was?

4    A.    Yes.

01:26    5    Q.    And did you do anything to find out what

6    the company policy violation was referring to?

7    A.    Yes.

8    Q.    And what did you do?

9    A.    The same answer as before.

01:26    10    Q.    So asked for your file --

11    A.    Talked to my attorneys.

12    Q.    -- and talked to your attorneys.

13        If you look further down in Exhibit 17 it

14    says, "If you have any follow up questions you can

01:27    15    email alum@twitter.com."    Do you see that?

16    A.    I see that.

17    Q.    And after your termination, did you ever

18    send an email to that email address with any

19    follow-up questions?

01:27    20    A.    If I recall correctly, that's where I

21    asked for my employee file, but I don't

22    specifically recall.

23    Q.    Did you send anything else to

24    alum@twitter.com asking "What was the recent

01:27    25    behavior that I engaged in that violated company

134

1  anything about coming back, even if it was a

2  suggestion by Marcus, "Hey, would you be interested

3  in coming back," something like that?

4      A.   I couldn't swear that didn't happen,

02:03  5  though I do not believe so, nor do I recall that.

6      Q.   Okay.  So then you received this email

7  from Mr. Rezaei, and there's a sentence in here

8  that says, "I wanted to reach out and see if you

9  would be interested in coming back to Twitter."  Do

02:03 10  you see that?

11      A.   I see that.

12      Q.   Were you surprised to get that?

13      A.   Yes.

14      Q.   And he also said he'd be happy to jump on

02:03 15  a call and discuss live, but you never called him

16  back?

17      A.   Correct.

18      Q.   And you never emailed him?

19      A.   Correct.

02:03 20  Q.   Why not?

21      A.   Given everything that had happened, I was

22  concerned about what this email might mean.  I was

23  unsure if it was serious or not.  I was unsure if

24  it was a trick or not.  And I felt like if they

02:04 25  were serious, they would message me again.  I also

158

1  <mark>wanted some time to think about it.</mark>

2      Q.   Did you perceive there would be any

3  downside of just responding to him just to find out

4  what he was talking about?

02:04  5      A.   Yes.

6      Q.   What was that downside?

7      A.   Once you begin legal processes, you should

8  only communicate with the person -- the other party

9  via your lawyers, and I was unsure of what this

02:04  10  conversation would be.

11      Q.   So as of November 22 of 2022, had you been

12  represented by counsel as of that point?

13      MS. LISS-RIORDAN:  You can answer that.

14      THE WITNESS:  Like I said, I had counsel

02:05  15  throughout a large portion of the acquisition, so

16  yes.  I don't recall if I was represented by

17  Shannon at that point or not.

18      Q.   BY MR. MECKLEY:  So what you're referring

19  to is if it wasn't Ms. Liss-Riordan, it was your

02:05  20  sister?

21      A.   It was Daniella Adler, yes.

22      Q.   Was there any other counsel before

23  November 20, 2022, that could have been

24  representing you other than your sister?

02:05  25      A.   Yes.

159

1    DEPOSITION OFFICER'S CERTIFICATE

2     (Civ. Proc. § 2025.520(e))

3 STATE OF CALIFORNIA  )

4         )  Ss

5 COUNTY OF SAN FRANCISCO )

6    I, BALINDA DUNLAP, CSR #10710, hereby

7 certify:

8    I am a duly qualified Certified Shorthand

9 Reporter, in the State of California, holder of

10 Certificate Number CSR 10710 issued by the Court

11 Reporters Board of California and which is in full

12 force and effect.  (Bus. & Prof. § 8016)

13    I am not financially interested in this

14 action and am not a relative or employee of any

15 attorney of the parties, or of any of the parties.

16 (Civ. Proc. § 2025.320(a))

17    I am authorized to administer oaths or

18 affirmations pursuant to California Code of Civil

19 Procedure, Section 2093(b) and prior to being

20 examined, the deponent was first placed under oath

21 or affirmation by me.  (Civ. Proc. §§ 2025.320,

22 2025.540(a))

23    I am the deposition officer that

24 stenographically recorded the testimony in the

25 foregoing deposition and the foregoing transcript

1  is a true record of the testimony given.  (Civ.

2  Proc. § 2025.540(a))

3          I have not, and shall not, offer or

4  provide any services or products to any party's

5  attorney or third party who is financing all or

6  part of the action without first offering same to

7  all parties or their attorneys attending the

8  deposition and making same available at the same

9  time to all parties or their attorneys.  (Civ.

10  Proc. § 2025.320(b))

11          I shall not provide any service or product

12  consisting of the deposition officer's notations or

13  comments regarding the demeanor of any witness,

14  attorney, or party present at the deposition to any

15  party or any party's attorney or third party who is

16  financing all or part of the action, nor shall I

17  collect any personal identifying information about

18  the witness as a service or product to be provided

19  to any party or third party who is financing all or

20  part of the action.  (Civ. Proc. § 2025.320(c))

21  Dated: May 6, 2024

22

23  _____

24

25

224

EITAN ADLER