# EXHIBIT 3

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

---oOo---

EITAN ADLER, ON BEHALF OF HIMSELF AND ALL OTHERS SIMILARLY SITUATED,

Plaintiff,

vs. CASE NO. 3:23-CV-01788-JD

TWITTER, INC. AND X CORP.,

Defendants.

***CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER***

VIDEO-RECORDED DEPOSITION OF ROSS NORDEEN

San Francisco, California

Tuesday, March 26, 2024

Stenographically Reported by: Ashley Soevyn, CSR No. 12019

Magna Job No. 1117400

Pages 1 - 179

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

---oOo---

EITAN ADLER, ON BEHALF OF HIMSELF AND ALL OTHERS SIMILARLY SITUATED,

Plaintiff,

vs. CASE NO. 3:23-CV-01788-JD

TWITTER, INC. AND X CORP.,

Defendants.

---

***CONFIDENTIAL PURSUANT TO COURT ORDER***

Video-recorded Deposition of ROSS NORDEEN, taken on behalf of the Plaintiff Eitan Adler, Pursuant to Notice, at the offices of Morgan Lewis, One Market Street, 28th Floor, San Francisco, California beginning at 10:01 a.m. and ending at 4:28 p.m. on Tuesday, March 26, 2024, before me, ASHLEY SOEVYN, Certified Shorthand Reporter No. 12019.

Eitan Adler vs Twitter, INC. and X Corp. | Videotaped | Ross Nordeen March 26, 2024

3

A P P E A R A N C E S:

For the Plaintiff Eitan Adler:

LICHTEN & LISS-RIORDAN, P.C.
BY: BRADLEY MANEWITH
BY: MATTHEW CARRIERI (REMOTE APPEARANCE)
Attorneys at Law
729 Boylston Street, Suite 2000
Boston, Massachusetts 02116
bmanewith@llrlaw.com
mcarrieri@llrlaw.com
(617) 994-5800

O'Brien & Levine, A Magna Legal Services Company
888.825.3376 - production@court-reporting.com
Page 3

A P P E A R A N C E S:

For the Defendants Twitter, Inc. and X Corp.:

QUINN EMANUEL URQUHART & SULLIVAN
BY: VICKI PARKER
Attorney at Law
50 California Street, 22nd Floor
San Francisco, California 94111
vickiparker@quinnemanuel.com
(415) 875-6503

-AND-

MORGAN LEWIS
BY: ERIC MECKLEY
Attorney at Law
One Market Street, Spear Street Tower,
28th Floor
San Francisco, California 94105
eric.meckley@morganlewis.com
(415) 442-1013

ALSO PRESENT:
MARY HANSBURY, In-House Counsel, X Corp.
ADAM MEHES, In-House Counsel, X Corp.
Frank Quirarti, Videographer

Eitan Adler vs Twitter, INC. and X Corp. | Videotaped | Ross Nordeen March 26, 2024

5

INDEX TO EXAMINATION

WITNESS: ROSS NORDEEN

| EXAMINATION BY: | PAGE |
|---|---|
| MR. MANEWITH | 8, 175 |
| MS. PARKER | 173 |

WITNESS INSTRUCTION NOT TO ANSWER

| PAGE | LINE |
|---|---|
| 11 | 24 |
| 39 | 23 |

O'Brien & Levine, A Magna Legal Services Company
888.825.3376 - production@court-reporting.com

Page 5

INDEX TO EXHIBITS

ROSS NORDEEN

ADLER V. TWITTER, INC. AND X CORP.

Tuesday, March 27, 2024

Ashley Soevyn, CSR No. 12019

| EXHIBIT NO. | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 1 | Email dated 10/31/2022 from David Sacks to Jonathan Chen; Bates No. X_ARBS_000021043 - 21044 | 66 |
| Exhibit 2 | Email dated 11/2/2022 from David Sacks to Ross Nordeen; Bates No. X_ARBS_000021049 - 21050 | 70 |
| Exhibit 3 | Email dated 10/30/22 from Ross Nordeen; Bates No. X_ARBS_LLR_334 - 344 | 78 |
| Exhibit 4 | Blind screen shot; Bates No. X_ARBS_LLR_345 | 128 |
| Exhibit 5 | Email titled A Fork in the Road dated 11/16/22 from ermt@twitter.com to team@twitter.com; Bates No. TWITTER_ARB_2183 | 134 |

DEPOSITION PROCEEDINGS

MARCH 26, 2024

---OOO---

THE VIDEOGRAPHER: Good morning, ladies and gentlemen. We're on video record. This begins Media No. 1 in the deposition of Ross Nordeen in the matter of Eitan Adler et al. versus Twitter, Inc. and X Corp. being held in the United States District Court for the Northern District of California San Francisco division.

Today's date is March 26, 2024. The time is approximately 10:02 a.m. This deposition is being taken at One Market Plaza, Spear Street Tower in San Francisco, California.

My name is Frank Quirarti. I'm your legal videographer. I'm here from Magna Legal Services.

And our court reporter is Ashley Soevyn, also from Magna Legal Services. At this time, will counsel and all present please identify yourself for the record.

MR. MANEWITH: Bradley Manewith on behalf of the plaintiff and my colleague Matt Carrieri is viewing via Zoom.

MR. CARRIERI: Good morning.

MS. PARKER: Vicki Parker of Quinn

Emanuel on behalf of defendants.

MR. MECKLEY: Eric Meckley Morgan Lewis on behalf of defendants.

MS. HANSBURY: Mary Hansbury for X on behalf of defendants.

MR. MEHES: Adam Mehes for X as well.

THE VIDEOGRAPHER: Madam court reporter, will you please swear in the witness.

THE STENOGRAPHIC REPORTER: Sir, can I please have you raise your right hand? Do you solemnly state that the testimony you are about to give in this deposition will be the truth, the whole truth and nothing but the truth?

THE WITNESS: I do.

THE STENOGRAPHIC REPORTER: Great. Thank you.

EXAMINATION

BY MR. MANEWITH:

Q Good morning, Mr. Nordeen. My name is Bradley Manewith. As I said, I represent the plaintiff in this matter. Just to put on the record and so you understand, although this deposition has been noticed under the Adler versus Twitter case, by agreement of the parties, we're able to use this across all the cases for individuals that my firm is

THE STENOGRAPHIC REPORTER: Sorry?

MR. MANEWITH: Brian Bjelde.

THE WITNESS: Not that I'm aware of, no.

BY MR. MANEWITH:

Q Was Steve Davis there?

A Not that I remember.

Q Was Jared Birchall there?

A Not that I remember.

Q Do you recall about how many people were there?

A Seemed like a small group initially.

Q Less than ten people?

A Are you talking about this first day?

Q Yes.

A Yeah, maybe.

Q Who led the meeting?

A Which meeting?

Q That first day that you showed up on the second floor of the now uninhabited building.

A So I was there for an insider threat analysis, which I came to find out. I'm not sure who led the meeting. They seemed to be meetings that were set up by Twitter.

Q Okay. You said that you were there for an insider threat analysis?

A Yes.
Q Who told you that you were there for an insider threat analysis?
A My boss.
Q That's Mr. Austin?
A Yes.
Q And what did that mean, that you're there for an insider threat analysis? What did that entail?
A So basically understanding how the various -- what the various controls are within the company. Different systems, how they tie together and how one might abuse them if there were a, you know, quote on quote 'rogue insider'.
Q Why were you being asked to do an analysis about rogue insiders?
MS. PARKER: Objection. Calls for speculation.
THE WITNESS: Well, the company was going to transition hands.
BY MR. MANEWITH:
Q So to the best of your knowledge, somebody was worried about a rogue insider and they asked you to do an analysis?
MS. PARKER: Objection. Calls for

would be kept at the company and which employees would be laid off as part of the first RIF?

MS. PARKER: Objection. Lacks foundation. Assumes facts not in evidence.

THE WITNESS: No. It was about identifying people that understood the systems.

BY MR. MANEWITH:

Q Who told you to sit in at these meetings?

MS. PARKER: Objection. Lacks foundation.

THE WITNESS: No one.

BY MR. MANEWITH:

Q So you just knew to go sit in on these meetings?

A I was just there helping.

Q Did you have any conversations with Elon about these meetings?

A Not that I remember.

Q So that very first meeting in late October 2022 that occurred on the second floor, you said it was sort of an ongoing meeting throughout the day. One of the topics was the analysis for -- the risk analysis for potential rogue individuals. It sounds like another topic was sort of these Twitter employee meetings and identifying who

understood the systems; is that right?

A Correct.

Q What else was discussed during that first meeting?

A I think that took up the majority of the time. It's a lot of stuff.

Q All right. Were those Twitter employee meetings, were those occurring in that second floor of the same space? Was that sort of intertwined altogether?

A Yes.

Q And you don't recall for sure whether this was before or after the acquisition closed?

A No. I don't remember that timing.

Q All right. When did you first find out that Elon Musk was acquiring Twitter?

A Probably on Twitter. In the news.

Q So you found out like the rest of the world?

A Yes.

Q Sometime in probably April 2022?

A Yeah. Probably would have been whenever the news came out. I think there was news about him acquiring a stake, but I don't think it was a whole thing. I don't think anyone knew it was going to

BY MR. MANEWITH:

Q You knew that he -- you had an understanding and you knew that he was looking for a smaller group of dedicated employees, right?

MS. PARKER: Objection. Lacks foundation.

THE WITNESS: I think what I said is that I knew that he had the understanding that it could be done with a smaller group, but it wasn't a directive to do this.

BY MR. MANEWITH:

Q And Tesla also has the same type of smaller dedicated workforce, correct?

MS. PARKER: Objection. Lacks foundation. Calls for speculation.

THE WITNESS: I don't know. I don't claim to know all of Tesla's teams.

BY MR. MANEWITH:

Q The team that you were on.

A It was small, yes.

Q Okay.

A It's a glitch in the matrix.

Q I appreciate the reference.

Do you recall how many employees were let go for cause due to their untrustworthiness?

A I don't remember the exact amount. No.

Q Okay. Ultimately, the fact that they were let go, resulted in a further reduction in the headcount of Twitter, correct?

MS. PARKER: Objection. Lacks foundation.

THE WITNESS: I would like to clarify, as well, that they were terminated for cause. Not let go.

But yes. But yes, that would end up reducing the total number if you subtract.

MR. MANEWITH: Let's go off record.

THE VIDEOGRAPHER: Going off the record. Time is 2:48 p.m.

(Recess.)?

THE VIDEOGRAPHER: We're back on the record. The time is 3:02 p.m.

BY MR. MANEWITH:

Q In early November 2022, were you involved in any meetings with Elon Musk at Twitter?

MS. PARKER: Objection. Vague.

THE WITNESS: I don't recall in particular.

BY MR. MANEWITH:

Q Okay. So have you ever had any meetings

I, the undersigned, a Certified Shorthand Reporter of the State of California, do hereby certify:

That the foregoing proceedings were taken before me at the time and place herein set forth; that any witnesses in the foregoing proceedings, prior to testifying, were duly sworn; that a record of the proceedings was made by me using machine shorthand, which was thereafter transcribed under my direction; further, that the foregoing is a true record of the testimony given.

I further certify I am neither financially interested in the action nor a relative or employee of any attorney or party to this action.

IN WITNESS WHEREOF, I have this March 29, 2024 subscribed my name.

Ashley Soevyn

ASHLEY SOEVYN
CSR No. 12019